**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KAREEM JACKSON,**

      **Petitioner,**

   **v.**                         **Case No. 2:03cv983**
                                         **JUDGE FROST**
**MARGARET BRADSHAW, Warden,**       **Magistrate Judge Kemp**

      **Respondent.**

**OPINION AND ORDER**

     Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action under 28 U.S.C. §2254. This matter is before the Court upon petitioner's first motion for leave to conduct discovery, (doc.no. 30), petitioner's motion for an evidentiary hearing, (doc.no. 31), and respondent's memorandum in opposition, (doc.no. 32).

I. Motion for Discovery

     Petitioner seeks to conduct discovery regarding his rights to the effective assistance of counsel during the trial and penalty phases of his capital case (first ground for relief); to a fair and impartial sentencing determination, untainted by extraneous influences on the jury (second and third grounds for relief); and to due process and a fair trial, violated when the state caused a witness not to testify on petitioner's behalf (sixth ground for relief). Petitioner asserts generally that he raised these claims in his postconviction action and requested both discovery and an evidentiary hearing, but that the state courts denied his petition without affording him either.

     Regarding these claims, petitioner seeks to conduct the following discovery:

     a.    Depositions of Donald Schumacher, Esq., and Brian Rigg, Esq., to determine issues surrounding Mr. Jackson's claims of ineffective assistance of counsel during both the trial and sentencing phases, i.e., claims of failure to fully investigate and present available evidence and failure to obtain the services of

competent experts.

b.    Record deposition and/or subpoena duces tecum of case files maintained by the Franklin County Prosecutor's Office pertaining to this case, including grand jury transcripts.

c.    Depositions of the members of the jury that tried and convicted Mr. Jackson, in support of his claims of ineffective assistance of counsel and denial of a fair trial and sentence determination.

d.    Record depositions and/or subpoena duces tecum of files maintained by the Franklin County Sheriff's Department for their investigation of Kareem Jackson for his involvement in the crime that occurred on March 24, 1997 at 3117 Lupo Court.

e.    Record depositions and/or subpoena duces tecum of files maintained by the Franklin County Sheriff's Department for their investigation of Derrick Boone for his involvement in the crime that occurred on March 24, 1997 at 3117 Lupo Court.

f.    Record depositions and/or subpoena duces tecum of files maintained by the Franklin County Sheriff's Department for their investigation of Michael Patterson for his involvement in the crime that occurred on March 24, 1997 at 3117 Lupo Court.

g.    Record depositions and/or subpoena duces tecum of files maintained by the Franklin County Sheriff's Department for their investigation of Malaika Williamson for her involvement in the crime that occurred on March 24, 1997 at 3117 Lupo Court.

h.    Record depositions and/or subpoena duces tecum of files maintained by the Clinton Township Police Department for their investigation of the crime that occurred on March 24, 1997 at 3117 Lupo Court.

I.    Deposition of petitioner's co-defendants, Malaika Williamson, Derrick Boone, and Michael Patterson, in support of the claim that trial counsel were ineffective during the trial and mitigation phase of his capital trial.

(Petitioner's Motion for Discovery, doc.no. 30, at 7-8).

Respondent opposes petitioner's discovery requests, arguing essentially that petitioner

cannot meet the standards for habeas corpus discovery because petitioner has offered nothing but

2

speculation as to what he hopes to find.

The discovery processes contained in the Federal Rules of Civil Procedure do not automatically apply in habeas corpus actions.  "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  In *Harris v. Nelson*, 394 U.S. 286, 295 (1969), the United States Supreme Court held that the "broad discovery provisions" of the Federal Rules of Civil Procedure did not apply in habeas corpus proceedings.  As a result of the holding in *Harris*, the Rules Governing Section 2254 Cases In United States District Courts were promulgated in 1976. Specifically, Rule 6(a) provides--

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Under this "good cause" standard, a district court should grant leave to conduct discovery in habeas corpus proceedings only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is ... entitled to relief....'" *Bracy*, 520 U.S. at 908-909 (quoting *Harris*, 394 U.S. at 300).  *See also Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001).  Under this standard, the Court will now consider petitioner's discovery requests.

### A.

Petitioner seeks to conduct discovery on the numerous allegations of ineffective assistance of trial counsel set forth in his first ground for relief.  Specifically, petitioner argues that the following acts or omissions on the part of his attorneys were objectively unreasonable:

a.    Failure to call Michael Patterson as a witness.

3

    b.    Failure to object to the state vouching for the credibility of its witness.

    c.    Failure to move for an expert witness on eyewitness identification.

    d.    Failure to object to prosecutorial misconduct.

    e.    Failure to impeach Ivana King.

    f.    Failure to conduct an adequate investigation and trial preparation.

    g.    Failure to present an available theory of defense.

    h.    Failure to object when the state impeached its own witness.

    I.    Failure to object to improper expert testimony.

    j.    Failure to object to improper jury instructions.

    k.    Failure to respond to extraneous influence on the jury.

    l.    Failure to adequately investigate family and social history for mitigating factors.

    m.    Failure to adequately investigate petitioner's psychological background.

    n.    Failure to investigate and prepare witnesses.

    o.    Failure to conduct reasonable investigation with appropriate expert assistance.

    p.    Failure to present cultural mitigation evidence.

    q.    Failure to allow jury to consider all relevant mitigating evidence.

    r.    Failure to object to improper jury instructions.

    s.    Failure to object to admission of irrelevant evidence/penalty-phase prosecutorial misconduct.

(Petitioner's Motion for Discovery, doc.no. 30, at 3).  Petitioner reasons that defense counsel's

actions and omissions were unreasonably deficient under the first prong of the two-part test set

forth in *Strickland v. Washington*, 466 U.S. 668 (1984), but that "[i]f prejudice is not presumed

4

from the record, then establishing prejudice requires taking the depositions of all Petitioner's jurors, including the alternate jurors."  (Petitioner's Motion for Discovery, doc.no. 30, at 3).

Petitioner argues that Ohio R. Evid. 606(B) should not bar the depositions of jurors, insofar as that rule applies only to the jurors' actual deliberations.  That rule provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith.

Petitioner reasons that deposing jurors regarding his allegations of ineffective assistance of counsel would not entail analyzing their actual deliberations; rather, it would only involve assessing the jurors' impressions about evidence that trial counsel failed to present.

In order to determine whether petitioner is entitled to conduct discovery on this claim, the Court initially must identify the essential elements of this claim.  *See Bracy*, 520 U.S. at 904. The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  With respect to the first prong of the *Strickland* test, the Court notes that, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*. at 689.  To establish the second prong of the *Strickland* test, *i.e.*, prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different.

5

*Id*. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.  Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the Court determine that petitioner has failed to satisfy one prong, it need not consider the other.  *Id*. at 697.  Petitioner need not prove these elements; rather, he must show that if the facts are developed through the discovery he seeks, he could prove a *Strickland* violation and would be entitled to relief. *See Harris, supra*, 394 U.S. at 299.

Inherent in counsel's responsibilities is the duty to investigate.  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland, supra*, 466 U.S. at 691; *Sims v. Livesay*, 970 F.2d 1575, 1580-81 (6th Cir. 1992); *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994)(failure to investigate, especially as to key evidence, must be supported by a reasoned and deliberate determination that investigation was not warranted); *Workman v. Tate*, 957 F.2d 1339, 1345-46 (6th Cir. 1992)(reasonable investigation was lacking, so counsel's performance was deficient). The importance of competent representation during the penalty phase of a capital trial cannot be understated, especially with respect to the duty to investigate, since, as a practical matter, all that stands between a defendant who has been convicted of a capital specification and death is whatever mitigation evidence he or she can muster.  *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999).

> [C]ertainly, trial counsel must commit a serious error to be judged unconstitutionally ineffective.  However, when a client faces the prospect of being put to death unless counsel obtains and presents something in mitigation, minimal standards require some investigation.

*Id.*

In determining whether a particular act or omission on the part of counsel was outside the

wide range of professional norms, this Court must accord a high measure of deference to counsel's decisions. *Strickland*, 466 U.S. at 681; *see also White v. McAninch*, 235 F.3d 988, 994-95 (6th Cir. 2000). Of course, a "strategic" or "tactical" decision is not automatically insulated from review, if it does not appear that the decision was supported by sufficient investigation.

> The determination as to whether counsel's trial strategy amounts to ineffective assistance of counsel should be made with respect to the thoroughness of the pretrial investigation that counsel conducted. The more thorough the investigation, the more deference the trial strategy receives, while strategic decisions made after incomplete investigation receive less....

*White v. McAninch*, 235 F.3d at 995-96 (citing *Strickland*, 466 U.S. at 690-91). *See also Wiggins v. Smith, supra*, 123 S.Ct. at 2535.

In determining whether petitioner can satisfy the "good cause" standard for conducting discovery, it stands to reason that the Court must also take into account the findings of the state courts regarding the issues on which petitioner seeks to conduct discovery. To satisfy the "good cause" standard for discovery, petitioner must demonstrate that the facts, if more fully developed, would entitle him to relief. Under the standard of review set forth in 28 U.S.C. §2254(d), petitioner would not be entitled to relief on his trial counsel ineffectiveness claims unless it appears that the state courts' rulings were contrary to or involved an unreasonable application of Supreme Court precedent, or that the state courts' factual findings were unreasonable based on the evidence presented.

Upon careful review, this Court is persuaded that petitioner has demonstrated good cause to conduct discovery on his claims of ineffective assistance of trial counsel, but only as to certain allegations. Initially, the Court notes that the record contains no affidavits or post-trial testimony

from trial counsel about their actions and omissions during trial.  Information about counsel's decisions, actions, and omissions is uniquely in the possession of counsel and not typically available from any other source besides counsel.  Thus, as to each of petitioner's trial counsel ineffectiveness claims for which petitioner has demonstrated good cause to conduct discovery (and such claims will be specifically identified below),  he is entitled to depose trial attorneys Donald Schumacher and Brian Rigg.

However, the Court is not persuaded by petitioner's argument that in order to determine whether petitioner was prejudiced by counsel's allegedly deficient performance, "it is necessary to question, under oath, the jurors who decided Petitioner's case."  (Petitioner's Motion for Discovery, doc.no. 30, at 3).  Petitioner has not cited, and the Court is not aware of, any case law holding that the only way to determine the prejudice component of the *Strickland* test is to depose the trial jurors.  In fact, this Court is aware of countless decisions in which the Court of Appeals for the Sixth Circuit granted relief on a claim of ineffective assistance of counsel without any evidence that the Sixth Circuit considered or needed testimony under oath from trial jurors in order to determine the prejudice component of the two-part *Strickland* test.  *See, e.g., Frazier v. Huffman*, 343 F.3d 780, 797-99 (6th Cir. 2003)("To make this showing [of prejudice], Frazier must direct us to mitigating evidence that could have been presented and that is sufficient to undermine our confidence in the outcome of the penalty phase."), *Opinion Supplemented on Denial of Rehearing by Frazier v. Huffman*, 348 F.3d 174 (6th Cir. 2003), *cert. denied*, 124 S.Ct. 2815 (2004); *Coleman v. Mitchell*, 268 F.3d 417, 452 (6th Cir. 2001); *Combs v. Coyle*, 205 F.3d 269, 290-91 (6th Cir. 2000).

In sub-part A to his first claim for relief (trial phase), petitioner argues that his trial

attorneys performed unreasonably and to his prejudice in failing to call Michael Patterson as a

witness.  According to petitioner, Mr. Patterson, after agreeing to plead guilty to involuntary

manslaughter and aggravated robbery, sent a letter to petitioner expressing a willingness "to tell

the truth about what happened."  (Amended Petition, doc.no. 18, at 8-9).  Petitioner's trial

attorneys apparently showed the letter to prosecutors and contacted Mr. Patterson's attorney.

Subsequently, during a meeting, Mr. Patterson indicated to petitioner's attorneys that he was no

longer willing to testify for fear of losing his plea agreement and that, if called to testify, he

would exercise his Fifth Amendment rights.  Consequently, defense counsel elected not to call

Mr. Patterson at all and, according to petitioner, that constitutes ineffective assistance.  Petitioner

faults defense counsel for alerting the prosecution to Mr. Patterson's letter, arguing they had no

duty to show Mr. Patterson's letter to the prosecution until and unless Mr. Patterson testified and

that, as a result of them doing so, the prosecution pressured Mr. Patterson not to testify by

threatening to withdraw his plea agreement.  Petitioner further argues that defense counsel

should have called Mr. Patterson in spite of his insistence that he would exercise his Fifth

Amendment rights so that the trial court could voir dire him about whether his exercise of his

Fifth Amendment rights was warranted.

    This claim of trial counsel ineffectiveness was considered and rejected by the Ohio

Supreme Court on direct appeal.  The Ohio Supreme Court concluded that, although state law

had not been complied with, insofar as the trial court was never given the opportunity to voir dire

Mr. Patterson to determine whether his alleged refusal to testify was warranted, "counsel's

decision in not calling Mr. Patterson as a defense witness could well have been a tactical

decision and therefore cannot be considered as rising to the level of ineffective assistance of

counsel." *State v. Jackson*, 92 Ohio St. 3d 436 (2001); J.A. Vol. II, Part B, at 103.  The Ohio Supreme Court went on to find that petitioner was not prejudiced by counsel's decision not to call Mr. Patterson, since there was no showing that his testimony would have been beneficial to petitioner.

This Court is of the view that there is no good cause to conduct discovery on this claim because it is clear from the record that defense counsel's decision not to call Mr. Patterson was a tactical one supported by investigation and consideration, as opposed to one resulting from insufficient investigation, oversight, apathy, or miscalculation.  Mr. Schumacher stated on the record, but out of the presence of the jury, that he and Mr. Rigg had "conferred on this extensively, and we are going to respectfully decline to call Mr. Patterson for a couple of reasons."  (Tr. Vol. X, at 100).  Mr. Schumacher went on to explain that defense counsel felt there would be an ethical problem in presenting Mr. Patterson solely for the purpose of him taking the Fifth Amendment, and more importantly, that they did not wish to attempt to put on the stand a witness who "put our client right in the middle of all this."  (*Id*. at 101).  Mr. Rigg expanded that since Mr. Patterson could either take the Fifth Amendment, or testify about the letter he sent to petitioner, or testify consistent with the story he had provided the state implicating petitioner for the aggravated robbery and double murder, "it scares me to put a witness on not knowing what he was going to say, especially since he had said damaging things against Mr. Jackson before."  (*Id*. at 102-103).  In short, defense counsel indicated that they had met with Mr. Patterson, that they had conferred extensively on the matter, and that they had decided, as a matter of strategy, not to call Mr. Patterson because he would most likely take the Fifth Amendment, because they could not be sure what he would testify to, and because he was

10

on the record with the prosecution with a story that put petitioner right in the middle of the crimes.

The Court is mindful that petitioner need not prove a *Strickland* violation to be entitled to discovery; but he must show that if the facts are developed through the discovery he seeks, he could prove a *Strickland* violation and would be entitled to relief. *See Harris, supra*, 394 U.S. at 299. Because the record is clear that counsel's decision not to call Mr. Patterson was a tactical one supported by reasonable investigation and consideration, neither depositions of trial counsel, the trial jurors, or petitioner's co-defendants, nor any of the records sought by petitioner, would assist him in proving that he is entitled to relief on this claim. Petitioner is not entitled to conduct discovery on sub-part A of his first claim for relief (trial phase).

In sub-part B of his first claim for relief (trial phase), petitioner argues that his trial attorneys were ineffective for failing to object when the prosecution vouched for the credibility of one of its witnesses, Derrick Boone, by emphasizing during direct examination of Boone a clause in his plea agreement requiring him to tell the truth. The prosecution pursued a similar line of questioning about Boone's plea agreement during direct examination of Detective Zach Scott. Petitioner complains that the prosecution's questions in this regard had the effect of suggesting that the prosecution knew the truth and was assuring its revelation.

This claim was considered and rejected by the Ohio Supreme Court on direct appeal. As to Derrick Boone, the court found no error in the prosecution's questioning of Boone, and therefore no deficient performance on counsel's part in not objecting to the prosecution's questions. *State v. Jackson, supra*; J.A. Vol. II, Part B, at 104. The court went on to find that, although the questioning of Detective Scott as to the "truth" clause in Boone's plea agreement

11

was error, it was not outcome determinative and, therefore, petitioner was not prejudiced by trial counsel's failure to object. *Id*. In light of the Ohio Supreme Court's conclusions in this regard, the Court is not persuaded that petitioner has demonstrated good cause to conduct discovery as to this component of his first claim for relief. None of the discovery sought by petitioner could advance this claim of trial counsel ineffectiveness, or lead to other evidence that might advance the claim. That is, petitioner has not alleged facts which, if more fully developed through the discovery he seeks, would entitle him to relief. Petitioner is not entitled to conduct discovery as to sub-part B of his first claim for relief (trial phase).

In sub-part C of his first claim for relief (trial phase), petitioner argues that his trial attorneys were ineffective for failing to obtain the services of an expert witness on eyewitness identification. Petitioner argues that the identifications of him as the shooter by Ms. Lewis and Ms. Long were essential to the state's case and that the ramifications attendant to eyewitness identifications are not commonly understood by lay jurors. Thus, according to petitioner, there was no strategic reason for counsel not to have investigated the need for an expert witness and a great deal of prejudice to his defense as a result of counsel's omission in this regard.

This claim was considered and rejected by the state courts during petitioner's postconviction proceedings. Both the trial court and the court of appeals concluded that the decision about which witnesses to call is a tactical decision not to be second-guessed in hindsight, and that petitioner was not prejudiced by counsel's failure to present this expert testimony because the evidence upon which the jury convicted him went beyond the identifications made by Ms. Lewis and Ms. Long. (J.A. Vol. IV, at 305). Specifically, the state courts noted that testimony by Derrick Boone and Malaika Williamson implicated petitioner in

12

the shootings, that the guns were found at the apartment belonging to Ivana King, where petitioner often stayed, and that King testified that, among other things, petitioner had asked her to provide him with an alibi for the time that the shootings occurred.

Out of an abundance of caution, the Court finds that there are more factors militating in favor of allowing discovery on this claim than against it.  For one thing, the record contains no evidence about whether, or to what extent, counsel's decision not to obtain an expert witness on eyewitness identification was informed by any investigation.  Petitioner asserts that counsel conducted no investigation in this regard.  In *Strickland*, the Supreme Court held that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland, supra*, 466 U.S. at 690.  Later, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court again emphasized that, "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."  *Wiggins*, 539 U.S. at 527, citing *Strickland, supra*, 466 U.S. at 691.  Thus, without any evidence on the record about the level of investigation that supported counsel's decision not to obtain an expert witness on eyewitness identification, or any decisions made by counsel that may have made such investigation unnecessary, it is difficult for the Court to conclude whether counsel's decision was a tactical one that should not be second-guessed.

Further, it is too easy, in this Court's view, to say that petitioner suffered no prejudice from counsel's omission just because there was other evidence beyond the identifications made

13

by Ms. Lewis and Ms. Long supporting the jury's verdict.  For instance, the state courts made note of the fact that Derrick Boone's testimony implicated petitioner in the shootings and that the guns were found in Ivana King's apartment, where petitioner often stayed; but petitioner has consistently challenged the import of such evidence on the basis that Derrick Boone was a viable suspect in the shootings and also had access to the apartment.

For these reasons, the Court is satisfied that petitioner has alleged facts which, if more fully developed through certain discovery he seeks, could entitle him to relief.  In light of the fact that four different men, according to Ms. Lewis and Ms. Long, were involved in the robbery that led to the shootings of Antorio Hunter and Terrance Walker, testimony identifying petitioner as the shooter can only be characterized as unfavorable to petitioner.  If counsel's decision not to call an expert witness on identification was objectively unreasonable based on the investigation or other strategic decisions that supported the omission, and there is a reasonable probability that, but for counsel's decision, the outcome of petitioner's trial would have been different, then petitioner would be entitled to relief on this claim.  The Court is persuaded that certain discovery sought by petitioner could shed light on these allegations. Specifically, petitioner is entitled to depose his trial attorneys.  Petitioner has not demonstrated, and the Court is not otherwise persuaded, that the other records sought by petitioner, or depositions of his trial jurors or co-defendants Malaika Williamson, Michael Patterson, or Derrick Boone, would shed any light on this claim of trial counsel ineffectiveness or lead to any evidence that would materially advance the claim.

In sub-part D of his first claim for relief (trial phase), petitioner argues that his trial attorneys were ineffective for failing to object to the prosecution's use of excessively leading

14

questions with its own witness, *i.e.*, Derrick Boone.  This claim was considered and rejected by

the Ohio Supreme Court on direct appeal.  Specifically, the court concluded that since it is within

the trial court's discretion to allow leading questions, trial counsel did not perform deficiently or

to petitioner's prejudice in failing to object to what petitioner characterized as leading questions.

*State v. Jackson, supra*; J.A. Vol. II, Part B, at 104.  In light of the Ohio Supreme Court's

decision, the Court is not persuaded that petitioner has shown good cause to conduct discovery

on this claim.  That is, petitioner has not alleged facts which, if developed through the discovery

he seeks, would entitle him to relief.  There is nothing that depositions of trial counsel, the

various records that petitioner seeks, depositions of his trial jurors, or depositions of his co-

defendants could do to advance his claim.  That being so, petitioner is not entitled to conduct

discovery on sub-part D of his first claim for relief.

In sub-part E of his first claim for relief (trial phase), petitioner argues that his trial

attorneys performed unreasonably and to his prejudice in failing to prepare to adequately cross

examine Derrick Boone about, among other things, his access to the apartment where guns

implicating petitioner in the shootings were found.  In its *Opinion and Order* of September 27,

2004, (doc.no. 27), this Court concluded that this claim of trial counsel ineffectiveness was

procedurally defaulted.  Petitioner does not appear to seek discovery on this claim.

In sub-part F of his first claim for relief (trial phase), petitioner argues that his trial

attorneys were ineffective for failing to impeach Ivana King.  Specifically, petitioner contends

that counsel failed to establish through cross-examination, and failed to present independent

evidence demonstrating, that petitioner had been unfaithful to Ms. King and that Ms. King was

obsessively jealous regarding petitioner's infidelity.  This, according to petitioner, would have

15

demonstrated bias on Ms. King's part against him.

This claim was rejected by the state courts during petitioner's postconviction proceedings. The trial court concluded that the claim was barred by *res judicata* because it could have been raised on direct appeal, a conclusion with which this Court disagreed in its *Opinion and Order* of September 27, 2004, (doc.no. 27). The state appellate court, in affirming the trial court's rejection of the claim, noted that trial counsel had questioned Ms. King as to whether she had been aware of his relationship with Malaika Williamson, that there was no indication that William Woods had independent knowledge of Ms. King's alleged jealousy over petitioner, and that it would have been futile to show bias on the part of Ms. King since several other witnesses had placed petitioner at the scene of the double murder. (J.A. Vol. IV, at 307).

The Court is persuaded that petitioner has demonstrated good cause to conduct discovery on this claim. As the Court has already noted, the record contains no affidavits or testimony from trial counsel regarding their decisions, actions, and omissions at trial. Thus, there is no evidence in the record establishing whether, or to what extent, trial counsel investigated the possibility of impeaching Ms. King by demonstrating that her obsessive jealousy over petitioner might have created a bias on her part against petitioner. As the Court noted earlier, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court emphasized that, "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins*, 539 U.S. at 527, citing *Strickland, supra*, 466 U.S. at 691. Thus, without any evidence on the record about whether counsel investigated the possibility of demonstrating bias on Ms. King's part, or any decisions made by counsel that may have made

16

such investigation unnecessary, it is difficult for the Court to conclude whether counsel's decision was a tactical one that should not be second-guessed.  Further, although it is true, as the state appellate court noted, that petitioner was not prejudiced by counsel's omission, due to the fact that counsel did cross examine Ms. King about petitioner's relationship with Malaika Williamson, that there was no indication that William Woods had independent knowledge of Ms. King's alleged jealousy, and that several other witnesses placed petitioner at the scene of the shootings, the fact remains that Ms. King did provide some damaging testimony against petitioner. She testified, among other things, that petitioner had asked her to provide him with an alibi and that petitioner told her he had "done two people," which she took to mean that he had killed two people.  (Tr. Vol. IX, 131, 122).

For these reasons, the Court is satisfied that petitioner has alleged facts which, if more fully developed through certain discovery he seeks, could entitle him to relief.  In light of the damaging testimony that Ms. King provided against petitioner, cross-examination or independent evidence that may have established a bias on Ms. King's part against petitioner would have been favorable to petitioner.  If counsel's failure to investigate whether such bias existed was objectively unreasonable based on the investigation or other strategic decisions that supported the omission, and there is a reasonable probability that, but for counsel's decision, the outcome of petitioner's trial would have been different, then petitioner would be entitled to relief on this claim.  The Court is persuaded that certain discovery sought by petitioner could shed light on these allegations. Specifically, petitioner is entitled to depose his trial attorneys.  Petitioner has not demonstrated, and the Court is not otherwise persuaded, that the other records sought by petitioner, or depositions of his trial jurors or co-defendants Malaika Williamson, Michael

17

Patterson, or Derrick Boone, would shed any light on this claim of trial counsel ineffectiveness or lead to any evidence that would materially advance the claim.

In sub-part G of his first claim for relief (trial phase), petitioner argues that his trial attorneys were ineffective for failing to prepare for trial witnesses and failing, as a result, to adequately cross-examine Derrick Boone and Ivana King, and to adequately question William Woods to establish an alibi for petitioner.  In its *Opinion and Order* of September 27, 2004, doc.no. 27, this Court determined that petitioner's allegations as to Derrick Boone and Ivana King were likely procedurally defaulted, but in any event were without merit.  Thus, those portions of sub-part G of petitioner's first claim for relief have been dismissed and petitioner is not entitled to conduct discovery on them.

The allegations as to William Woods raised in sub-part G, however, are properly before the Court for consideration.  In a related claim, petitioner argues in sub-part H of his first claim for relief that his trial attorneys were ineffective for failing to present an available theory of defense, *i.e.*, alibi testimony by William Woods.  Petitioner argues in sub-part G that Woods was not adequately prepared by defense counsel to provide petitioner with an alibi for the time of the shootings, and therefore was too confused to testify about his whereabouts or petitioner's whereabouts at the time of the shootings.  Petitioner argues in sub-part H that he and Woods were together at Ivana King's apartment at the time of the shootings.  These allegations were raised during petitioner's postconviction proceedings and supported with evidence outside the trial record, *i.e.*, affidavits by Kareem Jackson (postconviction exhibit 5) and William Woods (postconviction exhibit 37).  The trial court concluded that there was no deficient performance on counsel's part because they had questioned Mr. Woods about an alibi for petitioner, and

18

therefore had not abdicated any duty owed to petitioner.  The state appellate court concluded that there was no deficient performance or prejudice because Mr. Woods' affidavit simply did not establish an alibi for petitioner.  (J.A. Vol. IV, at 308).

Out of an abundance of caution, the Court finds that there are more factors militating in favor of allowing discovery on this claim than against it.  The Court notes again that the record contains no affidavits or testimony from trial counsel about their decisions, actions, and omissions.  Thus, there is no evidence in the record from which to determine whether, or to what extent, defense counsel investigated the alibi that William Woods allegedly was prepared to provide for petitioner.  As the Supreme Court held in *Wiggins v. Smith*, 539 U.S. 510 (2003), "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy.  Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy." *Wiggins*, 539 U.S. at 527, citing *Strickland, supra*, 466 U.S. at 691.  Without any evidence on the record about the level of investigation that supported counsel's preparation and questioning of Mr. Woods, or any decisions made by counsel that may have made such investigation unnecessary, it is difficult for the Court to conclude whether counsel's decision was a tactical one that should not be second-guessed.  Further, it is too easy, in this Court's view, to say that petitioner suffered no prejudice from counsel's omission just because Mr. Woods' affidavit does not clearly establish an alibi for petitioner.  In his own affidavit, petitioner stated, among other things, that he was with his children and Ivana King at her apartment when the shootings occurred.  (J.A. Vol. III, Part A, at 129-130).  Mr. Woods stated in his affidavit that because he was confused and frustrated by defense counsel's questions, he was unable to inform the jury clearly that he knew he was at

Ivana King's home on the evening of the shootings.  (J.A. Vol. III, Part D, at 136-37).  Thus, although Mr. Woods inexplicably did not come right out and say in his affidavit that he was with petitioner at the time of the shootings, both he and petitioner averred in their affidavits that they were at Ivana King's apartment at the time of the shootings.  That being so, the Court cannot dismiss Mr. Woods' affidavit as failing altogether to establish an alibi for petitioner.

For these reasons, the Court is satisfied that petitioner has alleged facts which, if more fully developed through certain discovery he seeks, could entitle him to relief.  In light of the evidence against petitioner, such as testimony by Ms. Lewis and Ms. Long identifying him as the shooter, testimony by co-defendants Derrick Boone and Malaika Williamson implicating him in the shootings, and testimony by Ivana King that petitioner told her he had "done two people," any testimony that might have established an alibi for petitioner could only be characterized as favorable.  That said, the Court is mindful of the apparent implausibility of William Woods' ability to establish an alibi for petitioner, in light of the evasive nature of his affidavit and the fact that Ivana King herself did not testify that petitioner and William Woods were with her at her apartment at the time of the shootings.  Still, in a death penalty case, the Court would rather err on the side of gathering too much information rather than too little.  If counsel's decision not investigate more thoroughly Mr. Woods' ability to establish an alibi for petitioner was objectively unreasonable, and there is a reasonable probability that, but for counsel's decision, the outcome of petitioner's trial would have been different, then petitioner would be entitled to relief on this claim.  It may very well be that counsel did investigate this matter and determined, based on their investigation, that Mr. Woods could not establish an alibi for petitioner.  At this point, the record is unclear and only trial counsel can provide clarity on the matter.  Thus, the

Court is persuaded that certain discovery sought by petitioner could shed light on these allegations. Specifically, petitioner is entitled to depose his trial attorneys.  Petitioner has not demonstrated, and the Court is not otherwise persuaded, that the other records sought by petitioner, or depositions of his trial jurors or co-defendants Malaika Williamson, Michael Patterson, or Derrick Boone, would shed any light on this claim of trial counsel ineffectiveness or lead to any evidence that would materially advance the claim.

In sub-part I of his first claim for relief (trial phase), petitioner argues that his trial attorneys were ineffective for failing to object when the prosecution improperly impeached its own witness, *i.e.*, Ivana King.  Petitioner argues that a week prior to her testimony, Ivana King reviewed the taped interview that she had given to police shortly after the shootings.  When asked at trial by the prosecution what petitioner had told her relating to the shootings, Ms. King testified that she could not remember.  That prompted the prosecution to impeach her with her prior statement even though, according to petitioner, the prosecution failed to establish "affirmative damage" in accordance with Ohio R. Evid. 607(A).  Petitioner further argues that, even assuming the prosecution was attempting merely to use the prior statement for purposes of refreshing the witness's recollection, the prosecution failed to comply with Ohio R. Evid. 612 in failing to show the witness her statement and then have her testify based on her review.

This claim of trial counsel ineffectiveness was considered and rejected by the Ohio Supreme Court on direct appeal.  Specifically, the Ohio Supreme Court concluded that it was error for the prosecution to have proceeded in the manner it did with respect to impeaching Ivana King with her prior statement, since there was no showing of surprise and affirmative damage as required under Ohio evidentiary rules.  *State v. Jackson, supra*; J.A. Vol. II, Part B, at 104.

21

Thus, according to the Ohio Supreme Court, trial counsel were deficient for failing to object. The court went on to conclude, however, that petitioner suffered no prejudice as a result of counsel's failure to object, since the prosecution would have been able to produce Ms. King's prior statement under Ohio R. Evid. 803(5) as past recollection recorded.

In light of the Ohio Supreme Court's decision that an objection by defense counsel would have accomplished nothing, the Court is not persuaded that petitioner has shown good cause to conduct discovery on this claim. That is, petitioner has not alleged facts which, if developed through the discovery he seeks, would entitle him to relief. There is nothing that depositions of trial counsel, the various records that petitioner seeks, depositions of his trial jurors, or depositions of his co-defendants could do to advance his claim. That being so, petitioner is not entitled to conduct discovery on sub-part I of his first claim for relief.

In sub-part J of his first claim for relief (trial phase), petitioner argues that trial counsel were ineffective "when they did not oppose expert opinion testimony expressed in terms that failed to specify a more probable than not outcome." (Amended Petition, doc.no. 18, at 17). Petitioner complains that testimony by three of the state's experts – Ronald Dye as to the bullet that was retrieved from Antonio Hunter's body, Keith Norton as to the cause of death of Terrance Walker, and Patrick Fardal as to the cause of death of Antonio Hunter – was not expressed in terms of probability and that defense counsel were deficient for failing to object to the testimony on that basis.

This claim was considered and rejected by the Ohio Supreme Court on direct appeal. Specifically, the court held that the expert opinions were correctly expressed because an expert opinion is competent if it is held to a reasonable degree of scientific or medical certainty, and

22

"we have found that 'reasonable certainty' is synonymous with the term 'probability.'" *State v. Jackson, supra*; J.A. Vol. II, Part B, at 103-104.  In light of the Ohio Supreme Court's conclusion that there was no error in the manner in which the expert opinions were expressed, it cannot be said either that counsel performed deficiently in failing to object or that petitioner was prejudiced by counsel's failure to object.  For this reason, petitioner has failed to allege facts which, if more fully developed through the discovery he seeks, would entitle him to relief.  There is nothing that depositions of trial counsel, the various records that petitioner seeks, depositions of his trial jurors, or depositions of his co-defendants could do to advance his claim.  That being so, petitioner is not entitled to conduct discovery on sub-part J of his first claim for relief.

In sub-part K of his first claim for relief (trial phase), petitioner argues that trial counsel were ineffective for failing to object to erroneous jury instructions telling the jury that it had to unanimously acquit a person of the capital crime and death penalty specifications before it could consider lesser offenses.  This claim was considered and rejected by the Ohio Supreme Court on direct appeal.  Specifically, the court concluded that the instructions at issue did not constitute an improper "unanimity" instruction, and that counsel, therefore, did not perform deficiently or to petitioner's prejudice in failing to object.  *State v. Jackson, supra*; J.A. Vol. III, Part B, at 102.  In light of the Ohio Supreme Court's conclusion that there was no state or federal error in the instruction at issue, it cannot be said either that counsel performed deficiently in failing to object or that petitioner was prejudiced by counsel's failure to object.  For this reason, petitioner has failed to allege facts which, if more fully developed through the discovery he seeks, would entitle him to relief.  There is nothing that depositions of trial counsel, the various records that petitioner seeks, depositions of his trial jurors, or depositions of his co-defendants could do to

23

advance his claim.  That being so, petitioner is not entitled to conduct discovery on sub-part K of his first claim for relief.

In sub-part A of his first claim for relief (mitigation phase), petitioner argues that his trial attorneys were ineffective for failing to respond to an extraneous influence upon juror Maureen Huddle.  Petitioner explains that, on Tuesday, January 27, 1998, just before the mitigation hearing commenced, the trial court learned of an incident which occurred on Friday, January 23, when juror Maureen Huddle returned home to find two men in her driveway, her garage door open, and bolts lying on her garage floor.  Later that day, the police came to Ms. Huddle's door to inform her that her garage door was open again.  After learning of these incidents, according to petitioner, the trial court asked a single question of Ms. Huddle:

> I have consulted with counsel, and we are certain there is no reason to think any of that activity is associated in any way with this case.  However, I want to make sure that you can focus on the task at hand here.  Do you believe that despite the fact that these incidents happened over the course of the weekend, that you can still give us your full attention in this matter?

(Tr. Vol. XI, at 20).  Ms. Huddle answered, "Yes."  (*Id.*).  No further questions were asked of Ms. Huddle and the trial court did not admonish her not to discuss the incident with the other jurors.  Petitioner complains that defense counsel, though they were given the opportunity, did not question Ms. Huddle in more detail.  Petitioner further complains that defense counsel failed to request the trial court to admonish Ms. Huddle not to discuss the incident with her fellow jurors.  Citing an affidavit from Juror Cahill, petitioner points out that Ms. Huddle did report the incident to her fellow jurors, told them that she had also received several bizarre phone calls, and had to be driven home by someone at the end of the day because she was so frightened.  None of this information, as reported by Juror Cahill, was known to the trial court, the prosecution, or

24

defense counsel.

This allegation of trial counsel ineffectiveness was rejected by the state courts during petitioner's state postconviction proceedings.  The trial court found that the issue of whether counsel should have questioned Ms. Huddle and asked the court to admonish her were matters that could have been determined from the record.  (J.A. Vol. III, Part F, at 528).  The trial court further found that any questions counsel may have asked would have been redundant.  (*Id.*).  The appellate court, in affirming the trial court's decision rejecting this claim, agreed that "the incident involving Huddle was part of the trial record, and any arguments pertaining to this incident could have been addressed at trial or on direct appeal."  (J.A. Vol. IV, at 311). Regarding the information set forth in Juror Cahill's affidavit – information which does not appear to have been known by the trial court, defense counsel, or the prosecution – the appellate court stated "[e]ven assuming that Cahill's affidavit is admissible, in it Cahill says nothing about the impact of Huddle's statements upon the jury and it does not add any material information." (*Id.*).

In its *Opinion and Order* of September 27, 2004, doc.no. 27, this Court concluded, on the basis of Juror Cahill's affidavit, that petitioner's claim was properly before the Court for a review on the merits because there was no evidence on the trial record indicating that Ms. Huddle related to the other jurors the incident about her garage door being open or the "bizarre phone calls" she had received, or that Ms. Huddle was upset about these matters.  This Court explained:

> If anything, the trial record reflects that Ms. Huddle was not concerned or worried about the incidents with her garage door, when that may not actually have been the case.   The impression Ms. Huddle conveyed on the record was that she did not think the incidents involving her garage door were connected to petitioner's

> trial, that she did not feel the incidents would undermine her capacity as a juror, and that she only related them to the court as a precaution.   Further, Ms. Huddle failed altogether to mention during the colloquy the "bizarre phone calls" that she later related to her fellow jurors in addition to the incidents about her garage door.

(Doc.No. 27, at 56).

Upon careful review and out of an abundance of caution, the Court is satisfied that petitioner has demonstrated good cause to conduct limited discovery on this claim.  The Court notes again that the record contains no affidavits or testimony from trial counsel about their decisions, actions, and omissions.  Thus, there is no evidence in the record from which to determine what impressions, if any, defense counsel had regarding the incident that Juror Huddle had reported or the impact it might have had on her ability to determine petitioner's sentence. As the Supreme Court held in *Wiggins v. Smith*, 539 U.S. 510 (2003), "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy.  Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."  *Wiggins*, 539 U.S. at 527, citing *Strickland, supra*, 466 U.S. at 691.  Of course, the Court is mindful that counsel were put on the spot, so to speak, on the issue of whether they wished to question Ms. Huddle, insofar as they were not given the opportunity, even if they had wanted it, to investigate or deliberate over the matter.  Still, without any evidence on the record about the level of investigation or deliberation that supported counsel's decision not to question Ms. Huddle or request that she be admonished not to discuss the incident with the other jurors, or any decisions made by counsel that may have made such investigation or deliberation unnecessary, it is difficult for the Court to conclude whether counsel's decision was a tactical one that should not be second-guessed.

Regarding the prejudice component of *Strickland*'s two-part test for reviewing claims of

26

ineffective assistance of counsel, the Court is satisfied that petitioner has made specific, credible allegations justifying further examination of both Juror Huddle and Juror Cahill.  The trial record conveys the impression that Ms. Huddle was of the view that the incident involving her garage door was not related to petitioner's trial, that Ms. Huddle was not concerned about the incident and only reported it to the trial court out of an abundance of caution, and that Ms. Huddle's ability to continue serving as a fair and impartial juror would not be impacted.  Juror Cahill's affidavit conveys quite a somewhat different impression – namely, that Ms. Huddle might have perceived a connection between the incident involving her garage door and "bizarre" phone calls she had received – phone calls she neglected to report to the trial court – and that Ms. Huddle was so upset about the incidents that she had to be driven home that evening by someone else. Further, in terms of determining whether petitioner was prejudiced by counsel's failure to question Ms. Huddle more extensively or request that she be admonished not to discuss the situation with other jurors, Mr. Cahill's affidavit merely scratches the surface regarding the information that Ms. Huddle conveyed to her fellow jurors, the impact that the incidents appeared to have on her, and what, if any, impact her revelations may have had on Mr. Cahill or any of the other jurors.  Mr. Cahill's affidavit in this regard consisted of a single paragraph averring that:

> 3)    Prior to the mitigation phase, Juror Maureen Huddle informed the remaining jurors as to the bizarre phone calls that she received at her home and as to the incident that occurred near her home the night prior to the trial phase deliberations.  Juror Huddle came in crying after these incidents and was taken home by someone one evening due to her fear.

(J.A. Vol. III, Part A, at 128).

For these reasons, the Court is satisfied that petitioner has alleged facts which, if more

27

fully developed through certain discovery he seeks, could entitle him to relief.  Any evidence suggesting that even one juror might have been influenced in her sentencing determination by anything other than the evidence establishing the aggravating circumstances and mitigating factors should be explored.  Petitioner has alleged specific, credible allegations suggesting at least enough to warrant further investigation in this regard.  If counsel's decision not to question Ms. Huddle was objectively unreasonable based on the amount of investigation or deliberation that supported the decision, and there is a reasonable probability that, but for counsel's decision, the outcome of petitioner's mitigation hearing would have been different, then petitioner would be entitled to relief on this claim.  Thus, the Court is persuaded that certain discovery sought by petitioner could shed light on these allegations. Specifically, petitioner is entitled to depose his trial attorneys, Juror Maureen Huddle, and Juror James Cahill.  Petitioner has not demonstrated, and the Court is not otherwise persuaded, that the other records sought by petitioner, or depositions of his co-defendants Malaika Williamson, Michael Patterson, or Derrick Boone, would shed any light on this claim of trial counsel ineffectiveness or lead to any evidence that would materially advance the claim.  Further, the Court is not persuaded, at this point, that it is necessary to depose any jurors besides Ms. Huddle and Mr. Cahill.  That is not to say, however, that the need might not arise following the depositions of Ms. Huddle and Mr. Cahill.

In sub-part B of his first claim for relief (mitigation phase), petitioner argues that his trial attorneys were ineffective for failing to adequately investigate petitioner's family and social background to determine what mitigating factors to raise.  Specifically, petitioner asserts that defense counsel focused so exclusively on plea negotiations that they did not give proper attention to preparing for the mitigation phase of petitioner's trial, and, as a result, failed to

28

interview adequately certain witnesses who testified, failed to interview altogether other witnesses, and failed to contact multiple other family and friends who could have provided useful information and favorable testimony.  Similarly, in sub-part D, petitioner argues that trial counsel were ineffective for failing to prepare their mitigation witnesses more adequately. Petitioner points out that trial counsel spoke only briefly to his mother, father, and aunt, and failed to go over with them the questions they would be asked.  Petitioner further assails the adequacy of counsel's questioning of Ophelia Felder regarding an incident during which petitioner had saved her grandson from drowning in a pool, and argues that Ms. Felder's grandson was present in the courtroom and could have testified about the incident himself.  As a result of counsel's deficient investigation and preparation, according to petitioner, the following mitigation evidence was never presented to the jury:

> 1.    Mr. Jackson's mother, Robbie, was subjected to the domestic violence and drinking of her parents as a child.  These family dynamics continued for another generation as Robbie gave birth to Mr. Jackson on March 5, 1974.

> 2.    As a child, Mr. Jackson witnesses his father, Michael's, obnoxious drunken and abusive behavior towards his mother.  His parents' on-again-off-again relationship continued until Mr. Jackson was six years old.

> 3.    Mr. Jackson's father never provided the foundation Mr. Jackson needed because he was preoccupied with drinking, doing drugs, and fighting with Mr. Jackson's mother.

> 4.    Mr. Jackson lived in an environment which lacked responsible adult role leadership, which led to his poor judgment and socially unacceptable behaviors.

> 5.    Mr. Jackson relocated with his parents 18 times before he turned 6 years old. He attended five schools between kindergarten and eighth grade.  During the third grade, he was absent for a total of 34.5 days.  Mr. Jackson's grades progressively declined through the fifth grade.

> 6.    The family experienced intense financial stress.  Mr. Jackson was left alone for extended periods as a child.  This prompted Mr. Jackson's search for

29

alternative 'parental figures' in a local gang.

7.    Mr. Jackson's mother attempted to restrict Mr. Jackson's activities while attending high school and prohibited him from having friends or girlfriends.

8.    While Mr. Jackson was attending high school, his mother would lock him out of the house for the evening if he was not home when she wanted.  Mr. Jackson was then left to find a place to stay for the night.  Mr. Jackson began staying with friends, who ultimately became the replacements for his familial support.

9.    Mr. Jackson's grandmother was the person who represented the only stability that he had ever known in his life.  After her death, Mr. Jackson saw his life as having lost all of its foundation.

(Amended Petition, doc.no. 18, at 21-22, ¶55).

This allegation of trial counsel ineffectiveness was considered and rejected by the state courts in postconviction.  The trial court and appellate court rejected petitioner's claim, finding that defense counsel had employed an investigator and a psychologist, and had in fact interviewed all but two of the people who submitted affidavits on petitioner's behalf in postconviction.  (J.A. Vol. IV, at 309-310).  The state courts further noted, with respect to petitioner's complaint that defense counsel failed to go over with their witnesses the questions that they would be asking, that there is no case law requiring counsel to discuss questions and answers with witnesses in advance, and that it may very well have been a tactical decision on counsel's part not to do so, in order to avoid their witnesses appearing "rehearsed."  (*Id.*).  Finally, the state trial court noted that Ms. Felder's grandson submitted no affidavit regarding the incident during which petitioner saved him from drowning in a pool, thereby negating any claim on petitioner's part that defense counsel were ineffective for not calling him to testify.  (J.A. Vol. III Part F, at 496).

The Court is constrained to find that petitioner has not demonstrated good cause to

30

conduct discovery on this claim.  That is, petitioner has not alleged facts which, if more fully developed through the discovery he seeks, would entitle him to relief.  Although the record contains no affidavits or testimony from trial counsel regarding their decisions, actions, and omissions with respect to the mitigation phase of petitioner's trial, the Court is not persuaded that petitioner could demonstrate through any of the discovery he seeks that there is a reasonable probability that the outcome of his sentencing hearing would have been different, but for counsel's deficient performance.  The Court is mindful that petitioner need not prove a *Strickland* violation to be entitled to discovery; but he must show that if the facts are developed through the discovery he seeks, he could prove a *Strickland* violation and would be entitled to relief. *See Harris, supra*, 394 U.S. at 299.  Careful review of the record reveals that the information which, according to petitioner, was never presented to the jury due to counsel's failure to adequately investigate his family and social background, is largely cumulative to testimony that was presented at petitioner's mitigation hearing or is of such marginal value that its omission cannot reasonably be said to have affected the outcome of petitioner's sentencing hearing.  Thus, neither depositions of trial counsel, the trial jurors, or petitioner's co-defendants, nor any of the records sought by petitioner, would assist him in proving that he is entitled to relief on this claim.

During petitioner's mitigation hearing, testimony was presented regarding petitioner's mother suffering domestic violence at the hands of petitioner's father, (Tr. Vol. XI, at 55-56); to the extent petitioner complains that no evidence was presented regarding domestic violence his mother may have experienced or observed as a child, that evidence strikes this Court as marginally relevant at best.  Testimony was also presented that petitioner witnessed his father's

abusive behavior toward his mother, (*Id*. at 56).  Further, significant testimony was presented demonstrating that petitioner's father played less and less of a role in petitioner's life as petitioner grew from a young boy into adolescence, (*Id*. at 57-58, 39-40).  In that regard, testimony was also presented suggesting that petitioner lacked responsible, male role models in his life, (*Id*. at 96).  Petitioner complains that the jury was not presented with evidence that he relocated 18 times before he turned six-years-old, and that his school performance suffered as a result, but testimony was presented demonstrating that petitioner and his mother moved very frequently, due to financial hardships, and that petitioner was an average student, at best.  (*Id*. at 61-62, 58).  In that regard, petitioner's mother testified openly about the financial hardships that they endured, (*Id*. at 61); testimony was also presented that petitioner's father provided no financial help, (*Id*. at 41).  Petitioner complains that no testimony was presented regarding his mother's attempts to restrict his activities and friendships, or about how his mother allegedly locked him out of the house if he failed to get home by his curfew; this Court is of the view that such testimony would have been marginally valuable at best, and possibly even damaging, insofar as it might have conveyed to the jury that petitioner actually had in his life a parent who was active in petitioner's life and who attempted to keep him on the straight and narrow.  Finally, petitioner complains that no testimony was presented demonstrating how close he was to his grandmother and how profoundly her death affected him; actually, petitioner's mother did testify that petitioner was especially close to his grandmother, who often lived with them, (*Id*. at 63).  Petitioner's assertion about how the death of his grandmother affected him is directly contradicted by his mother's testimony that petitioner showed very little reaction to the passing of his grandmother, (*Id*. at 60-70).

In light of the foregoing, no matter what petitioner might be able to prove through discovery about the reasonableness of counsel's performance with respect to their investigation of his family and social background, the Court is not persuaded that petitioner could demonstrate through any of the discovery he seeks that there is a reasonable probability that the outcome of his sentencing hearing would have been different, but for counsel's deficient performance.  That being so, petitioner has not alleged facts which, if more fully developed through the discovery he seeks, would entitle him to relief.  Petitioner has not shown good cause to conduct discovery on sub-part B of his first claim for relief (mitigation phase).

In sub-part C of his first claim for relief (mitigation phase), petitioner argues that his trial attorneys were ineffective for failing adequately to investigate and present psychological evidence.  In sub-part F of his first claim for relief (mitigation phase), petitioner argues that his defense attorneys were ineffective for failing to protect his Eighth Amendment right to have the jury consider all relevant mitigation evidence, to wit: testimony by a psychologist. Petitioner argues that, although defense counsel obtained funds for, and secured the services of, a psychologist, Dr. Kathleen Burch, they subsequently failed to provide her with any background information and did not call her to testify at petitioner's mitigation hearing.  Dr. Burch stated in an affidavit that she was unable to conduct full testing of petitioner because he was evasive and closed, that she consulted with defense counsel by telephone two months after her attempt to test petitioner, and that defense counsel thereafter informed her that they would not need her for petitioner's mitigation hearing.  Citing the findings of Dr. Hugh Turner, who evaluated petitioner in connection with his postconviction proceedings, petitioner argues that his defense attorneys did nothing to rebut assertions by the prosecution that petitioner enjoyed a "normal childhood,"

as opposed to one in which domestic violence was prevalent and which led petitioner to turn to drugs.

These allegations were considered and rejected by the state courts in postconviction.  The trial court noted that a psychologist was made available to petitioner, that any background information needed by the psychologist was within petitioner's knowledge, and that petitioner's refusal to cooperate with the psychologist negates any argument on his part that his attorneys were somehow ineffective in connection with their failure to present psychological testimony. The appellate court likewise noted that "trial counsel's ability to present psychological evidence was impeded by appellant's failure to cooperate with Dr. Burch, the psychologist retained by the defense team to assist with the development of mitigation evidence."  (J.A. Vol. IV, at 310).

The Court is satisfied that petitioner has demonstrated good cause to conduct discovery on this claim, but only as to his request to depose his trial attorneys.  The record before this Court contains no affidavits or testimony from trial counsel regarding their strategy, decisions, actions, and omissions in connection with presenting psychological evidence during petitioner's mitigation hearing.  Thus, there is scant evidence in the record from which to determine the degree of investigation that supported counsel's decision not to call Dr. Burch, and no evidence whatsoever demonstrating whether counsel's decision not to call Dr. Burch was tactical, oversight, or complacency.  As the Supreme Court held in *Wiggins v. Smith*, 539 U.S. 510 (2003), "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy.  Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy."  *Wiggins*, 539 U.S. at 527, citing *Strickland, supra*, 466 U.S. at 691.  With very little evidence on the record about the level

34

of investigation that supported counsel's decision not to call Dr. Burch, and no evidence demonstrating whether counsel's decision not to call Dr. Burch was a reasoned decision, it is difficult for the Court to conclude whether counsel's decision was a tactical one that should not be second-guessed.  Further, as to the prejudice prong of *Strickland*, it does not appear that the state courts gave much consideration to the affidavits submitted by Drs. Burch and Turner.  That being so, the Court cannot say that petitioner is unable to demonstrate that there is a reasonable probability that the outcome of his sentencing hearing might have been different, had defense counsel developed and presented psychological evidence.

For these reasons, the Court is satisfied that petitioner has alleged facts which, if more fully developed through certain discovery he seeks, could entitle him to relief.  If counsel's decision not to call Dr. Burch was objectively unreasonable based on the investigation that supported it, and there is a reasonable probability that, but for counsel's decision, the outcome of petitioner's sentencing hearing would have been different, then petitioner would be entitled to relief on this claim.  In so concluding, the Court is mindful that the record demonstrates that petitioner refused to cooperate with Dr. Burch, and that this factor militates strongly against petitioner being able to demonstrate that he is entitled to relief on this claim of trial counsel ineffectiveness.  However, this factor does not, in this Court's view, negate the need to glean whatever information is possible from trial counsel regarding their investigation and decision-making with respect to presenting psychological testimony at the mitigation hearing.  Thus, the Court is persuaded that certain discovery sought by petitioner could shed light on these allegations. Specifically, petitioner is entitled to depose his trial attorneys.  Petitioner has not demonstrated, and the Court is not otherwise persuaded, that the other records sought by

petitioner, or depositions of his trial jurors or co-defendants Malaika Williamson, Michael

Patterson, or Derrick Boone, would shed any light on this claim of trial counsel ineffectiveness

or lead to any evidence that would materially advance the claim.

In sub-part E of his first claim for relief (mitigation phase), petitioner argues that his trial

attorneys were ineffective for failing to present a cultural expert.  Relying on an affidavit

submitted in postconviction by Dr. Kwaw David Whittaker, petitioner argues that lay jurors were

unable to comprehend that:

> Culturally speaking, Kareem was virtually doomed to failure before his birth.
> Two generations of problems preceded his birth.  His death will carry these same
> problems into a third generation.  The lives of the victims were important and
> should not have been quieted.  However, this is not a situation where the theory of
> 'an eye-for-an-eye' applies.  In point of fact, all of these young people are victims
> of the same cultural nullification.

(Amended Petition, doc.no. 18, at 26).  Juror James Cahill stated in his affidavit that such

information would have made a difference in his sentencing determination.  (*Id*.).

This claim of trial counsel ineffectiveness was considered and rejected by the state courts

in postconviction.  The state trial court concluded that trial counsel were faced with a choice of

theories and chose the "good kid led astray" theory over the "doomed from birth" theory

advanced by Dr. Whittaker, and that the latter theory may very well have been undercut by

evidence presented during the mitigation hearing that petitioner had a strong religious

upbringing.  For this reason, the trial court concluded that defense counsel's decision was a

reasonable trial tactic that cannot be second guessed.  Similarly, the court of appeals concluded

that evidence presented during the mitigation hearing demonstrated relative stability and a strong

religious foundation in petitioner's upbringing.   (J.A. Vol. IV, at 310-11).

The Court cannot find that petitioner has demonstrated good cause to conduct discovery

36

on this claim because the Court is not persuaded that petitioner has alleged facts which, if more fully developed through the discovery he seeks, would entitle him to relief.  That is, none of the discovery that petitioner seeks would enable him to establish ineffective assistance of counsel in this regard.  In the Sixth Circuit, where counsel performs something of an investigation, and presents something in the form of mitigation, then the petitioner will be required to demonstrate not only that his attorney's performance was deficient, but also that counsel's deficient performance prejudiced the outcome of the petitioner's sentencing proceeding.  *Martin, supra*, 280 F.3d at 613.  In the instant case, a review of the mitigation phase transcript reveals that counsel presented something in the form of mitigation, and permits a reasonable inference that counsel performed something of an investigation.  That being so, "'[w]hen, as here, counsel has presented a meaningful concept of mitigation, the existence of alternate or additional mitigation theories does not establish ineffective assistance.'" *Jamison v. Collins*, 100 F.Supp.2d 647, 732 (S.D. Ohio 2000), quoting *State v. Combs*, 100 Ohio App. 3d 90, 105 (1994).  The Court is mindful that petitioner need not prove a *Strickland* violation to be entitled to discovery; but he must show that if the facts are developed through the discovery he seeks, he could prove a *Strickland* violation and would be entitled to relief. *See Harris, supra*, 394 U.S. at 299.  This, petitioner cannot do.  Accordingly, petitioner is not entitled to conduct discovery on sub-part E of his first claim for relief (mitigation phase).

In sub-part G of his first claim for relief (mitigation phase), petitioner argues that his trial attorneys were ineffective for arguing to the jury, contrary to Ohio law, that it must first decide whether to impose the death sentence before moving on to consider the various life sentence options.  In so arguing, according to petitioner, trial counsel invited the jury not to consider any

37

mitigating evidence unless they first agreed that death was not an appropriate sentence.

This claim was considered and rejected by the Ohio Supreme Court on direct appeal. The court concluded that trial counsel did not perform deficiently because they merely paraphrased R.C. §2929.03(D)(2) and subsequently argued the mitigation evidence that was presented in urging the jury to reject the death sentence. *State v. Jackson, supra*; J.A. Vol. II, Part B, at 102.  In light of the Ohio Supreme Court's conclusions in this regard, the Court is not persuaded that petitioner has demonstrated good cause to conduct discovery as to this component of his first claim for relief.  None of the discovery sought by petitioner could advance this claim of trial counsel ineffectiveness, or lead to other evidence that might advance the claim.  That is, petitioner has not alleged facts which, if more fully developed through the discovery he seeks, would entitle him to relief.  Petitioner is not entitled to conduct discovery as to sub-part G of his first claim for relief (mitigation phase).

In sub-part H of his first claim for relief (mitigation phase), petitioner argues that his trial attorneys were ineffective for failing to object to the admission during the mitigation phase of evidence from the trial phase that, according to petitioner, did not relate to the proven aggravating circumstances.  Combined with the trial court's instructions to the jury to consider all of the evidence in determining whether the aggravating circumstances outweighed the mitigating factors, petitioner argues that the jury was invited to consider some evidence that was gruesome and irrelevant to the aggravating circumstances.

This claim was considered and rejected by the Ohio Supreme Court on direct appeal. Specifically, the Ohio Supreme Court concluded that the evidence in question was relevant under Ohio R. Evid. 401 because it pertained to the nature and circumstances of the offense, which

jurors are required to consider as possible mitigating factors and that, according, defense counsel were not deficient for not objecting to that which was not error. *State v. Jackson, supra*; J.A. Vol. II, Part B, at 103. The court went on to conclude that any prejudice would have been cured by the court's independent weighing of aggravating circumstances and mitigating factors. In light of the Ohio Supreme Court's determination as a matter of state law that there was no error in the readmission during the mitigation phase of evidence from the trial phase, and that defense counsel were not ineffective for failing to object to that which was not error, the Court is not persuaded that petitioner has demonstrated good cause to conduct discovery as to this component of his first claim for relief. None of the discovery sought by petitioner could advance this claim of trial counsel ineffectiveness, or lead to other evidence that might advance the claim. That is, petitioner has not alleged facts which, if more fully developed through the discovery he seeks, would entitle him to relief. Petitioner is not entitled to conduct discovery as to sub-part H of his first claim for relief (mitigation phase).

Finally, in sub-part I of his first claim for relief (mitigation phase), petitioner argues that his trial attorneys were ineffective for failing to object to jury instructions that improperly permitted the jury to aggregate the aggravating circumstances and weigh them collectively against the mitigating factors, thereby tilting the scales in favor of a death sentence. This claim was considered and rejected by the Ohio Supreme Court on direct appeal. The court determined that the trial court specifically instructed the jury that "[t]he penalty for each individual count must be assessed separately. Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count." *State v. Jackson, supra*; J.A. Vol. II, Part B, at 102-103. Since the jury instructions, when read as a whole, did not contain the error

alleged by petitioner, according to the Ohio Supreme Court, trial counsel cannot be found to have been ineffective for failing to object to the instructions.

In light of the Ohio Supreme Court's determination as a matter of state law that there was no error in the jury instructions as alleged by petitioner, and that defense counsel were not ineffective for failing to object to that which was not error, the Court is not persuaded that petitioner has demonstrated good cause to conduct discovery as to this component of his first claim for relief.  None of the discovery sought by petitioner could advance this claim of trial counsel ineffectiveness, or lead to other evidence that might advance the claim.  That is, petitioner has not alleged facts which, if more fully developed through the discovery he seeks, would entitle him to relief.  Petitioner is not entitled to conduct discovery as to sub-part I of his first claim for relief (mitigation phase).

For the foregoing reasons, petitioner is entitled to conduct discovery on his first claim to the extent set forth above.

B.

Petitioner seeks to conduct discovery on his second and third claims for relief, *i.e.*, that extraneous influences improperly affected the jury's determination of his sentence and that the trial court failed to take steps to ensure that extraneous influences did not improperly affect the jury's determination of petitioner's sentence.  Specifically, petitioner explains that, on Tuesday, January 27, 1998, just before the mitigation hearing commenced, the trial court learned of an incident which occurred on Friday, January 23, when juror Maureen Huddle returned home to find two men in driveway, her garage door open, and bolts lying on her garage floor.  Later that day, the police came to Ms. Huddle's door to inform her that her garage door was open again.

40

After learning of these incidents, according to petitioner, the trial court asked a single question of Ms. Huddle:

> I have consulted with counsel, and we are certain there is no reason to think any of that activity is associated in any way with this case. However, I want to make sure that you can focus on the task at hand here. Do you believe that despite the fact that these incidents happened over the course of the weekend, that you can still give us your full attention in this matter?

(Tr. Vol. XI, at 20). Ms. Huddle answered, "Yes." (*Id*.). No further questions were asked of Ms. Huddle and the trial court did not admonish her not to discuss the incident with the other jurors. Citing an affidavit from Juror Cahill, petitioner points out that Ms. Huddle did report the incident to her fellow jurors, told them that she had also received several bizarre phone calls, and had to be driven home by someone at the end of the day because she was so frightened. None of this information, as reported by Juror Cahill, was known to the trial court, the prosecution, or defense counsel.

In order to determine whether petitioner is entitled to conduct discovery on this claim, the Court initially must identify the essential elements of this claim. *See Bracy*, 520 U.S. at 904. A criminal defendant tried by a jury of his peers has a constitutional right to a fair and impartial jury. U.S. CONST. AMEND VI; *Duncan v. Louisiana*, 391 U.S. 145 (1968). Thus, a defendant's rights are violated when a jury's verdict is affected by prejudicial extraneous facts that are not part of the evidence introduced at trial. *See, e.g., Smith v. Phillips*, 455 U.S. 209 (1982). Regarding the trial court's responsibility when faced with a possibility of extraneous influences on the jury, the Court of Appeals for the Sixth Circuit has held:

> Clearly established Supreme Court precedent dictates that "[w]hen a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous

41

information actually was on that jury."  *Nevers v. Killinger*, 169 F.3d 352, 373 (6th Cir. 1999), *overruled on other grounds by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000); *cf. United States v. Rigsby*, 45 F.3d 120, 124-25 (6th Cir. 1995)("When there is a credible allegation of extraneous influences, the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated."); *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985)("A trial court's refusal to permit an evidentiary hearing may constitute abuse of discretion when the alleged jury misconduct involves extrinsic influences.").***.

*Williams v. Bagley*, 380 F.3d 932, 945 (6th Cir. 2004).

These allegations were considered and rejected by the state courts in postconviction.  The trial court found, based on the colloquy between the trial court and Ms. Huddle and Mr. Cahill's affidavit, that there was no evidence that Ms. Huddle was prejudiced by the incident and no evidence of misconduct by her or any other juror.  (J.A. Vol. III, Part F, at 530).  The trial court further found, regarding petitioner's attempt to use Mr. Cahill's affidavit to "recast the facts," that the affidavit did not establish an issue of bias with respect to Ms. Huddle or Mr. Cahill, and that the inferences petitioner sought to draw from the affidavit of widespread affect on the other jurors were implausible.  (*Id*. at 530-31).  The trial court was satisfied from the questioning of Ms. Huddle that there was no risk of extraneous influence on her because she stated that she did not believe that the incident was related to petitioner's trial and that it would not affect her ability to continue serving as a juror in petitioner's case.  (*Id*. at 530).

In its *Opinion and Order* of September 27, 2004, doc.no. 27, this Court concluded, on the basis of Juror Cahill's affidavit, that petitioner's claim was properly before the Court for a review on the merits because there was no evidence on the trial record indicating that Ms. Huddle related to the other jurors the incident about her garage door being open or the "bizarre phone calls" she had received, or that Ms. Huddle was upset about these matters.  (Doc.No. 27,

42

at 59-60).  As the Court explained in connection with petitioner's claim of trial counsel

ineffectiveness relating to this incident:

> If anything, the trial record reflects that Ms. Huddle was not concerned or worried
> about the incidents with her garage door, when that may not actually have been
> the case.   The impression Ms. Huddle conveyed on the record was that she did
> not think the incidents involving her garage door were connected to petitioner's
> trial, that she did not feel the incidents would undermine her capacity as a juror,
> and that she only related them to the court as a precaution.   Further, Ms. Huddle
> failed altogether to mention during the colloquy the "bizarre phone calls" that she
> later related to her fellow jurors in addition to the incidents about her garage door.

(Doc.No. 27, at 56).

Upon careful review and out of an abundance of caution, the Court is satisfied that

petitioner has demonstrated good cause to conduct limited discovery on this claim.  The Court

has already determined that petitioner is entitled to conduct discovery on his claim of trial

counsel ineffectiveness regarding this incident as to his requests to depose his trial attorneys, Ms.

Huddle, and Mr. Cahill.    Specifically, as to depositions of Ms. Huddle and Mr. Cahill, the Court

determined that petitioner had made specific, credible allegations justifying further examination

of both Juror Huddle and Juror Cahill regarding the possibility that extraneous influences

affected Ms. Huddle and/or the other jurors.   The trial record conveys the impression that Ms.

Huddle did not believe that the incident involving her garage door was related to petitioner's

trial, that Ms. Huddle was not concerned about the incident and only reported it to the trial court

out of an abundance of caution, and that Ms. Huddle's ability to continue serving as a fair and

impartial juror would not be impacted.  Juror Cahill's affidavit conveys quite a somewhat

different impression – namely, that Ms. Huddle might have perceived a connection between the

incident involving her garage door and "bizarre" phone calls she had received – phone calls she

neglected to report to the trial court – and that Ms. Huddle was so upset about the incidents that

she had to be driven home that evening by someone else.  Further, Mr. Cahill's affidavit merely scratches the surface regarding the information that Ms. Huddle conveyed to her fellow jurors, the impact that the incidents appeared to have on her, and what, if any, impact her revelations may have had on Mr. Cahill or any of the other jurors.  Mr. Cahill's affidavit in this regard consisted of a single paragraph averring that:

> 3)    Prior to the mitigation phase, Juror Maureen Huddle informed the remaining jurors as to the bizarre phone calls that she received at her home and as to the incident that occurred near her home the night prior to the trial phase deliberations.  Juror Huddle came in crying after these incidents and was taken home by someone one evening due to her fear.

(J.A. Vol. III, Part A, at 128).

For these reasons, the Court is satisfied that petitioner has alleged facts which, if more fully developed through certain discovery he seeks, could entitle him to relief on at least his second claim for relief.  Any evidence suggesting that even one juror might have been influenced in their sentencing determination by anything other than the evidence establishing the aggravating circumstances and mitigating factors should be explored.  Petitioner has alleged specific, credible allegations suggesting at least enough to warrant further investigation in this regard.  If Ms. Huddle or any other juror was influenced in the determination of petitioner's sentence by the incident involving her garage door and/or the "bizarre" phone calls she discussed with other jurors, then petitioner might be entitled to relief on this claim.  The trial court's on-the-record colloquy with Ms. Huddle establishing that Ms. Huddle was not at all concerned about the incident appears to conflict with Mr. Cahill's affidavit suggesting that she might have drawn a connection between the incident and petitioner's trial, between "bizarre" phone calls she received and petitioner's trial, and that she might have been so upset about the incident as to

44

have cried about it and requested that another juror drive her home one night.  Thus, the Court is

persuaded that certain discovery sought by petitioner could shed light on these allegations.

Specifically, petitioner is entitled to depose Juror Maureen Huddle and Juror James Cahill.

Petitioner has not demonstrated, and the Court is not otherwise persuaded, that the other records

sought by petitioner, or depositions of his co-defendants Malaika Williamson, Michael Patterson,

or Derrick Boone, would shed any light on this claim or lead to any evidence that would

materially advance the claim.  Further, the Court is not persuaded, at this point, that it is

necessary to depose any jurors besides Ms. Huddle and Mr. Cahill.  That is not to say, however,

that the need might not arise following the depositions of Ms. Huddle and Mr. Cahill.

C.

Petitioner seeks to conduct discovery on his sixth claim for relief, *i.e.*, that he was

deprived of his rights to a fair trial and due process when the state caused a witness to refuse to

testify.  Specifically, petitioner argues that co-defendant Michael Patterson, after agreeing to

plead guilty to involuntary manslaughter and aggravated robbery, sent a letter to petitioner

expressing a willingness "to tell the truth about what happened."  Petitioner's trial attorneys

apparently showed the letter to prosecutors and contacted Mr. Patterson's attorney.

Subsequently, during a meeting, Mr. Patterson indicated to petitioner's attorneys that he was no

longer willing to testify for fear of losing his plea agreement and that, if called to testify, he

would exercise his Fifth Amendment rights.  Consequently, defense counsel elected not to call

Mr. Patterson at all and, according to petitioner, counsel's inability to call Mr. Patterson was a

direct result of the state's coercision of Mr. Patterson not to testify on petitioner's behalf.

45

Petitioner argues that, prior to the meeting during which Mr. Patterson indicated to defense counsel that he was not willing to testify at petitioner's trial, a meeting occurred between Patterson, his attorney, the prosecutors, and a detective during which the prosecutor informed Mr. Patterson that he was not living up to his obligations under his plea agreement.  (Petitioner's Motion for Discovery, doc.no. 30, at 6, citing Tr. Vol. X, at 99).  According to petitioner, the prosecutors then informed Mr. Patterson's attorney that they were of the view that he had violated his plea agreement and that they had grounds to seek to have his plea agreement set aside.  It was after this meeting, petitioner argues, that Mr. Patterson reneged on his offer to testify at petitioner's trial about what had happened.

In order to determine whether petitioner is entitled to conduct discovery on this claim, the Court initially must identify the essential elements of this claim.  *See Bracy*, 520 U.S. at 904. "Prosecutorial actions which are aimed at discouraging defense witnesses from testifying on a defendant's behalf deprive a defendant of his right to due process."  *Johnson v. Renico*, 314 F.Supp.2d 700, 709 (E.D. Mich. 2004).  To prove a claim that he was denied due process and a fair trial by prosecutorial intimidation of a defense witness, the defendant must establish that the prosecutor's actions "worked to deprive him of a witness who would have testified on his behalf."  *Wynne v. Renico*, 279 F.Supp.2d 866, 888 (E.D. Mich. 2003), quoting *United States v. Stewart*, 820 F.2d 370, 375 (11th Cir. 1987).

This claim of alleged prosecutorial misconduct was considered and rejected by the Ohio Supreme Court on direct appeal.  The Ohio Supreme Court concluded that:

> The record does not support the contention that the state coerced or threatened Patterson into not testifying for the defense.  In fact, defense counsel advised the trial court that, for tactical reasons, it did not intend to call Patterson as a witness because Patterson said that he would invoke the Fifth Amendment.

46

> When alerted that there was "a potential problem," the prosecutor met with Patterson and Patterson refused to discuss the case. The prosecutor informed Patterson that his lack of cooperation could lead to the revocation of the plea agreement. There is no indication that the state threatened or prevented Patterson from testifying, as appellant asserts. In this case, the prosecutor simply reiterated the terms of Patterson's plea agreement and did not commit prosecutorial misconduct or deprive appellant of a fair trial by his actions.

*State v. Jackson, supra*, 92 Ohio St. 3d at 443; J.A. Vol. II, Part B, at 100.

This Court cannot find that petitioner is entitled to conduct discovery on this claim because petitioner has failed to allege any facts which, if more fully developed through the discovery he seeks, would entitle him to relief on his claim that the prosecutors improperly coerced Mr. Patterson into not testifying for the defense. Regarding petitioner's claim that his rights to due process and a fair trial were violated, the record contains multiple indications that the prosecution did nothing beyond merely reminding Mr. Patterson about the terms and conditions of his plea agreement and suggesting to him that his refusal to cooperate with the state might provide grounds for setting aside his plea agreement. This matter was discussed on the record out of the presence of the jury. (Tr. Vol. X, at 95- 104). Mr. Stead, on behalf of the state, confirmed that he had met with Mr. Patterson, along with Ms. Kurilchik and Detective Winters, in an effort to remind Mr. Patterson that his plea agreement required his cooperation and truthful testimony. (*Id*. at 98-99). At the meeting, according to Mr. Stead, Mr. Patterson refused to discuss with them anything about the events of the morning of March 25, 1997, at which point Mr. Stead informed Mr. Patterson that he felt Patterson was not cooperating with him and that he (Patterson) needed to talk to his lawyer. (*Id*. at 99). After Mr. Patterson consulted with his lawyer, Mr. Kentner, Mr. Stead told Mr. Kentner that it was the state's position that Mr. Patterson was not living up to his obligations under the plea agreement and that the state felt it

47

had a basis for setting aside the plea agreement.  (*Id*. at 99-100).  Mr. Stead clarified that the state had not decided for certain that it would seek to set aside the plea agreement, only that the state believed it had grounds to do so.  Mr. Kentner confirmed Mr. Stead's account.  (*Id*. at 100). Defense counsel indicated that after meeting with Mr. Patterson and conferring extensively, they had decided not to call Mr. Patterson because he would probably just take the Fifth Amendment, because they could not be sure what he might say, and because he was on the record with the prosecution with a story implicating petitioner in the crimes.

Thus, the prosecution was on the record as stating they had merely informed Mr. Patterson and his attorney that Mr. Patterson was required to cooperate and to tell the truth, and that under the terms and conditions of his plea agreement, his refusal to cooperate with them might provide a basis for having that plea agreement set aside.  Nothing from the prosecution's statements on the record permits a reasonable inference that they coerced Mr. Patterson.  Further, Mr. Patterson's attorney, Mr. Kentner, confirmed the prosecution's account, providing further record evidence against an inference that the state had coerced Mr. Patterson.  Finally, defense counsel, after their consultation with Mr. Patterson and extensive deliberation as to whether to call him, never stated or even suggested on the record a belief on their part that the state had coerced Mr. Patterson into not testifying for petitioner.

In contrast, neither the record nor petitioner's unsupported assertions support a reasonable inference that the prosecutor coerced Mr. Patterson into not testifying.  Petitioner is only speculating in this regard and speculation is insufficient to satisfy the "good cause" standard for conducting discovery in habeas corpus.  Thus, the Court cannot find that petitioner has alleged facts which, if more fully developed through certain discovery he seeks, would

48

entitle him to relief on  this claim.  Petitioner is not entitled to conduct discovery on his sixth claim for relief.

## II.  Motion for an Evidentiary Hearing

Petitioner has also filed a motion for an evidentiary hearing, (doc.no. 31).  Because the Court has determined that petitioner is entitled to conduct limited discovery on some of his claims, his motion for an evidentiary hearing will be denied without prejudice, subject to renewal after completion of the limited discovery granted by the Court.

## III.  Conclusion

For the foregoing reasons, the Court concludes that petitioner has satisfied the good cause standard set forth in Habeas Corpus Rule 6 to conduct the following discovery:

1.   In connection with sub-part C of his first claim for relief (trial phase), petitioner is entitled to depose his trial attorneys, Donald Schumacher and Brian Rigg.

2.   In connection with sub-part F of his first claim for relief (trial phase), petitioner is entitled to depose his trial attorneys.

3.   In connection with sub-parts G and H of his first claim for relief (trial phase), petitioner is entitled, with respect to just those allegations regarding William Woods, to depose his trial attorneys.

4.   In connection with sub-part A of his first claim for relief (mitigation phase), petitioner is entitled to depose his trial attorneys, juror Maureen Huddle, and juror James Cahill.

5.   In connection with sub-parts C and F of his first claim for relief (mitigation phase), petitioner is entitled to depose his trial attorneys.

6.   In connection with his second and third claims for relief, petitioner is entitled to depose jurors Maureen Huddle and James Cahill.

Although the Court concludes that this discovery is warranted, the Court will not permit prolonged, unlimited discovery.  Since the discovery requests granted by this Court will consist

49

of only the gathering of records and a few depositions, petitioner is granted three (3) months from the date of this Order to conduct the discovery set forth in this order.

Within thirty (30) days of the completion of discovery, petitioner shall file any motion to supplement the record and/or any renewed motion for an evidentiary hearing.  Respondent shall have twenty (20) days from the date of petitioner's motion(s) to file a memorandum in response. Petitioner shall have fifteen (15) days from the date of the memorandum in response to file a reply.

For the foregoing reasons, petitioner's motion to conduct discovery, (doc.no. 30), is GRANTED in part and DENIED in part.  Petitioner's motion for an evidentiary hearing, (doc.no. 31), is DENIED without prejudice, subject to renewal upon completion of discovery.

**IT IS SO ORDERED.**

  **  /s/ Gregory L. Frost        **
**GREGORY L. FROST**
**United States District Judge**