IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KAREEM JACKSON,

        Petitioner,

      v.                              **Case No. 2:03-cv-983**
                                           **JUDGE GREGORY L. FROST**

MARGARET BRADSHAW, Warden,       **Magistrate Judge Terence P. Kemp**

        Respondent.

<u>OPINION AND ORDER</u>

    Petitioner, Kareem Jackson, a prisoner sentenced to death by the State of Ohio, has

pending before this Court a habeas corpus action under 28 U.S.C. §2254. Petitioner filed his

original habeas petition on October 23, 2003 (Doc. # 9) and an amended petition on December

19, 2003 (Doc. # 18). On September 27, 2004, this Court issued an Opinion and Order granting

in part and denying in part Respondent's motion to dismiss procedurally defaulted claims. (Doc.

# 27.) Specifically, this Court dismissed as procedurally defaulted grounds 1 (trial phase, sub-

part E), 5 (¶¶ 100-105), 10, 11, 12, and 13. Additionally, the Court dismissed as plainly without

merit ground 1 (trial phase, sub-part G, ¶ 28). The Court permitted limited factual development,

issuing a May 10, 2005 decision allowing Petitioner to depose his trial attorneys, Donald

Schumacher and Brian Rigg, as well as two jurors, Maureen Huddle and James Cahill.

However, on August 25, 2005, Petitioner's counsel filed a notice indicating that, after contacting

those witnesses, counsel learned that none of them had any new information to offer. With

express consent from Petitioner, counsel waived their right to conduct discovery and asked the

Court to rule on the merits of Petitioner's claims based solely on the pleadings and record that

had been filed.

This case is now ripe for a final decision on the merits of those claims that are properly before the Court:  grounds 1 (except trial phase sub-part E and sub-part G ¶ 28), 1 (mitigation phase), 2, 3, 4, 5 (except ¶¶ 100-105), 6, 7, 8, 9, 14, 15, 16, 17, and 18.

## I.  Factual and Procedural History

The facts and procedural history of this case were set forth by the Supreme Court of Ohio in *State v. Jackson*, 92 Ohio St. 3d 436 (2001):

> The evidence at trial revealed that on the evening of March 24, 1997, appellant and four other individuals decided to rob an apartment in Columbus, Ohio.  Appellant and a man called "Little Bee" devised the plan, which called for both men to enter the apartment and purchase drugs.  The men would then be joined by two others, Michael Patterson and Derrick Boone, who would enter the apartment armed with guns.  Malaika Williamson was put in charge of driving the men to and from the robbery.

> Just past midnight, on March 25, 1997, Malaika Williamson drove the men to the Lupo Court apartment.  The victims, Antorio Hunter and Terrance Walker, were inside the apartment with their friends, Nikki Long and Becky Lewis.  Long and Walker were in the back bedroom talking when appellant and Little Bee knocked at the door.  Hunter answered the door and allowed appellant and Little Bee to enter.  Walker came out of the back bedroom, recognized appellant, shook appellant's hand and said, "I haven't seen you in a long time." Appellant and Little Bee then bought some marijuana.

> Almost immediately after the purchase, Patterson and Boone burst into the apartment armed with shotguns.  The men searched the apartment for drugs and money.  Appellant struck Lewis on the head with his handgun, placed a pillow behind her head and threatened to kill her.  Lewis begged appellant not to kill her, and appellant refrained from doing so.  Appellant led Lewis into the kitchen. Patterson and Little Bee left the apartment, but appellant and Boone remained.

> According to Boone's testimony, Walker and Hunter were both lying on the floor.  Appellant ordered one of them to crawl beside the other and to lie face down on the floor so that his head was next to the other's.  While on the floor, either Hunter or Walker told appellant that he "didn't have no money or weed" and that he wouldn't call the police.  Nevertheless, appellant told Boone, "They know my name.  I have to kill them."  Appellant then grabbed a pillow, hesitated, and shot one of the men in the head.  The other, while still lying on the floor, begged for his life, saying, "Please don't kill me.  I ain't going to say nothing."

Despite his plea, appellant placed a pillow behind the second victim's head. Appellant hesitated again and then shot him in the back of the head.

Following the shootings, appellant and Boone left the apartment and joined the others in the car. Williamson drove the men back to her apartment, where they divided the proceeds from the robbery, which consisted of approximately $40 in cash, $60 worth of marijuana, and a cellular phone.

In the meantime, Long and Lewis, who had heard the gunshots but had not witnessed the shootings, waited in the kitchen until they felt it was safe to leave. They called Hunter's name, and when there was no response, they went into the living room and saw that Hunter and Walker had been shot. The two women, afraid to leave through the front door, fled through a bedroom window. They went into another apartment and called the police.

Officer Andrew Shuster of the Clinton Township Police Department responded to a dispatcher's call at about 12:42 a.m. Upon arriving at the Lupo Court apartments, the officer found the door to the apartment ajar and discovered the bodies of Hunter and Walker lying face down on the floor just inside the doorway. A cushion with bullet holes was found next to the victims.

Later that morning, an agent from the Bureau of Criminal Identification and Investigation met with Long, who provided him with enough information to make a composite portrait of Boone using a face kit. Police distributed the sketch of Boone to the sheriff's department and to the media. Soon after the release of the composite, Boone turned himself in to the Franklin County Sheriff's Department.

Boone cooperated with the police and gave them a statement implicating appellant and the others involved in the shootings. As a result, the police presented Lewis with a photo array lineup, which included a photo of appellant. Lewis positively identified appellant from the photo array lineup as the "guy with the little gun," the person who hit her over the head with the gun during the robbery and threatened to kill her.

Police then collected physical evidence relating to the shootings. Police retrieved a handgun from Williamson's apartment, which was tested and found to have fired the bullets retrieved from Antorio Hunter. The firearms expert could not conclusively state that the handgun fired the other bullet removed from Terrance Walker. However, this bullet possessed some characteristics matching appellant's handgun, and the bullet was the same caliber as his weapon. Police also searched the apartment appellant shared with his girlfriend, Ivana King, and found a shotgun in a closet and two rifles hidden beneath the molding under the kitchen sink cupboard. Police retrieved nine .38 caliber bullets from the

3

apartment.  Police also interviewed Ivana King, who said that appellant had told her that "he [had] done two people."

Deputy coroners from the Franklin County Coroner's Office performed autopsies on Hunter and Walker.  Each coroner concluded that the victims had died from gunshot wounds to the head.

Appellant was arrested on March 28, 1997, and was subsequently indicted on six counts of aggravated murder for the deaths of Hunter and Walker.  Each murder count included two death penalty specifications for multiple murder and murder during an aggravated robbery and/or kidnapping in violation of R.C. 2929.05(A)(5) and (A)(7).  Appellant was also charged with four counts of aggravated robbery, four counts of kidnapping, and one count of felonious assault.  Each of the fifteen total counts carried a firearm specification.

At trial, the trial court granted appellant's motion for acquittal on count eight, the aggravated robbery of Lewis.  However, the jury found appellant guilty as charged on the remaining counts.

At the conclusion of the penalty phase, the jury recommended that the court sentence appellant to death.  The trial court accepted this recommendation and sentenced appellant accordingly.

*Jackson*, 92 Ohio St. 3d at 436-38.

Represented by two new attorneys, Petitioner appealed to the Ohio Supreme Court and raised seventeen issues for review.  On August 15, 2001, the Ohio Supreme Court issued a decision rejecting Petitioner's propositions of law and determining after an independent review that the aggravating circumstances outweighed the mitigating factors, that the death sentence was appropriate, and that the death sentence was not disproportionate.  *State v. Jackson*, 92 Ohio St. 3d 436.  Petitioner filed a motion for reconsideration on August 22, 2001, arguing that trial counsel's failure to call Michael Patterson as a witness was not a tactical decision and that Michael Patterson had information that would have been useful to Petitioner.  On October 10, 2002, the Ohio Supreme Court issued an entry summarily denying Petitioner's motion for reconsideration without opinion.

4

Represented by new counsel from the Ohio Public Defender's Office, Petitioner filed a

November 1, 2001 application for reopening of his direct appeal pursuant to Ohio R. App. P.

26(B), the procedure in Ohio for raising claims of ineffective assistance of appellate counsel.

Petitioner raised five claims of ineffective assistance of appellate counsel, several of which

consisted of multiple sub-parts. On January 16, 2002, the Ohio Supreme Court issued an entry

summarily denying Petitioner's application for reopening without opinion.

Represented by counsel from the Ohio Public Defender's Office, Petitioner filed an April

19, 1999 postconviction action in the state trial court pursuant to Ohio Rev. Code § 2953.21.

Petitioner originally raised twenty-six grounds for relief. On May 24, 2001, Petitioner filed a

motion for leave to amend his petition to add two more grounds for relief.[1] On June 18, 2001,

the trial court issued findings of fact and conclusions of law denying Petitioner's postconviction

action. Petitioner appealed to the Ohio Court of Appeals for the Tenth Appellate District, which

on June 7, 2002 issued a decision rejecting Petitioner's assignments of error and affirming the

trial court's judgment denying Petitioner's postconviction action. Petitioner appealed to the

Supreme Court of Ohio. On October 30, 2002, the Ohio Supreme Court issued an entry

declining to accept jurisdiction to hear the appeal.

## II. Standards for Habeas Review

The provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which

became effective prior to the filing of the instant petition, apply to this case. *See Lindh v.*

*Murphy*, 521 U.S. 320, 336 (1997). Under the AEDPA, a federal court shall not issue a writ of

habeas corpus on a claim that the state courts adjudicated on the merits unless the state court

---

[1]     It does not appear that the trial court ruled on the additional assignments of error or that Petitioner
pursued them on appeal.

5

adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Section 2254(d)(1) circumscribes a federal court's review of claimed legal errors, while § 2254(d)(2) places restrictions on a federal court's review of claimed factual errors.

Under § 2254(d)(1), a state court decision is "contrary to" Supreme Court precedent "when the state court confronts facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent[]" or "when the state court 'applies a rule that contradicts the governing law set forth in' Supreme Court cases." *Williams v. Coyle*, 260 F.3d 684, 699 (6th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406-07 (2000)). A state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of the Petitioner's case. *Coyle*, 260 F.3d at 699. A federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Id*. Rather, a state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

Further, § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state court adjudication

of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In this regard, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that a Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.

### III. Petitioner's Claims

This case is now ripe for a final decision on the merits of those claims that are properly before the Court: grounds 1 (except trial phase sub-part E and sub-part G ¶ 28), 1 (mitigation phase), 2, 3, 4, 5 (except ¶¶ 100-105), 6, 7, 8, 9, 14, 15, 16, 17, and 18.

> **First Ground for Relief**: Mr. Jackson was denied the right to the effective assistance of counsel at the culpability and penalty phases of his capital trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

In his first ground for relief, Petitioner raises numerous claims of ineffective assistance of counsel. He argues that his attorneys, through their acts or omissions, performed unreasonably and to Petitioner's prejudice. In Part I, Petitioner sets forth claims of ineffective assistance stemming from the trial phase of his case. In Part II, Petitioner presents claims of ineffective assistance stemming from the mitigation phase of his case.

### Part I: Trial Phase Ineffectiveness

> **A.** **Defense counsel abrogated their duty to zealously represent Mr. Jackson when they failed to call Michael Patterson as a witness.**

In Part I of his first ground for relief, Petitioner submits in sub-part (A) that his defense counsel abrogated their duty to zealously represent Mr. Jackson when they failed to call Michael Patterson as a witness. (Amended Petition, Doc. # 18, at ¶¶ 2-8.) Mr. Patterson participated in

7

the planning and robberies of the victims and, as a result, was charged with involuntary manslaughter and aggravated robbery.  He entered into a plea agreement that, among other things, required him to testify truthfully if called by the State, and ultimately he received a fifteen-year prison sentence.  At some point prior to or during Petitioner's trial, defense counsel learned that Mr. Patterson purportedly had sent a letter to Petitioner offering "to tell the truth" about what had happened during the incident.  (J.A. Vol. II, D.A., OSC, Part B, at 121.) Petitioner's defense counsel provided the prosecutors with a copy of the letter and contacted Mr. Patterson's attorney for the purpose of setting up a meeting with Mr. Patterson.  When defense counsel met with Mr. Patterson, Mr. Patterson indicated that he no longer was willing to speak to them because he understood that he was in jeopardy of losing his plea agreement and that he intended, on his counsel's advice, to invoke his Fifth Amendment privilege against self-incrimination if called to testify at Petitioner's trial.  He also apparently failed to authenticate the letter.  Subsequently, over Petitioner's objection, defense counsel declined to call Mr. Patterson as a witness or to attempt to introduce the letter into evidence.  (Tr.Vol. X, at 103-104.)

Petitioner argues that his attorneys performed unreasonably because they had no obligation or strategic reason for informing the prosecutors about Mr. Patterson's letter and that by doing so, they gave the prosecutors an opportunity to pressure Mr. Patterson into backing out of his offer to assist Petitioner. Petitioner further argues that counsel had no strategic reason for declining to call Mr. Patterson to the stand so that, at the very least, the trial court could determine whether Mr. Patterson even was entitled to invoke his Fifth Amendment privilege against self-incrimination.  Petitioner argues that Mr. Patterson's guilty plea effectively operated as a waiver of his Fifth Amendment privilege regarding these offenses and that there was no

indication from his letter that he was being compelled to incriminate himself or intended to testify as to anything other than Petitioner's involvement in the offense. Petitioner argues that counsel's deficient performance was prejudicial because it deprived Petitioner of the opportunity to present a favorable witness.

Petitioner raised this allegation of ineffective assistance of counsel on direct appeal to the Ohio Supreme Court.[2] (J.A. Vol. II, D.A., OSC, Part A, at 146-48.) Citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the Ohio Supreme Court prefaced its discussion of all of Petitioner's claims of trial counsel ineffectiveness by stating that "[r]eversal of a conviction based upon ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Jackson*, 92 Ohio St. 3d at 445-6. The Ohio Supreme Court went on to reject Petitioner's claim challenging his trial counsel's refusal to call Michael Patterson, holding that Petitioner had not established either deficient performance or prejudice. Citing *Hoffman v. United States*, 341 U.S. 479, 486-87 (1951), the Ohio Supreme Court recognized that when a witness asserts the privilege against self-incrimination, it is for the trial court to determine whether the witness's refusal to answer is justified. *Jackson*, 92 Ohio St. 3d at 447. Although that did not happen in this case, due to counsel's decision not to call Mr. Patterson, the Ohio Supreme Court explained that "counsel's decision in not calling Mr. Patterson as a defense witness could well have been a tactical decision and therefore cannot be

---

[2] Petitioner also raised this claim of ineffective assistance in a motion for reconsideration of the Ohio Supreme Court's decision rejecting his direct appeal. But the Ohio Supreme Court summarily denied his motion without opinion. Petitioner also attempted to raise this claim of ineffective assistance of counsel in a May 24, 2001 motion to amend his postconviction action. It does not appear, however, that the trial court addressed the claim in its June 18, 2001 decision or that Petitioner pursued the issue on appeal.

considered as rising to the level of ineffective assistance of counsel." *Jackson*, 92 Ohio St. 3d at 447. "Furthermore," the Ohio Supreme Court explained, "[Jackson] has not proven that but for his counsel's actions, the result of the case would have been different." *Id.* Specifically, the Ohio Supreme Court concluded, Petitioner made no showing that Mr. Patterson's testimony would have aided Petitioner in his defense. *Id.*

Petitioner argues herein that he is entitled to relief under 28 U.S.C. § 2254(d)(2) because the Ohio Supreme Court's decision involved an unreasonable determination of the facts and law in light of the evidence presented in state court. (Traverse, Doc. # 42, at 16.) Petitioner further argues that he is entitled relief because, although *Strickland* holds that a Petitioner is prejudiced if counsel's deficient performance undermines confidence in the outcome of his trial, the Ohio Supreme Court in this case incorrectly employed an outcome-determinative test for examining whether prejudice existed. (*Id.*)

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard for demonstrating a claim of ineffective assistance of counsel is composed of two parts:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. Scrutiny of defense counsel's performance must be "highly deferential." *Id.* at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's

10

conduct falls within the wide range of reasonable professional assistance." *Id.* To establish the second prong of the *Strickland* test, prejudice, a Petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that Petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

For the reasons that follow, the Court is not persuaded either that counsel performed deficiently or that, but for counsel's performance, there is a reasonable probability that the outcome of Petitioner's trial would have been different. Further, the Court is not persuaded that the Ohio Supreme Court's decision rejecting Petitioner's claim involved either an unreasonable application of clearly established Supreme Court precedent or an unreasonable determination of the facts.

To demonstrate deficient performance sufficient to satisfy the first prong of the *Strickland* standard, Petitioner must show that counsel's performance "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). The decision of which witnesses to call and what evidence to present generally is reserved for counsel's discretion and judgment. *See, e.g., United States v. Foreman*, 323 F.3d 498, 504 (6th Cir. 2003). Regarding the deference that a reviewing court owes to counsel's discretion and judgment, the Supreme Court has instructed that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable

11

precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690; *Wiggins*, 539 U.S. at 521.

In rejecting Petitioner's claim that his trial attorneys were ineffective for not calling Michael Patterson to the stand, the Ohio Supreme Court observed that "counsel's decision in not calling Patterson as a defense witness could well have been a tactical decision and therefore cannot be considered as rising to the level of ineffective assistance of counsel." *Jackson*, 92 Ohio St. 3d at 447. This Court cannot disagree with that assessment, much less find it unreasonable. If anything, this Court is of the view that counsel's decision not to call Mr. Patterson unequivocally was a tactical decision.

Unlike ineffective assistance claims in many cases, where the determination of what was or was not a tactical decision is largely a matter of speculation, the record as to this ineffective assistance claim is relatively well developed on the issue of counsel's reasons for not calling Michael Patterson as a defense witness. A few weeks into Petitioner's trial, just before the defense called its final witness during its case-in-chief, Petitioner's trial attorneys placed on the record facts concerning Petitioner's receipt of a letter purporting to be from co-defendant Michael Patterson and defense counsel's reasons, ultimately, for declining to call Mr. Patterson as a defense witness. Defense counsel Mr. Schumacher explained that Petitioner had, at some point during the pendency of his trial, received and shown to counsel a letter from Mr. Patterson indicating his willingness "to tell the truth" about what had happened. This version of the events was contrary to what he had told the State to obtain his plea agreement. (Tr.Vol. X, at 95-96.) The letter was marked as defendant's exhibit A, not to be shown to the jury, but for purposes of appellate review. (*Id.* at 96.) Recognizing that the letter could be beneficial to Petitioner's case,

according to Mr. Schumacher, defense counsel provided the letter to the prosecutors in compliance with discovery and then contacted Mr. Patterson's attorney, David Kentner, in order to set up a meeting.  Mr. Kentner, in turn, spoke to Mr. Patterson and then relayed to Petitioner's defense attorneys that Mr. Patterson was amenable to meeting them.  When Mr. Schumacher, co-counsel Mr. Rigg, and Mr. Kentner went to talk to Mr. Patterson at the county jail where, apparently, Mr. Patterson had been transported due to the prosecution's intention to call him to testify against Petitioner (Tr.Vol. X, at 99), Mr. Patterson indicated that he no longer wished to discuss the case with Petitioner's defense attorneys because he understood that he was in jeopardy of losing his plea agreement.  Mr. Patterson refused to say anything to authenticate the letter or its contents, and declined to discuss what he would say in court beyond invoking his Fifth Amendment privilege against self-incrimination.  (*Id*. at 97.)

To this, prosecuting attorney Mr. Stead added that Michael Patterson had a plea agreement that required him to cooperate and provide truthful testimony if the State needed him. According to Mr. Stead, the prosecution had already brought Mr. Patterson from the Lebanon Correctional Institute to the Franklin County jail so the prosecution could call him to testify at Petitioner's trial when Mr. Stead learned "there was a potential problem" regarding Mr. Patterson's testimony.  (*Id*. at 99.)  Mr. Stead, accompanied by co-counsel Ms. Kurilchick and Detective Larry Winters, met with Mr. Patterson, at which point Mr. Patterson refused to discuss the case.  Mr. Stead stated that he informed Mr. Patterson that he (Stead) was of the view that Mr. Patterson was not living up to his plea agreement and that Mr. Patterson should talk to his lawyer.  Mr. Stead stated that he, too, spoke to Mr. Patterson's lawyer, Mr. Kentner, to inform him that the prosecution was of the view that Mr. Patterson was not living up to his end of the

bargain and that the prosecution had a basis for seeking to have the plea agreement set aside.

Mr. Stead stated to Mr. Kentner that the prosecution had not decided for certain whether it

would, in fact, seek to have Mr. Patterson's plea agreement set aside.  (*Id*. at 99-100.)  Mr.

Kentner substantiated the representations by Mr. Schumacher and Mr. Stead.  (*Id*. at 98, 100.)

Mr. Schumacher then explained, on the record, defense counsel's reasons for declining to

call Mr. Patterson as a defense witness over their client's objection.  First, according to Mr.

Schumacher, defense counsel were of the view that it would be unethical to call Mr. Patterson to

the stand solely for the purpose of having the jury hear him invoke his privilege against self-

incrimination.  (*Id*. at 100-101.)  Beyond that, Mr. Schumacher continued, defense counsel

decided "as a tactical reason" not to call to the stand a witness who was on record with the

prosecution with a statement that involved Petitioner in the crime.[3]  (*Id*. at 101.)   Mr.

Schumacher emphasized that defense counsel would have considered calling Mr. Patterson if

they had had any inkling that he might say something contrary his previous statement to

authorities, but that with "absolutely no idea what" Mr. Patterson would say, defense counsel

would have been "foolhardy" to have called Mr. Patterson.  (*Id*. at 101-102.)  Co-counsel Mr.

Rigg emphasized that Mr. Patterson would not tell defense counsel what he would say if called

to the stand and that Mr. Rigg was reluctant to call a witness without knowing what that witness

would say, "especially since he had said damaging things against Mr. Jackson before."  (*Id*. at

103.)  Finally, at the trial court's invitation, Petitioner Jackson stated on the record that he did

not understand why his attorneys could not put the letter into evidence, to which Mr.

Schumacher responded that defense counsel were of the view that the Rules of Evidence

---

[3]      Patterson's statement was marked as defendant's exhibit B, not to be shown to the jury, but for purposes of appellate review.  (Tr.Vol. X, at 101.)  That statement is not part of the record before this Court.

14

precluded admission of the letter, not only because it had not been authenticated but also because of hearsay rules. (*Id*. at 103-104.)

In arguing that his attorneys performed deficiently, Petitioner asserts that Mr. Patterson's announced intention to invoke his Fifth Amendment privilege against self-incrimination did not justify counsel's decision not to call him as a defense witness and that counsel violated their duty to represent zealously Petitioner when they provided Mr. Patterson's letter to the prosecutor, thereby giving the prosecution an opportunity to coerce Mr. Patterson into backing out of his offer to testify for Petitioner. Both arguments miss the mark. First, contrary to Petitioner's assertion, Mr. Patterson's announced intention to invoke his privilege against self-incrimination was <u>not</u> the sole, or even primary, reason that trial counsel declined to call him as a defense witness. As detailed above, Petitioner's trial attorneys provided several tactical reasons why, beyond Mr. Patterson's intention to invoke his privilege against self-incrimination, they did not wish to call Mr. Patterson as a defense witness. Notwithstanding Mr. Patterson's purported letter to Petitioner stating his willingness to "tell the truth" (J.A. Vol. II, D.A., OSC, Part B, at 121), Mr. Patterson refused to discuss with Petitioner's trial attorneys not only the events of March 24-25, 1997, but also what he would say if called as a defense witness. Counsel had no idea what Mr. Patterson would say if called as a defense witness, but of the three possible scenarios, the one that might have been beneficial to Petitioner was the least probable. Not knowing whether Mr. Patterson would "take the Fifth" and say absolutely nothing, testify consistent with his purported letter and contrary to his statement to authorities, or testify consistent with his statement to authorities and plea agreement, counsel chose not to take the risk. (Tr.Vol. X, at 102-03.) At best, given the substantial unlikelihood that Mr. Patterson would have jeopardized

15

his favorable plea agreement by testifying consistent with his purported letter and contrary to the statement he had given authorities (a statement that presumably implicated Petitioner as the shooter), Mr. Patterson could have invoked his privilege against self-incrimination, thereby providing nothing of value to Petitioner's case.  At worst, he could have testified consistent with his plea agreement and statement to authorities, providing additional, damaging evidence against Petitioner.  This Court is of the view that counsel were reasonable in deciding not to risk putting Mr. Patterson on the stand.

Petitioner focuses much of his argument here, as he did in the state courts, on the premise that counsel were obligated to call Mr. Patterson as a defense witness so that, at the very least, the trial court could determine whether he was entitled to refuse to answer questions on the basis of his privilege against self-incrimination.  *See Hoffman v. United States*, 341 U.S. 479, 486-87 (1951) ("The witness is not exonerated from answering merely because he declares that in doing so he would incriminate himself–his say so does not itself establish the hazard of incrimination.").  Petitioner reasons that because Mr. Patterson had pleaded guilty to involuntary manslaughter and because Mr. Patterson gave no indication in his letter that he was being compelled to be a witness against himself, Mr. Patterson was not entitled to invoke his privilege against self-incrimination and could not have refused to answer questions about the level of Petitioner's involvement in the offenses.  (Traverse, Doc. # 42, at 15-16.)  Even if trial counsel were mistaken in their belief that they could not ethically call a witness to the stand solely for the purpose of that witness "taking the Fifth," as Petitioner suggests and contrary to what *Hoffman* seems to say about the fact that it is for the trial court to say whether a witness may invoke the Fifth Amendment privilege, the fact remains that, as discussed above, Petitioner's trial counsel

16

voiced other, more substantial tactical reasons for not calling Mr. Patterson as a defense witness and those reasons justify their decision.

Regarding Petitioner's argument that defense counsel had no obligation to disclose Mr. Patterson's letter to the prosecution and that doing so gave the prosecution an opportunity to coerce Mr. Patterson into not testifying, that argument fails because it finds no support in the record. The Ohio Supreme Court, in rejecting a related claim by Petitioner of prosecutorial misconduct, found no evidence in the record that the prosecution had unduly coerced Mr. Patterson not to testify on Petitioner's behalf. (J.A. Vol. II, D.A., OSC, Part B, at 100.) Petitioner asserts that the Supreme Court's finding, which it referenced in rejecting Petitioner's claim that his trial attorneys were unreasonably deficient for providing Mr. Patterson's letter to the prosecution, constitutes an unreasonable determination of the facts in light of the evidence presented in the state courts. (Traverse, Doc. # 42, at 16.) But Petitioner offers nothing beyond pure speculation to cast doubt on that finding, much less the "clear and convincing evidence" necessary to rebut the presumption of correctness to which state court findings are entitled in habeas corpus. 28 U.S.C. §§ 2254(d)(2) and (e)(1).

Regardless of whether defense counsel had a duty under state discovery rules to provide Mr. Patterson's letter to the prosecution, Petitioner's argument that their doing so gave the prosecution an opportunity to coerce Mr. Patterson into backing out of his offer to help Petitioner rings hollow. Petitioner's argument suggests that defense counsel's decision to provide Mr. Patterson's letter to the prosecution alerted the prosecution to meet with Mr. Patterson before defense counsel had a chance to meet him for the purpose of coercing him into backing out of his offer to testify for Petitioner. The record, however, indicates that the prosecution would have

talked to Mr. Patterson regardless of whether they had been informed about his letter to

Petitioner.  The prosecution had brought Mr. Patterson from the correctional facility where he

was incarcerated to the county jail for the purpose of calling him to testify against Petitioner,

consistent with his plea agreement wherein he had promised to cooperate with the State and

provide testimony in any trial in which the State called him.  (Tr.Vol. X, at 99.)  When lead

prosecutor Mr. Stead learned that "there was a potential problem,"–when he learned of Mr.

Patterson's letter to Petitioner–Mr. Stead met with Mr. Patterson, who refused to discuss the case

at all.  (*Id*.)  It was at that point that Mr. Stead advised Mr. Patterson that his refusal to cooperate

could result in the revocation of his plea agreement.  (*Id*. at 99-100.)

The Ohio Supreme Court thus found no indication that the prosecution had threatened or

prevented Mr. Patterson from testifying as a defense witness and found that the prosecution had

merely reiterated the terms of Mr. Patterson's plea agreement.  Petitioner has not shown, and this

Court is not otherwise persuaded after its own review of the record, that the Ohio Supreme

Court's determination of the facts was unreasonable in light of the evidence presented.

Even assuming that Petitioner's trial counsel had performed deficiently with respect to

the manner in which they handled Mr. Patterson's letter to Petitioner or their decision not to call

Mr. Patterson as a defense witness–a notion that this Court absolutely rejects–the fact remains

that Petitioner fails entirely to demonstrate that he was prejudiced by counsel's allegedly

deficient performance.  Petitioner has not shown that there is a reasonable probability that, but

for counsel's errors, the result of the proceedings would have been different.  *Strickland*, 466

U.S. at 694.  If demonstrating prejudice under *Strickland* requires a showing that counsel "was

so *manifestly* ineffective that defeat was snatched from the hands of probable victory," *United*

*States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc) (emphasis in original), Petitioner falls considerably short.  The Ohio Supreme Court concluded with respect to the prejudice prong of *Strickland* that "there was no showing that the testimony of Patterson would have aided [Jackson] in his defense."  *Jackson*, 92 Ohio St. 3d at 447.  This Court agrees.

In his purported letter to Petitioner, Mr. Patterson stated, among other things, that "I got to tell the truth," and "I got to tell them that Boone did it."  (J.A. Vol. II, D.A., OSC, Part B, at 121.)  Mr. Patterson's letter was never authenticated, and Petitioner has never offered a shred of evidence beyond that letter, such as an affidavit or postconviction testimony, to demonstrate what Mr. Patterson might have testified to or substantiate the cryptic reference in the letter "that Boone did it."  That being so, this Court cannot find unreasonable the Ohio Supreme Court's conclusion that Petitioner failed to show that Mr. Patterson's testimony would have been favorable to his defense.

Petitioner argues that the Ohio Supreme Court erred in its application of *Strickland*'s prejudice standard by employing a more stringent "outcome determinative" test.  (Doc. # 42, at 16.)  Petitioner's argument is unpersuasive.  This Court is of the view that, in holding that "[Jackson] has not proven that but for his counsel's actions, the result of the case would have been different" *Jackson*, 92 Ohio St. 3d at 447, the Ohio Supreme Court was simply making an abbreviated reference to *Strickland*'s prejudice standard by omitting the "reasonable probability" modifier, not requiring a more stringent "outcome determinative" showing.  Such "shorthand reference[s]" to *Strickland*'s prejudice standard do not result in a decision that contravenes or unreasonably applies clearly established Supreme Court precedent, especially where, as here, the state court prefaced its discussion of all of Petitioner's ineffective assistance claims by citing

19

*Strickland* and correctly stating the prejudice standard as set forth in *Strickland*.  *Urban v. Ohio Adult Parole Authority*, 116 F. App'x 617, 627 (6th Cir. 2004) (citing *Woodford v. Visciotti*, 537 U.S. 19, 23-24 (2002) (*per curiam*), and *Holland v. Jackson*, 542 U.S. 649 (2004) (*per curiam*)).

It is true that failure to investigate or call a particular witness can constitute ineffective assistance in violation of the Sixth Amendment.  *See, e.g., Clinkscale v. Carter*, 375 F.3d 430, 443 (6th Cir. 2004) (collecting cases).  But cases in which courts have found ineffective assistance under those circumstances involved not only a complete failure on the part of counsel to investigate the witness or even explain the failure to investigate, but also a showing that the witness or witnesses whom counsel failed to investigate did, in fact, have favorable testimony to offer.  *See Stewart v. Wolfenbarger*, 468 F.3d 338, 356-57 (6th Cir. 2006); *Towns v. Smith*, 395 F.3d 251, 258-59 (6th Cir. 2005); *Clinkscale v. Carter*, 375 F.3d at 443.   The instant case, on the other hand, involves none of those elements.  *See, e.g., Goldsby v. United States*, No. 04-3340, 152 F. App'x 431, 436 (6th Cir. 2005) (finding no ineffectiveness for failure to call witness who was unlikely to provide helpful testimony and more likely to support government's case and for choice to focus on more promising avenues of investigation).

For the foregoing reasons, the Court denies sub-part (A) of Petitioner's first ground for relief regarding trial phase ineffectiveness.  Petitioner has not shown, and it does not otherwise appear to this Court, that the Ohio Supreme Court's decision rejecting that ineffective assistance claim contravened or unreasonably applied controlling Supreme Court precedent or involved an unreasonable determination of the facts in light of the evidence presented.

**B.**     **Defense counsel failed to object to the prosecutor's vouching for the credibility of State witnesses.**

In Part I of his first ground for relief, Petitioner submits in sub-part (B) that his defense

20

counsel rendered ineffective assistance when they failed to object to the prosecutor's vouching

for the credibility of State witnesses. (Amended Petition, Doc. # 18, at ¶¶ 9-11.) Petitioner

argues that during the direct examination of Derrick Boone, the prosecutor elicited from Boone

both that his plea agreement required him to provide truthful testimony and that the prosecutor

had tried from the first night they had met to persuade Boone to tell the truth. Petitioner further

argues that through direct examination of Detective Zachary Scott, the prosecutor elicited that

Boone was repeatedly asked to tell the truth and that the sheriff's office was consulted about the

plea deals that were offered and what sort of information was considered in determining to

whom to offer plea deals. Reasoning that the prosecutor was vouching for the credibility of

State witnesses, Petitioner generally argues that defense counsel performed unreasonably and to

his prejudice in failing to object to those questions.

Specifically, Petitioner argues that by referencing the "truth" component in Derrick

Boone's plea agreement, the prosecutor not only created the illusion that he knew what the truth

was and was ensuring its revelation, but also placed the prestige of the government behind

Derrick Boone's credibility. Petitioner further argues that the prosecutor's questions of

Detective Scott again created the illusion that the prosecution and sheriff's department knew

what the truth was, when the prosecution actually had no independent means of discerning

truthfulness. Thus, according to Petitioner, defense counsel at a minimum should have requested

a curative instruction to the effect that " 'promises in the cooperation agreement do not increase

the propensity of a witness to tell the truth beyond that required by the oath.' " (Amended

Petition, Doc. # 18 ¶ 11 (quoting *United States v. Carroll*, 26 F.3d 1380, 1389 (6th Cir. 1994))).

The Ohio Supreme Court rejected this claim of trial counsel ineffectiveness on direct

appeal. After noting that attorneys are precluded from expressing their beliefs or opinions regarding the credibility of a witness, the Ohio Supreme Court concluded that "the line of questioning in this case was not prosecutorial vouching, as [Jackson] alleges." *Jackson*, 92 Ohio St. 3d at 449. Rather, according to the Ohio Supreme Court, "through Boone's testimony, the prosecutor was establishing that there was, in fact, a plea agreement, and that as part of that agreement, Boone had agreed to tell the truth." *Id*. The Ohio Supreme Court went on to find, however, that the question to Detective Scott did *not* relate to the plea agreement and may have been improper. The Ohio Supreme Court concluded, however, that "even if this questioning [were] improper, any error that may have occurred was certainly not outcome-determinative." *Id*.

Petitioner takes issue with two aspects of the Ohio Supreme Court's decision rejecting his claim that his attorneys were ineffective for failing to object to the prosecutor's vouching for the credibility of its own witness. First, Petitioner argues that the Ohio Supreme Court's finding that the questioning discussed above did not constitute vouching by the prosecution amounts to an unreasonable determination of the facts based on the evidence presented. 28 U.S.C. § 2254(d)(2). Second, Petitioner argues that the Ohio Supreme Court compounded its initial error by relying on its own plain-error analysis, which is outcome-determinative, rather than the less onerous prejudice standard set forth in *Strickland*, in concluding that, even if any of the questioning were improper, it did not entitle Petitioner to relief. (Doc. # 42, at 18.) Citing *Williams (Terry) v. Taylor*, 529 U.S. 362, 409 (2000), in which the United States Supreme Court explained the new deferential standard of review set forth in 28 U.S.C. § 2254(d)(1), Petitioner insists that "[a]ny reliance on plain error analysis by the Ohio Supreme Court to reject Jackson's

22

Sixth Amendment claim is itself 'objectively unreasonable.' " (Doc. # 42, at 18.) Petitioner

argues that under *Strickland*, he is required to show only that counsel's error undermines

confidence in the result of the trial. (*Id*., citing *Strickland*, 466 U.S. at 694.)

Regarding Petitioner's first argument, this Court cannot disagree with, much less find

unreasonable, the Ohio Supreme Court's factual finding that the prosecutor's questioning of

Derrick Boone regarding his plea agreement did not constitute improper prosecutorial vouching.

The Ohio Supreme Court's decision was entirely consistent with Sixth Circuit law in that regard.

Because counsel cannot be regarded as ineffective for failing to object to something that was not

error, this Court rejects Petitioner's claim that his attorneys performed unreasonably or to his

prejudice in failing to object to the prosecutor's questioning of Derrick Boone regarding his plea

agreement.

The Sixth Circuit has held that " '[i]mproper vouching occurs when a prosecutor supports

the credibility of a witness by indicating a personal belief in the witness's credibility thereby

placing the prestige of the [prosecutor's office] behind that witness.' " *United States v. Trujillo*,

376 F.3d 593, 607 (6th Cir. 2004) (quoting *United States v. Martinez*, 253 F.3d 251, 253-54 (6th

Cir. 2001)). In *United States v. Francis*, the Sixth Circuit explained in more detail what

constitutes improper prosecutorial vouching:

> Generally, improper vouching involves either blunt comments, *see, e.g., United
> States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) (stating that improper
> vouching occurred when prosecutor asserted own belief in witness's credibility
> through comments including "I think he [the witness] was candid. I think he is
> honest."), or comments that imply that the prosecutor has special knowledge of
> the facts not in front of the jury or of the credibility and truthfulness of witnesses
> and their testimony, *see, e.g., Carroll*, 26 F.3d at 1388 (stating that improper
> vouching occurred when prosecutor argued that the witness testifying under a
> plea agreement was in jeopardy if the court or government did not find the
> testimony truthful).

*United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).  The Sixth Circuit in *Francis* found improper vouching on the part of the prosecutor for arguing that if one of the state's witnesses who had been given a plea agreement testified truthfully, the prosecutor intended to recommend a fifteen-year sentence and for further emphasizing the role that the prosecutor would play in determining the sentence that the witness received.  *Id.* at 550-51.  Those two arguments, the Sixth Circuit explained, allowed the jury to infer that the prosecutor had a special ability or extraneous knowledge to assess the credibility of the witness.  *Id.* at 551.  The Sixth Circuit found additional improper vouching by the prosecutor for explaining that, although she had broken off talks with a state witness when they first met because she did not believe he was telling the truth, the prosecutor offered him a plea agreement following their second meeting because she finally believed that he was telling the truth.  *Id.*  The Sixth Circuit condemned that argument as improper vouching because it clearly indicated the prosecutor's personal belief in the witness's credibility.  *Id.*

Notwithstanding the impropriety described above, the Sixth Circuit has always "allowed a prosecutor to refer to the plea agreement of a testifying witness."  *Id.* at 550 (citing *United States v. Renteria*, 106 F.3d 765, 767 (7th Cir. 1997)).  "The prosecutor may elicit testimony about [the plea agreement's] terms, attack the credibility of the witness because of it and even refer to the plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility."  *Id.*  Thus, the Sixth Circuit found no improper vouching in *Trujillo*, 376 F.3d 593.  There, the prosecutor asked a government witness whether her plea agreement required her "truthful cooperation" and another government witness whether her plea agreement required her to "tell the truth."  *Id.* at 607-08.  The Sixth Circuit held

24

that the prosecutor's questions "merely encompassed the terms of [their] plea agreements which this Court has held to be permissible" and not improper vouching. *Id*. at 609.

In the instant case, the prosecutor concluded direct examination of Derrick Boone by asking a series of questions pertaining to Mr. Boone's plea agreement. After establishing through questions to Mr. Boone that his plea agreement resulted in him pleading guilty (to two counts of involuntary manslaughter, one count of aggravated robbery, and a firearm specification) and receiving a fifteen-year sentence, the prosecutor also elicited from Mr. Boone that he had agreed to cooperate with the State and to provide truthful testimony whenever called to testify in any matter pertaining to the events of March 25, 1997. (Tr.Vol. IX, at 71-72.) The prosecutor asked Mr. Boone whether the prosecutor had ever told Mr. Boone what to say, other than to tell the truth, and whether the prosecutor had, from the first night they met, asked Mr. Boone repeatedly to tell the truth. (*Id*. at 72-73.) Defense counsel objected to none of this as improper prosecutorial vouching and, in this Court's view, justifiably so.

The questioning that occurred in this case possessed none of the hallmarks of impropriety defined by the Sixth Circuit as improper prosecutorial vouching. The prosecutor did not ask any questions indicating, even implicitly, a personal belief in Mr. Boone's truthfulness or otherwise placing the prestige of the prosecution behind Mr. Boone's credibility, the type of impropriety that the Sixth Circuit condemned in *Francis*, 170 F.3d at 550-51. *See also United States v. Causey*, 834 F.2d 1277, 1283 (6th Cir. 1987) (stating that the test for improper vouching is whether jury reasonably could believe that prosecutor was indicating a personal belief in the witness's credibility). Nor did the prosecutor's questions give rise to an inference that the prosecutor was in a special position to discern the truth of the facts or credibility of the witness,

25

as the Sixth Circuit denounced in *Francis*, 170 F.3d at 550-51. *See also United States v. Carroll*, 26 F.3d 1380, 1387 (6th Cir. 1994) (finding improper vouching where prosecutor argued that a witness testifying pursuant to plea agreement was in jeopardy if the court or government did not find testimony to be truthful). Rather, the prosecutor's questions merely referenced the existence and various terms of Mr. Boone's plea agreement, which the Sixth Circuit has expressly condoned and which is exactly what the Ohio Supreme Court found. Thus, the Court is not persuaded that the Ohio Supreme Court's finding was an unreasonable determination of the facts or that counsel performed deficiently or to Petitioner's prejudice in failing to object to the prosecutor's questioning of Derrick Boone regarding his plea agreement.

Regarding the prosecutor's questioning of Detective Zachary Scott about the plea agreements that were offered to cooperating witnesses, Petitioner does not take issue with any fact-finding by the Ohio Supreme Court. This is understandable in view of the fact that the Ohio Supreme Court appeared to suggest that the questioning was improper. Rather, Petitioner takes issue with the "outcome-determinative" standard that the Ohio Supreme Court applied in rejecting Petitioner's claim that his trial attorneys were ineffective for failing to object to the questioning.

Even if the questioning were improper–and this Court is not entirely persuaded of that, *see, e.g., Lam v. Kelchner*, 304 F.3d 256, 272 (3rd Cir. 2002) (finding no improper vouching where agent testified about investigative techniques that led government to credit cooperating witnesses's statements)–and even if the Ohio Supreme Court applied a more stringent "prejudice" standard than *Strickland* requires, the Court is not persuaded, ultimately, that Petitioner's attorneys performed unreasonably or to his prejudice in failing to object to the

26

questioning.  The prosecutor's questioning of Detective Zachary Scott regarding the plea agreements that were offered to testifying witnesses does not entitle Petitioner to relief on his claim that trial counsel were ineffective for failing to object to those questions as improper vouching.  Although the questioning of Detective Scott may have strayed further from what the Sixth Circuit has condoned as acceptable, it did not cross the line of what the Sixth Circuit has denounced as impermissible.

The questioning that Petitioner assails as improper prosecutorial vouching went as follows.  First, while questioning Detective Scott about his initial interviews with Derrick Boone, the prosecutor asked whether he and Detective Scott repeatedly had asked Mr. Boone to tell the truth.  (Tr.Vol. IX, at 216.)  Later, in concluding the direct examination of Detective Scott, the prosecutor asked him whether he had become aware that the prosecutor's office was negotiating with Derrick Boone and Malaika Williamson and whether he or the sheriff's department had been consulted with respect to any deals that were offered to those cooperating witnesses.  (*Id*. at 229-30.)  When the prosecutor asked Detective Scott whether the witnesses's prior records were considered, defense counsel objected to the question as leading and the trial court directed the prosecutor to rephrase it.  When the prosecutor asked, "[w]hat kind of things did we consider," Detective Scott answered, "[p]rior record, amount of involvement."  (*Id*. at 230.)  Finally, the prosecutor asked whether the degree of the witnesses's cooperation had been considered and whether Detective Scott had agreed with the deals that were offered to the cooperating witnesses.  (*Id*. at 230-31.)

The closest that the questions came to approaching improper vouching–by suggesting that the prosecutor's office or sheriff's department was in a special position to discern the

27

truthfulness of the cooperating witnesses– requires a leap of inferences and assumptions. On the other hand, the factors that were in fact considered in deciding whether to offer deals to Mr. Boone and Ms. Williamson according to the prosecutor's questioning of Detective Scott (prior records, level of involvement in the crimes, and degree of cooperation) strike this Court as perfectly legitimate and do not give rise to an inference that the government was in a special position to discern the truthfulness of the cooperating witnesses. Because the questions were isolated, brief, and benign, this Court cannot find either that Petitioner's defense attorneys performed deficiently in not objecting or that Petitioner was prejudiced by counsel's failure to object.

The deficient-performance component of *Strickland* requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *Strickland*, 466 U.S. at 687, and that the prejudice component requires a showing that counsel's unprofessional errors "actually had an adverse effect on the defense." *Id*. at 693. It nearly tests the limits of credulity to suggest either that defense counsel breached that standard in not objecting to the prosecutor's questioning of Detective Scott about the deals that the State offered to cooperating witnesses or that the allowance of those questions, due to the absence of an objection by counsel, actually had an adverse effect on Petitioner's defense. Regardless of whether the Ohio Supreme Court may have employed a more rigorous, "outcome-determinative" standard than that required by *Strickland*, Petitioner simply has not shown that trial counsel performed unreasonably or to his prejudice in failing to object to the prosecutor's questioning of Detective Scott regarding the plea agreements that were offered to Derrick Boone and Malaika Williamson. For that reason, the Court denies

28

sub-part (B) of Petitioner's first ground for relief regarding trial phase ineffectiveness.

### C.     Counsel failed to move for an expert identification witness.

In Part I of his first ground for relief, Petitioner argues in sub-part (C) that his defense counsel rendered ineffective assistance when they failed to move the trial court for appointment of an expert on eyewitness identification.  (Amended Petition, Doc. # 18, at ¶¶ 12-14.)  Petitioner argues that trial counsel's failure to request appointment of an eyewitness identification expert cannot be characterized as a reasonable exercise of professional judgment.  Petitioner reasons that because the eyewitness identifications by Becky Lewis and Nikki Long were essential to the State's case, counsel's failure to present or even investigate the need for an eyewitness identification expert could not have been the product of reasonable trial strategy.  Petitioner further argues that "[t]he ramifications attendant to eyewitness identification in criminal cases are not commonly understood by attorneys or lay jurors.  Expert assistance would have allowed counsel to prepare an effective defense against the State's eyewitness identification evidence and to inform the jurors of all factors that are involved in such identification."  (Amended Petition, Doc. # 18 at ¶ 14.)

Petitioner expands on these arguments in his Traverse, relying on an affidavit from Dr. Harvey Shulman that Petitioner submitted to the state courts during his postconviction proceedings.  (Doc. # 42, at 18-20.)  Citing that affidavit, Petitioner argues that an eyewitness identification expert could have explained that several factors undermine the reliability of the identifications by Becky Lewis and Nikki Long, such as the fact that they were not casual observers of the events, but rather, were actively involved and in danger.  Petitioner points out that Lewis was so shaken that she did not follow an order to sit and initially was not able to

29

provide descriptions of the assailants. Petitioner goes on to argue that "both witnesses viewed the perpetrator of the crime under circumstances that provided suboptimal perceptual conditions, such as the influence of marijuana or alcohol or the fact that the criminal wore a hat." (Doc. # 42, at 19.) Formation of memories under such conditions, according to Petitioner, is likely to diminish the accuracy of later identifications.

Petitioner argues that further calling into question Lewis's identification of him is the fact that the identification was cross-racial, Lewis being Caucasian and Petitioner being African-American. Petitioner also argues that certain influences that occurred between the formation and retrieval of the witnesses's memories undermine the accuracy of their resulting identifications, such as the fact that Lewis had been told, before she had chosen Petitioner's picture from a photo array, that police had a suspect in custody, thereby elevating her willingness to make a choice even if she was uncertain. Lewis was told after she had chosen Petitioner's picture that she had done a good job, thereby reinforcing her selection of that photo. Similarly, according to Petitioner, Long's in-court identification of Petitioner was unduly influenced by having seen him being arrested on television.

Petitioner raised this claim of ineffective assistance in his state postconviction petition, supporting it with the Affidavit of Dr. Harvey Shulman (J.A. Vol. III, PC, Trial, Part A, at 116-124). The state courts rejected Petitioner's claim on the merits, concluding that he had ineffective assistance of counsel under the *Strickland* standard. The last state court to address Petitioner's claim, the Ohio Court of Appeals for the Tenth Appellate District, stated that the decision not to call an expert witness generally will not sustain a claim of ineffective assistance. *State v. Jackson*, No. 01AP-808, 2002 WL 1279001, at *8 (Ohio App. 1st Dist. June 27, 2002).

The appellate court went on to state that Petitioner could demonstrate no prejudice from the allegedly deficient performance, given that the evidence upon which the jury convicted Petitioner was not limited to the eyewitness identifications by Lewis and Long. Specifically, according to the appellate court, the State presented testimony by Derrick Boone and Malaika Williamson implicating Petitioner, as well as testimony by Ivana King recounting not only Petitioner's admission that he had "done two people," but also Petitioner's subsequent request that she invent an alibi for him. *Id.*

This Court is not persuaded that the state courts' decision rejecting Petitioner's ineffective assistance claim either contravened or unreasonably applied clearly established Supreme Court precedent or involved an unreasonable determination of the facts based on the evidence presented. In short, the Court is not persuaded that counsel performed deficiently or to Petitioner's prejudice in the manner he alleges. Thus, the Court cannot find anything unreasonable about the state courts' rejection of Petitioner's claim.

Courts have held that a defense attorney is not required to hire an eyewitness identification expert and may instead rely on cross examination and closing arguments to impeach eyewitness testimony. *Madrigal v. Bagley*, 276 F. Supp. 2d 744, 791 (N.D. Ohio 2003) (citing *United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir. 1987), and *Hughes v. Hubbard*, No. 99-56436, 2000 WL 1728113 (9th Cir. Nov. 21, 2000)). In *Madrigal*, the district court rejected Petitioner's claim of trial counsel ineffectiveness for the failure to present an eyewitness identification expert, finding that counsel had made what was at the time a reasonable tactical choice to use their limited resources for a ballistics expert rather than an eyewitness identification expert. *Madrigal*, 276 F. Supp. 2d at 791. The district court noted that

31

although an eyewitness expert may have, in hindsight, been more helpful than a ballistics expert, "the best strategy is not always clear beforehand." *Id*. The district court went on to find that counsel's actions were reasonable because, in keeping with the spirit of *Strickland*'s discussion of the hallmarks of effective assistance, they preserved the adversarial process. *Id*. at 791-92. The district court further concluded that Petitioner could not demonstrate prejudice from counsel's allegedly deficient performance, insofar as counsel had effectively highlighted, during cross-examination and closing arguments, inconsistencies in the witnesses's descriptions of the offender, the severe stress that the eyewitnesses were under when they formed their impressions, and other factors that limited their ability to observe the offender, such as the limited time frame, an obstructed view, and the witnesses's focus on the offender's gun. *Id*. at 792.

By contrast, in *Forensic v. Birkett*, 451 F. Supp. 2d 874, 884-87 (E.D. Mich. 2006), *aff'd* __ F.3d __, 2007 WL 2471276 (6th Cir. Sept. 4, 2007), a district court found that Petitioner's trial counsel had performed deficiently and to Petitioner's prejudice in failing to present an eyewitness identification expert. There, defense counsel had requested funds and arranged for the services of Dr. Harvey Shulman, but subsequently failed to obtain his written report, which the trial court demanded before it would allow Dr. Shulman to testify. Counsel also failed to subpoena Dr. Shulman to testify. Based on counsel's testimony that he had had no recollection of whether he had subpoenaed Dr. Shulman and the fact that the only defense witness, the Petitioner's father, had added little to the defense strategy of mistaken identity, the district court concluded that counsel's failure to obtain the report or call Dr. Shulman was not the result of trial strategy. The district court further concluded that counsel's deficient performance had prejudiced the Petitioner–had undermined confidence in the outcome of the Petitioner's

32

trial–because eyewitness identification was the only evidence the State had produced linking the Petitioner to the crimes.

The facts relevant to the identifications by Lewis and Long are as follows. Becky Lewis testified that she was a friend of the victims and had been visiting with them at their apartment a short while before the incident occurred. (Tr.Vol. VIII, at 132-36.) She was able to identify Petitioner as one of two men who had come to the apartment to buy drugs from Hunter and Walker shortly after she had arrived. She also identified him as one of the assailants who broke into the apartment minutes after the drug deal demanding drugs, money, and other belongings from the occupants, Hunter and Walker, and the visitors, Lewis and Nikki Long. She identified him as the assailant who struck her in the head with a handgun, put a pillow to her head and threatened to shoot her, and eventually led her into the kitchen where she and Long remained until after Hunter and Walker were killed. She attempted to assist police computer-sketch artists in developing a composite sketch of Petitioner, but with little success. (*Id*. at 154.) Several days after the incident, however, she identified Petitioner in a photo array. (*Id*. at 158-60.) Subsequently, she made an in-court identification of Petitioner during a hearing on Petitioner's motion to suppress her identification of Petitioner from the photo array (Tr.Vol. I, at 94) and during his trial (Tr.Vol. VIII, at 141-42). She affirmed during direct examination that she had consumed some marijuana and a little bit of beer just prior to the incident and that she also had smoked some marijuana earlier that day. (Tr.Vol. VIII, at 161-64.) On cross examination, defense counsel asked a few questions exploring how much marijuana and beer Lewis had consumed that evening and establishing that she was "very scared" when everything was happening and never saw who fired the shots. (Tr.Vol. VIII, at 171, 177.) The bulk of defense

33

counsel's cross examination focused on the level of drug-dealing that took place in the apartment and the presence throughout the evening of other people.

Nikki Long was also a friend of Hunter and Walker's and had been at their apartment on the evening/morning of the incident since approximately 9:00 p.m. (Tr.Vol. VIII, at 260-62.) Regarding the incident, Long testified that she had had the best look at the tall, light-skinned assailant with a long gun–Boone–and had assisted police sketch artists in developing a composite sketch of him. (*Id*. at 283-85.) Although she was never able to provide a description of Petitioner or identify him from the composite sketch that Lewis had assisted police in developing, she made an in-court identification of Petitioner during his trial. (*Id*. at 283-86.) Long affirmed on direct examination that she had seen Petitioner on the news, three or four days after the incident. (*Id*. at 286-87.) She also affirmed on direct examination that she had consumed no marijuana or beer that evening and that she never smoked marijuana or drank alcohol. (*Id*. at 265.) On cross examination, defense counsel asked Long whether her in-court identification of Petitioner was the result of her identifying the only African-American male sitting at the defense table and established that she never saw who fired the shots. (*Id*. at 295.) As with Lewis, the bulk of defense counsel's cross examination focused on the level of drug-dealing that took place in the apartment and the presence throughout the evening of other people in the apartment.

Defense counsel devoted a portion of closing arguments to impeaching the eyewitness identifications by Lewis and Long. Defense counsel argued, "Becky Lewis testified that she was high and drank some beer, that she was scared that night, and two of her friends were killed." (Tr.Vol. X, at 154.) Regarding Long's in-court identification, defense counsel emphasized that

34

Long had never identified Petitioner until after she had seen him on television and that "of course she was going to be able to sit in a courtroom and point out the only black man sitting here at counsel table as the defendant."  (*Id*. at 154-55.)

  This Court is of the view that the instant case is more akin to *Madrigal* than *Forensic*. Although this Court does not have the benefit of post-trial testimony or affidavits setting forth counsel's reasons for not obtaining an eyewitness identification expert or whether, for that matter, they even considered that course of action, this Court, like the *Madrigal* court, is reluctant to characterize counsel's failure to obtain an eyewitness identification expert as unreasonable, considering that they made a notable effort to impeach the identifications by Lewis and Long during cross examination and closing arguments.  And unlike the facts in *Forensic*, the identifications by Lewis and Long were not the sole or even primary component of the prosecution's case against Petitioner, sufficient to alert any reasonable attorney in trial counsel's position that counsel's defense of Petitioner would hinge on undermining those identifications and that the testimony of an eyewitness identification expert was the best means by which to do so.

  It bears reminding that, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.  Even if this Court were of the view, as was the *Madrigal* court, that in hindsight an eyewitness identification expert would have been beneficial to Petitioner's defense, that would be insufficient to support a finding of deficient performance under *Strickland*, because "the best strategy is not always clear beforehand."  *Madrigal*, 276 F.

Supp. 2d at 791.  In view of the efforts that counsel made to impeach the identifications by

Lewis and Long, and considering that those identifications were not the entire basis of the

prosecution's case against Petitioner, this Court is not persuaded that counsel performed

unreasonably in failing to obtain an eyewitness identification expert.

      An even stronger basis for rejecting Petitioner's ineffective assistance claim exists in the

prejudice component of the *Strickland* test.  For the same reasons that the Ohio appellate court

advanced for rejecting this claim, this Court agrees that Petitioner "has not established that trial

counsel's failure to call an expert identification witness caused prejudice."  *Jackson*, 2002 WL

1379001, at *8.  Neither Lewis nor Long saw who shot the victims or ever identified Petitioner

as the shooter.  The most that their testimony established was that Petitioner was among the

assailants who entered the apartment to rob the occupants and that he was armed with a handgun.

The prosecution presented other competent evidence–namely, testimony by accomplices Malaika

Williamson and Derrick Boone–establishing that Petitioner was in the apartment and armed with

a handgun.  Additionally, the prosecution presented testimony by Ivana King recounting that

Petitioner had told her shortly after the incident that "he had done two people" (Tr.Vol. IX, at

122-23) and that Petitioner had asked her shortly before his trial to concoct an alibi for him

(Tr.Vol. IX, at 131).

      The state appellate court concluded that Petitioner "failed to satisfy the *Strickland*

standard for ineffective assistance with regard to trial counsel's decision not to call an expert

identification witness."  *Jackson*, 2002 WL 1379001 at *8.  This Court concurs and cannot

conclude that the Ohio court's decision contravened or unreasonably applied controlling

Supreme Court precedent or involved an unreasonable determination of the facts.  The Court

36

therefore concludes that the trial counsel ineffectiveness claim set forth in sub-part (C) of Part I

of Petitioner's first ground for relief is insufficient to warrant habeas relief.

> **D.** **Defense counsel failed to object to the prosecutor's unfair,**
> **improper, and excessive use of leading questions.**

In Part I of his first ground for relief, Petitioner argues in sub-part (D) that his defense

counsel rendered ineffective assistance when they failed to object to the prosecution's unfair,

improper, and excessive use of leading questions. (Amended Petition, Doc. # 18, at ¶ 15.)

Petitioner argues that Ohio R. Evid. 611(C) forbids the use of leading questions on direct

examination except where necessary to develop testimony. Petitioner argues that there was no

such need in this case and no finding by the trial court of such a need. Referring to sixty-nine

pages of the prosecutor's direct examination of Derrick Boone that Petitioner characterizes as

consisting largely of detailed questions from the prosecutor and one-word answers from Mr.

Boone, Petitioner complains that defense counsel should have objected and requested the trial

court to compel Mr. Boone to testify in his own words as to the planning and execution of the

robbery. Instead, Petitioner argues, the prosecutor, who was infinitely more credible, became an

unsworn witness who was able to present his version of the events and deprive the jury of the

opportunity to make a credibility determination as to Mr. Boone.

Petitioner argues that he was prejudiced by defense counsel's failure to object because

Mr. Boone was the State's key witness, the only person who identified Petitioner as the shooter,

and was himself a viable alternative suspect. Petitioner also argues that he was prejudiced by

counsel's ineffectiveness because it is speculative to assume that Mr. Boone would have testified

to sufficient facts to convince Petitioner's jury of his guilt had the prosecutors not fed him his

testimony. In short, according to Petitioner, defense counsel performed deficiently and to

Petitioner's prejudice because counsel allowed the State to present its own unsworn version of the events and denied Petitioner his constitutional right to confront his accuser.

On direct appeal, the Ohio Supreme Court rejected this claim of ineffective assistance. Citing a staff note to Ohio R. Evid. 611(C) and *State v. D'Ambrosio*, 67 Ohio St. 3d 185, 190 (1993), the Ohio Supreme Court stated that "it is within the trial court's discretion to allow leading questions." *Jackson*, 92 Ohio St. 3d at 449. Thus, the Ohio Supreme Court continued, counsel's failure to object to any leading questions did not constitute ineffective assistance. The Ohio Supreme Court further concluded that there was no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 694). Petitioner argues that the Ohio Supreme Court's decision involved an unreasonable determination of the facts in light of the evidence presented. (Doc. # 42, at 21-22.) This Court disagrees.

In order to determine whether counsel was ineffective for failing to object, the Court must first determine whether the prosecutor committed misconduct. *Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000) (citing *Cobb v. Perini*, 832 F.2d 342, 347-48 (6th Cir. 1987) (rejecting claim that counsel's failure to object comprised ineffectiveness in part because it was unclear whether challenged evidence was improper), and *Barton v. Morris*, No. 95-3848, 1996 WL 408504, at *2 (6th Cir. July 19, 1006) (concluding that counsel's failure to object to prosecutor's closing argument was not ineffective because "those comments did not amount to prosecutorial misconduct and would not have provided the basis for action by the trial judge")). The Court is not persuaded that Petitioner's counsel were ineffective as alleged above because it appears to this Court that the direct examination questions that Petitioner characterizes as leading

38

would have been permitted under Ohio law.  Thus, even assuming defense counsel had objected to those questions, it is highly improbable that the trial court would have sustained that objection or disallowed the questions.

Rule 611(C) of the Ohio Rules of Evidence generally prohibits the use of leading questions on direct examination of a witness except where necessary to develop his testimony. The decision to allow leading questions on direct examination is within the discretion of the trial court.  *See, e.g., D'Ambrosio*, 67 Ohio St. 3d at 190 (citing Staff Note to Ohio R. Evid. 611(C)). Further, Ohio R. Evid. 611(C) expressly permits leading questions "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party ...."  Ohio R. Evid. 611(C); *see also State v. Dolce*, 92 Ohio App. 3d 687, 704 (Ohio App. 6th Dist. 1993).  Even assuming that some or most of the prosecutor's questions to Mr. Boone could be characterized as leading, a point the Ohio Supreme Court did not appear to question, the record in this case certainly suggests that Mr. Boone was a hostile witness or a witness identified with Petitioner and that Mr. Boone was reluctant to testify.

Derrick Boone testified that he and Petitioner had grown up together in church and were best friends until they lost contact when they were sixteen or seventeen years old.  (Tr.Vol. IX, at 7-8.)  He testified that they had re-established contact after bumping into each other in 1996 or 1997, and then began hanging out together almost daily.  (*Id*. at 8-10.)  After a series of curt answers to foundational questions about the events leading up to the planning and execution of the robbery, the following exchange occurred:

> Q.   Do you want to be here today?
>
> A.   No.

> Q.    Why not?
>
> A.    Just don't.
>
> Q.    Is it hard testifying against a friend?
>
> A.    Sure is.

(Tr.Vol. IX, at 21-22.)  A review of Mr. Boone's entire testimony similarly reflects that he was reluctant to testify and gave answers that, at best, were less-than-forthcoming, and, at worst, evasive.  Under these circumstances, the trial court reasonably could have found that Mr. Boone was a hostile witness or a witness identified with Petitioner, which are reasons sufficient to warrant leading questions under Ohio R. Evid. 611(C).  *See, e.g., State v. Stearns*, 7 Ohio App. 3d 11, 14 (Ohio App. 8th Dist. 1982) (finding that leading questions were proper under Ohio R. Evid. 611(C) of witnesses who demonstrated an affinity for the defendant, often gave incomplete or evasive answers, and gave testimony that differed from their prior statements).  It is therefore difficult to characterize counsel's failure to object as unreasonable.  Even assuming counsel were unreasonable for failing to object, this Court can find no prejudice because the Court is not persuaded that the trial court would have sustained that objection or disallowed the questioning that Petitioner characterized as leading.

Petitioner argues that defense counsel's failure to object to the State's questioning of Mr. Boone was deficient and prejudiced Petitioner because it allowed the State to present its unsworn version of the events and denied Petitioner the ability to confront his accuser.  (Doc. # 42, at 22, citing *Crawford v. Washington*, 541 U.S. 36 (2004), and *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).  In the instant case, the Ohio Supreme Court rejected Petitioner's claim of trial counsel ineffectiveness, holding that "it is within the trial court's discretion to allow leading questions."

*Jackson*, 92 Ohio St. 3d at 449.  The Court cannot find that the Ohio Supreme Court's decision contravened or unreasonably applied federal law or involved an unreasonable determination of the facts in light of the evidence that was presented.  Given the indications that Mr. Boone was a hostile witness and in view of the discretion enjoyed by the trial court to allow leading questions of hostile or adverse witnesses under Ohio R. Evid. 611(C), this Court is not persuaded either that counsel performed deficiently in not objecting to the allegedly leading questions that the prosecutor asked or that Petitioner was prejudiced by counsel's failure to object.  Thus, the Court concludes that the trial counsel ineffectiveness claim set forth in sub-part (D) of Part I of Petitioner's first ground for relief is without merit.

> **E.** **Defense counsel failed to prepare for trial, resulting in the failure to adequately cross-examine Derrick Boone, one of the co-defendants charged in the crime and, himself, a viable suspect.**

The Court determined that this claim was barred by procedural default.  (Doc. # 27, at 26-41.)

> **F.** **Defense counsel failed to present available independent evidence to impeach Ivana King.**

In Part I of his first ground for relief, Petitioner argues in sub-part (F) that his defense counsel rendered ineffective assistance when they failed to present available independent evidence to impeach Ivana King.  (Amended Petition, Doc. # 18 ¶¶ 21-23.)  Petitioner asserts that during cross-examination, defense counsel attempted to impeach Ms. King concerning her possible bias against Petitioner due to his infidelity.  Petitioner appears to argue that due to inadequate investigation, counsel not only failed to pursue that line of questioning more effectively, but also failed to discover and present independent evidence of Ms. King's obsessive

41

jealousy regarding Petitioner.  Relying on an affidavit by defense witness William Woods, Petitioner argues that Mr. Woods could have testified that Ms. King was jealous over Petitioner's interactions with other women and questioned his behavior constantly.  Defense counsel called Mr. Woods to provide an alibi for Petitioner, but never questioned him regarding Ms. King's jealousy.  This is not surprising, according to Petitioner, because defense counsel did not prepare Mr. Woods to testify and only met with him briefly the day that he appeared to testify.  Thus, according to Petitioner, defense counsel performed deficiently and to his prejudice because they failed to investigate and present evidence of bias on Ms. King's part in an effort to impeach her credibility and mitigate her damaging testimony.

Petitioner raised this claim of trial counsel ineffectiveness in his state postconviction action.  The last state court to issue a reasoned decision, the Ohio Court of Appeals for the Tenth District, concluded that this claim was barred under Ohio's doctrine of *res judicata*, "as the content of trial counsel's examination of witnesses is a matter of trial record."  *Jackson*, 2002 WL 1379001, at *9.  Alternatively, the state appellate court concluded that Petitioner "failed to demonstrate that trial counsel was ineffective."  *Id*.  More specifically, the appellate court found that defense counsel had questioned Ms. King about Petitioner's other relationships and had expressly asked whether she knew Petitioner had been involved with Malaika Williamson during the time at issue.  Finding no indication from William Woods' affidavit that he had personal knowledge of Ms. King's jealousy or bias against Petitioner, the appellate court went on to conclude that Petitioner had failed to demonstrate that such testimony by Mr. Woods would have been admissible evidence.  Finally, the appellate court reiterated that in addition to Ms. King's testimony, the jury also heard from several witnesses who testified that Petitioner was in the

victims' apartment when the crimes were committed. Petitioner appears to argue not only that this Court owes no deference to the appellate court's decision–because it was not an adjudication on the merits–but also that the appellate court's alternative holdings involved an unreasonable determination of the facts in light of the evidence that was presented and unreasonably applied clearly established federal law.

In this instance, the state appellate court primarily rejected Petitioner's claim not on the merits, but on the basis of a state procedural rule. The state appellate court also rejected Petitioner's claim on the merits. In its Opinion and Order of September 27, 2004, this Court concluded that Petitioner's claim was properly before it in this habeas corpus proceeding and that Petitioner had not committed procedural default in raising the claim in his state postconviction action instead of on direct appeal, given that the claim relied on and was supported by evidence outside the trial record. (Doc. # 27, at 43-46.) Because of confusion arising from the appellate court's dual holdings, Petitioner appears to argue on the one hand that this Court should conduct de novo review of his claim, and on the other hand that the appellate court's decision involved an unreasonable determination of the facts and an unreasonable application of clearly established federal law. Regarding Petitioner's first argument, it is true that a federal habeas court's review of a constitutional claim is not circumscribed by a state court decision that was not an adjudication on the merits. *See, e.g., Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (citing *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). In any event, this Court need not resolve the quandary because, whether it conducts de novo review or applies § 2254(d)'s deferential standard of review, the Court concludes that this trial counsel ineffectiveness claim is without merit.

43

In short, Petitioner has fallen short of demonstrating that his attorneys performed deficiently or to his prejudice.  Petitioner cites four cases for the proposition that under the two-part *Strickland* test, counsel can render ineffective assistance for failing to adequately conduct cross-examination or failing to adequately impeach prosecution witnesses.[4]  (Doc. # 42, at 24.) The Court does not disagree with that proposition or Petitioner's citation to those cases in support of it.  But the level of ineffectiveness at issue in the cases cited by Petitioner was pervasive and deserving of condemnation under any standard, in stark contrast to the conduct for which Petitioner takes his own counsel to task herein.  "Courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel."  *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002) (citing *Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997)).  Further, "[i]mpeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available."  *Id.* (citing *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 607 (E.D. Mich. 2001)).

Counsel in the instant case essentially did what Petitioner asserts they failed to do.  They pursued on cross-examination a line of questioning to damage Ms. King's credibility by showing she had a bias against Petitioner, though simply not to his satisfaction.  During cross-examination, defense counsel asked Ms. King about a heated telephone conversation she had had on the day Petitioner was arrested with a female named Christy concerning an alleged affair between Petitioner and Christy.  Counsel thus sought to establish that Ms. King was angry with

---

[4]        Petitioner cites *Groseclose v. Bell*, 895 F. Supp. 935 (M.D. Tenn. 1995), *Rickman v. Dutton*, 864 F. Supp. 686 (M.D. Tenn. 1994), *Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995), and *Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989).

Petitioner that day as a result.  (Tr.Vol. IX, at 145-46.)  Defense counsel also asked Ms. King

whether she knew Sheila Hamiter, the mother of two of Petitioner's children, in an apparent

attempt to establish that Ms. King was also jealous about that relationship.  (*Id*. at 146.)  Further

undermining any allegation of deficient performance, the independent evidence of Ms. King's

bias that counsel allegedly failed to investigate and present, testimony by William Woods

concerning Ms. King's obsessive jealousy, would have been of minimal, if any, value.  Mr.

Woods' affidavit contains a single sentence concerning his "knowledge" about Ms. King's

obsessive jealousy, with neither an indication of how he came by this information nor any

examples of Ms. King's allegedly obsessive jealousy.  He stated, "I became aware through my

dealings with her and Kareem that she was very jealous of him as to his interactions with other

women and she questioned his behavior all the time."  (J.A. Vol. III, P.C., Trial, Part D, at 136-

37.)

    The Court also notes, with respect to the deficient performance prong of the *Strickland*

test, that counsel may very well have decided as a matter of strategy not to attempt to undermine

Ms. King's credibility on the basis of her possible bias against him.  It arguably would have been

difficult to establish that Ms. King had a bias against Petitioner sufficient to compel her to want

to implicate him in a double murder, given her testimony on direct examination that she was in

love with Petitioner at the time of the crimes and was still in love with him at the time of her

testimony.  (Tr.Vol. IX, at 125, 134.)  The record suggests that counsel attempted to undermine

the damaging portions of Ms. King's testimony by asserting during closing arguments that the

police had coerced or intimidated her into implicating Petitioner.  (Tr.Vol. X, at 152-53.)  As

noted above, cross-examination of witnesses falls within the area of tactics or strategy that ought

not be subjected to second-guessing merely because that particular strategy proved to be unsuccessful. *See, e.g., Millender v. Adams*, 187 F. Supp. 2d 852, 872 (E.D. Mich. 2002).

Even assuming counsel's performance was deficient in this regard, there is no reasonable probability that absent counsel's alleged ineffectiveness, the outcome of Petitioner's trial would have been different. Had managed to impeach Ms. King's credibility with evidence of bias sufficient to persuade the jury to disregard or at least doubt her testimony, the fact remains, as the state appellate court pointed out, that the jury still heard from several witnesses who testified that Petitioner was in the victims' apartment at the time of the crimes. This Court therefore cannot find that there is a reasonable probability that absent counsel's failure to present the evidence of Ms. King's bias set forth by Petitioner, the outcome of Petitioner's trial would have been different.

For the foregoing reasons, the Court concludes that the trial counsel ineffectiveness allegation set forth in sub-part (F) of Part I of Petitioner's first ground for relief is without merit.

### G.    Defense counsel failed to conduct an adequate investigation and to adequately prepare for the trial witnesses.

Petitioner argues in sub-part (G) of Part I of his first ground for relief that his trial attorneys were ineffective for failing to conduct adequate investigation and for failing to prepare adequately to question witnesses. (Doc. # 18 ¶¶ 24-29.) Due to their failure to investigate and prepare, according to Petitioner, counsel did not adequately question witnesses about pertinent matters and did not adequately impeach witnesses with credibility problems. Petitioner argues that defense counsel failed to establish an alibi through William Woods because their failure to prepare him caused him to get frustrated and confused by their questions and unable to recall specific dates when he was with Petitioner at Ivana King's apartment. Petitioner argues that

46

defense counsel failed altogether to ask questions of Mr. Woods that would have provided independent evidence of Ivana King's bias against Petitioner. Petitioner goes on to argue that defense counsel's lack of preparation also affected their ability to present evidence of an alternative suspect, insofar as they failed to establish more effectively through their cross-examination of Ivana King that Derrick Boone had had unfettered access to her apartment during the time in question and had stored his belongings in or near the location in her apartment from which police recovered guns.

Petitioner presented these allegations to the state courts in his postconviction action and supported them with the affidavit of William Woods. The last state court to issue a reasoned decision on those allegations was the state court of appeals, which rejected them on the merits. The appellate court addressed that claim (the tenth ground for relief in Petitioner's postconviction action), along with a claim of ineffective assistance for the failure to present a theory of defense (the ninth ground for relief in Petitioner's postconviction action). The state appellate court rejected those claims, finding that:

> Woods' affidavit does not supply an alibi for appellant, as nowhere in this affidavit does he state that appellant was with him at the time that the crimes were committed. Although Woods may have been confused at trial about his own whereabouts on the night at issue, it is appellant's whereabouts that are material.

*Jackson*, 2002 WL 1379001, at *10. Petitioner asserts that he is entitled to relief on this claim because the state court's decision involved an unreasonable determination of the facts.

Petitioner's assertion finds no support in the record.[5]

---

[5] The Court reiterates that in its Opinion and Order of September 27, 2004, it not only dismissed as patently without merit the allegations concerning counsel's failure to cross-examine Ivana King about Derrick Boone's unfettered access to her apartment, but also dismissed as procedurally defaulted any allegations about counsel's failure to cross-examine Derrick Boone regarding his unfettered access to Ms. King's apartment. (Doc. # 27, at 47-51.)

To demonstrate that he is entitled to relief, Petitioner must show under *Strickland* that counsel performed unreasonably and to his prejudice. The cases that Petitioner cites finding ineffective assistance for the failure to conduct adequate investigation or to prepare witnesses, *Berryman v. Morton*, 100 F.3d 1089 (3rd Cir. 1996), and *Groseclose v. Bell*, 895 F. Supp. 935, and finding ineffective assistance for the failure to present evidence consistent with claims of innocence, *Sims v. Livesay*, 970 F.2d 1575 (6th Cir. 1992), are inapposite not because they fail to support those propositions, but because they are factually distinguishable. In that regard, this Court rejects Petitioner's assertion that the state appellate court's decision rejecting this claim of ineffective assistance involved an unreasonable determination of the facts based on the evidence that was presented. As to the factual findings made by the state appellate court in rejecting this claim of ineffective assistance, Petitioner has not rebutted those with any evidence, much less clear and convincing evidence.[6] To the extent that the state courts made no factual findings regarding some of the allegations set forth in this ineffective assistance claim, this Court's own review of the record belies any finding of deficient performance on the part of counsel or prejudice resulting therefrom.

First, this Court regards as unassailable the state appellate court's finding that Mr. Woods' affidavit failed to establish an alibi for Petitioner. Mr. Woods averred in his affidavit that:

I was confused when counsel asked me whether I was at Ivana's home the

---

[6] As the Court noted earlier, 28 U.S.C. § 2254(d)(2) prohibits a federal court from granting an application for habeas relief on a claim that the state courts adjudicated on the merits unless the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Further, § 2254(e)(1) provides that the findings of fact of a state court are presumed to be correct and that the Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.

> evening of the crime.  Because I was confused, I was not able to adequately
> inform the jury that I knew I was there at her home that evening, but I could not
> recall the exact date.

(J.A. Vol. III, P.C., Trial, Part D, at 136.)  That statement falls short of establishing an alibi for

Petitioner.

To the extent that Petitioner is suggesting that Mr. Woods, had counsel better prepared

him to testify, definitely could have provided an alibi for Petitioner, then it is curious that

Petitioner did not mention in his own affidavit that Mr. Woods was with him on the night in

question.  Petitioner averred in his affidavit that, "I was at home with my children and my

girlfriend, at the time that this crime occurred."  (J.A. Vol. III, P.C., Trial, Part A, at 130.)  Thus,

to the extent that the state appellate court rejected this claim of ineffective assistance on the basis

of its factual finding that Mr. Woods' affidavit failed to establish an alibi for Petitioner,

Petitioner points to no evidence, much less clear and convincing evidence, to rebut that finding.

Regarding Petitioner's allegation that counsel's inadequate investigation and preparation

resulted in their failure to ask Mr. Woods on direct examination about Ivana King's jealousy in

an effort to provide independent evidence of her bias against Petitioner, this Court considered

and rejected that allegation above.

Finally, Petitioner alleges that counsel's inadequate investigation and preparation

resulted in their failure to establish during cross-examination of Ivana King evidence of a viable

alternative suspect, specifically Derrick Boone.  Petitioner argues that counsel failed, to his

prejudice, to demonstrate that Mr. Boone had unfettered access to Ms. King's apartment, where

police found guns and ammunition, and that the area where police found those items was the area

where Derrick Boone stored his belongings.  This Court finds that these allegations fall short of

establishing ineffective assistance for two reasons.

First, a review of the transcript reveals that defense counsel *did* question Ivana King on cross-examination about Mr. Boone's access to her apartment during the relevant time period. Thus, Petitioner cannot argue that counsel failed to do something that they did. Second, the record before this Court is lacking in persuasive evidence that the guns that police found in Ms. King's apartment were in fact found in an area where Mr. Boone kept his belongings. The Court cannot find ineffectiveness on the part of counsel for failing to establish a fact that Petitioner himself has not even provided solid evidence to establish.

As the Court noted above, a review of Ivana King's trial testimony reveals not only that defense counsel cross-examined her about Derrick Boone's access to her apartment, but also that the same initially was established on direct examination. First, on direct examination, Ms. King testified that Mr. Boone began staying at her Bancroft apartment on a somewhat regular basis by March 1997. (Tr.Vol. IX, at 113-14.) Defense counsel pursued the matter on cross-examination, establishing that although Mr. Boone stayed at the apartment only occasionally, he kept some belongings there and had unfettered access to a key to the apartment. (*Id*. at 139-40.) In light of the foregoing, the Court is not persuaded by Petitioner's allegation that counsel's inadequate investigation and preparation for trial witnesses was evident in their failure to establish through cross-examination of Ms. King that, among other things, Mr. Boone had unfettered access to the apartment in which police found guns and ammunition.

Petitioner is correct, however, in his assertion that counsel failed to ask Ms. King during cross-examination whether the area of her apartment in which the police found guns was the same area in which Mr. Boone stored his belongings. The only evidence that Petitioner offers to

50

support his assertion that the guns were found in an area of the apartment where Mr. Boone kept his belongings is Petitioner's own affidavit.  (Tr.Vol. III, P.C., Trial, Part A, at 130.)  Although the Court does not discount that affidavit simply because it is self-serving, it alone is insufficient to establish that counsel performed unreasonably or to Petitioner's prejudice in failing to establish that "fact" during cross-examination of Ms. King.  Further, the record establishes that police found a Browning Arms shotgun in a closet, two long rifles behind some loose molding under the sink, and various rounds of ammunition hidden in a valance.  (Tr.Vol. VIII, at 79-80, 86.)  Nothing in the record establishes that Mr. Boone kept belongings in the closet, behind some loose molding under the sink, and hidden in a valance.  That being so, Petitioner has not shown that counsel's inadequate investigation and preparation were evident in their failure to establish during cross-examination of Ivana King that the guns found in her apartment were found in a location where Mr. Boone stored his belongings.

For the foregoing reasons, the Court rejects Petitioner's assertion that the state appellate court's decision rejecting this claim of ineffective assistance involved an unreasonable determination of the facts.  The Court further concludes that Petitioner has failed to demonstrate either that his attorneys performed deficiently or that there is a reasonable probability that, but for the deficient performance, the outcome of his trial would have been different.  The Court therefore concludes that sub-part (G) of Part I of Petitioner's first ground for relief is without merit.

      **H.**      <u>**Defense counsel failed to present an available theory of defense.**</u>

Petitioner argues in sub-part (H) of Part I of his first ground for relief that defense counsel were ineffective for failing to present an available theory of defense.  (Doc. # 18 ¶¶ 30-

34.)  Petitioner argues that defense counsel's closing argument did not cogently present evidence

supporting Petitioner's defense, that counsel gave the jury no reason to acquit Petitioner, and that

the first time the jury heard about an alibi was during the trial court's jury instructions.

Petitioner argues that defense counsel's lack of preparation and failure to present adequately a

cohesive defense was highlighted by the affidavit of William Woods, in which Mr. Woods

complained that because of counsel's failure to prepare him to testify, Mr. Woods was confused,

frustrated, and unable to recall the date on which he was with Petitioner at Ivana King's

apartment.  Petitioner further argues that counsel failed to present clearly important information

regarding a viable alternate suspect, specifically by failing to cross-examine Derrick Boone

about the fact that he had unfettered access to the apartment where police found guns and

ammunition.  In short, according to Petitioner, counsel made a feeble attempt at presenting an

alibi, but failed to prepare sufficiently their alibi witness, William Woods, and failed to present

important information concerning a viable alternative suspect.

Petitioner presented this argument to the state courts in the ninth ground for relief of his

postconviction action.  (J.A. Vol. III, P.C, Trial Court, Part A, at 46-48.)  The last state court to

issue a reasoned decision addressing the claim was the state appellate court, and it rejected the

claim on the merits.  As this Court noted above in its rejection of sub-part (G) of this ground for

relief, the state appellate court addressed the instant claim of ineffective assistance for the failure

to present a theory of defense together with Petitioner's claim that trial counsel were ineffective

for failing to conduct an adequate investigation and to prepare adequately witnesses.  The state

appellate court rejected those claims, finding:

> Woods' affidavit does not supply an alibi for appellant, as nowhere in this
> affidavit does he state that appellant was with him at the time that the crimes were

committed.  Although Woods may have been confused at trial about his own whereabouts on the night at issue, it is appellant's whereabouts that are material.

*Jackson*, 2002 WL 1379001, at *10.  As with sub-part (G) of this ground for relief, Petitioner asserts that he is entitled to relief on sub-part (H) because the state court's decision involved an unreasonable determination of the facts.  And as with its rejection of sub-part (G) of this ground for relief, this Court concludes that Petitioner's assertion finds no support in the record.

To demonstrate that he is entitled to relief on this claim, Petitioner must first overcome the factual finding by the state appellate court that William Woods' affidavit did not provide an alibi for Petitioner.  This Petitioner cannot do.  As this Court previously discussed, it regards as unassailable the state appellate court's finding that Mr. Woods' affidavit failed to establish an alibi for Petitioner.  Mr. Woods averred in his affidavit:

> I was confused when counsel asked me whether I was at Ivana's home the evening of the crime.  Because I was confused, I was not able to adequately inform the jury that I knew I was there at her home that evening, but I could not recall the exact date."

(J.A. Vol. III, P.C., Trial, Part D, at 136.)  That statement falls short of establishing an alibi for Petitioner.  Further, to the extent that Petitioner is suggesting that Mr. Woods, had counsel better prepared him to testify, definitely could have provided an alibi for Petitioner, then it is curious that Petitioner did not mention in his own affidavit that Mr. Woods was with him on the night in question.  Petitioner averred in his affidavit that, "I was at home with my children and my girlfriend, at the time that this crime occurred."  (J.A. Vol. III, P.C., Trial, Part A, at 130.)  Thus, to the extent that the state appellate court rejected Petitioner's claim of ineffective assistance for the failure to present a theory of defense on the basis of its factual finding that Mr. Woods' affidavit failed to establish an alibi for Petitioner, Petitioner points to no evidence, much less

53

clear and convincing evidence, to rebut that finding.

In short, counsel cannot be deemed ineffective for failing to present evidence in support of an alibi where, as here, that evidence is shaky at best, and non-existent at worst.  *Poindexter v. Mitchell*, 454 F.3d 564, 575 (6th Cir. 2006); *see also Wolfe v. Bock*, 412 F. Supp. 2d 657, 677-78 (E.D. Mich. 2006) (finding no ineffectiveness for failing to present alibi defense where the Petitioner failed to present any evidence to support that alibi defense).  In *Poindexter*, the Sixth Circuit rejected the Petitioner's claim of ineffective assistance for the failure to present evidence in support of an alibi because counsel was never able to substantiate the Petitioner's claimed alibi.  The Sixth Circuit noted that counsel had been unable to locate a bus driver who, according to the Petitioner, could have testified that Petitioner was on a bus at the time the offenses were committed, that counsel had received little cooperation from the bus company, and that there was overwhelming evidence in the record that the Petitioner was at his ex-girlfriend's apartment and did commit the murders.  *Poindexter*, 454 F.3d at 574.  In this case, William Woods' affidavit fails to establish an alibi for Petitioner.  Further, Petitioner's own affidavit, in which he states that he was home with his girlfriend and children during the time at issue fails to mention that William Woods was with him.  Finally, the jury heard from three different witnesses who placed Petitioner in the victims' apartment during the time the crimes were committed:  Becky Lewis, Malaika Williamson, and Derrick Boone.  For the same reason–namely, the tenuous nature of the alibi evidence that counsel allegedly failed to offer–this Court finds unpersuasive Petitioner's argument that his attorneys were ineffective for allowing the jury to hear about an alibi for the first time during jury instructions.  *Cf. Harrison v. Motley*, 478 F.3d 750, 759 (6th Cir. 2007), *petition for cert. filed*, (U.S. May 22, 2007) (NO. 07-5832) (finding no ineffectiveness for failing

to fulfill promise made during opening statements of alibi defense where proposed alibi witnesses would have offered recantations, allegations of bribery, and inconsistent testimony). Thus, to the extent that Petitioner argues that his attorneys failed to present an available theory of defense by failing to present evidence in support of an alibi and allowing the jury to hear about an alibi for the first time through the jury instructions, Petitioner has failed to prove that his attorneys performed deficiently or to his prejudice.

As for Petitioner's claim that counsel were ineffective for failing to present important information about Derrick Boone being a viable alternate suspect, this Court rejects that claim because, as the Court has previously explained, counsel in this case *did* present such evidence and argument.  *See, e.g., Wolfe v. Bock*, 412 F. Supp. 2d at 678-79 (rejecting Petitioner's claim of ineffective assistance where, contrary to Petitioner's assertion, counsel did present evidence of alternate suspects).  As the Court noted above, a review of Ivana King's trial testimony reveals not only that defense counsel cross-examined her about Derrick Boone's access to her apartment, but also that the same information was elicited on direct examination.

First, on direct examination, Ms. King testified that Mr. Boone began staying at her Bancroft apartment on a somewhat regular basis by March 1997.  (Tr.Vol. IX, at 113-14.) Defense counsel pursued the matter on cross-examination, establishing that although Mr. Boone stayed at the apartment only occasionally, he kept some belongings there and had unfettered access to a key to the apartment.  (*Id*. at 139-40.)  To the extent that Petitioner argues that his counsel were ineffective for failing to establish that Mr. Boone enjoyed unfettered access to Ms. King's apartment through cross-examination of Mr. Boone himself, Petitioner has not shown, and it is not otherwise apparent to the Court, what difference that would have made.  Trial

55

counsel's cross-examination of Mr. Boone, even if it failed to include questions establishing what Ivana King's testimony quite clearly established (that Mr. Boone had unlimited access to Ms. King's apartment), was vigorous and asserted the point not only that Mr. Boone had lied to police on numerous occasions about his involvement in the offenses, but also that Mr. Boone had received a relatively favorable prison sentence for agreeing to plead guilty and to testify against Petitioner.  Further, defense counsel's closing argument focused heavily on the fact that Mr. Boone's testimony was the linchpin to the State's case and that Mr. Boone's testimony was rife with credibility problems.  Counsel emphasized such points as the fact that Mr. Boone knew exactly where to tell police they could find the guns and ammunition that were hidden in Ms. King's apartment, that the jury should weigh cautiously the credibility of witnesses such as Mr. Boone who made deals with the State, and that Mr. Boone appeared to be implicating Petitioner in an effort to protect either Little Bee or himself.

Contrary to Petitioner's assertions and to cases where counsel have been found ineffective for failing to present a theory of defense or evidence in support of their theory of defense, this is not a case where counsel advanced no clear theory or failed to subject the State's case to adversarial testing.  *See, e.g., Groseclose v. Bell*, 130 F.3d 1161, 1169 (6th Cir. 1997) (finding ineffective assistance where counsel failed to present any theory whatsoever, failed to conduct any meaningful adversarial challenge as evidenced by the failure to cross-examine most of the State's witnesses or to present any defense witnesses, and abdicated the Petitioner's case to his co-defendant's counsel.)  Petitioner's trial counsel stated unequivocally in their opening statement that, "[w]hat we are disputing is that Kareem Jackson was part of this tragedy, and we are disputing–or we are making a statement in this case that Kareem Jackson was not involved in

the taking of the lives of these two young men." (Tr.Vol. VIII, at 19.) Counsel then explained

that the State's case was based on the testimony of witnesses who had made deals with the State

and who would not, as a result, be spending the rest of their lives in prison or facing the electric

chair; that this case would be about identifying who was there, who was not, and who was

involved in the deaths of the victims; and that the State bore the burden of proving beyond a

reasonable doubt every element of every offense with which Petitioner was charged. (*Id.* at 19-

20.) During trial, counsel essentially delivered that which they had promised–namely, subjecting

the cooperating witnesses to vigorous cross-examination about the leniency of their respective

sentences and their incentive to implicate Petitioner, as well as questioning the reliability of

witnesses who had identified Petitioner in court. In their closing argument, defense counsel

emphasized that Derrick Boone could have been lying to protect either Little Bee or himself.

Counsel reiterated that the jury should weigh with suspicion the testimony of cooperating

witnesses and that the State had not established, through the testimony of Becky Lewis or Nikki

Long, the identity of Petitioner as one of the robber-assailants. In short, Petitioner has not

established that his attorneys performed deficiently or to his prejudice by allegedly failing to

provide a theory of defense.

      For the foregoing reasons, the Court finds without merit sub-part (H) of Part I of

Petitioner's first ground for relief. Petitioner has not shown that the state appellate court's

rejection of that claim contravened or unreasonably applied controlling Supreme Court precedent

or involved an unreasonable determination of the facts. Further, to the extent the state appellate

court did not address certain aspects of Petitioner's claim, this Court's own review of the record

and relevant case law reveals no ineffective assistance under the two-part *Strickland* test.

**I.**     <u>Defense counsel failed to object to the State improperly</u>
              <u>impeaching its own witness with a prior inconsistent statement</u>.

In sub-part (I) of Part I of Petitioner's first ground for relief, Petitioner argues that his trial attorneys provided ineffective assistance by failing to object when the State improperly impeached its own witness using a prior inconsistent statement. (Doc. # 18 ¶¶ 35-37.) In response to questions by the prosecution on direct examination about what Petitioner had told her shortly after the crimes were committed, Ivana King testified that she could not remember. The prosecution then impeached her with her prior statement to police in which she recounted that Petitioner had told her he had "done two people." (Tr.Vol. IX, at 120-22.) Petitioner argues that the prosecution's impeachment of Ms. King with her prior inconsistent statement was improper because the prosecution failed to first make a showing of surprise and affirmative damage as required by Ohio R. Evid. 607(A). Petitioner further argues that, even assuming that the prosecution's intent was solely to refresh Ms. King's recollection with her prior statement, the prosecution still violated Ohio R. Evid. 612, which requires the witness to first review her statement and then to testify from her refreshed memory. Thus, Petitioner argues that counsel performed deficiently in failing to object to the improper impeachment and that he was prejudiced by the deficient performance because it allowed the jury to hear damaging information to which it was not entitled.

Petitioner presented this claim of ineffective assistance to the Supreme Court of Ohio on direct appeal. The Ohio Supreme Court rejected it, but not before first finding that Petitioner's counsel *had* performed deficiently in failing to object. The Supreme Court began its analysis by reasoning that the impeachment as described above was improper under Ohio R. Evid. 607(A) and then concluded that "defense counsel's failure to object was deficient in this respect."

*Jackson*, 92 Ohio St. 3d at 448. The court went on to conclude, however, that Petitioner had suffered no prejudice from his counsel's failure to object because "even if defense counsel had objected to this line of questioning, the prosecutor would still have been able to properly introduce the witness's statement under Evid.R. 803(5), as past recollection recorded." *Id.*

Petitioner argues that the Ohio Supreme Court's decision that he had suffered no prejudice from counsel's deficient performance involved an unreasonable application of clearly established federal law. With respect to the Ohio Supreme Court's rationale that the prosecution would have been able to properly introduce Ms. King' statement under Ohio R. Evid. 803(5) as past recollection recorded, Petitioner argues that "the State did not make this argument, and the Ohio Supreme Court cannot assume the State would have." (Doc. # 42, at 30-31.) This Court finds no unreasonable application of clearly established federal law on the part of the Ohio Supreme Court in concluding that Petitioner was not prejudiced by counsel's failure to object to the prosecution's improper impeachment of its own witness.

Initially, the Court assumes for purposes of this discussion that the Ohio Supreme Court was not only reasonable, but also correct, in concluding that the prosecution's use of Ivana King's prior inconsistent statement to impeach her was improper under Ohio R. Evid. 607(A) and that trial counsel performed deficiently under the first part of the *Strickland* test in failing to object to that misconduct. The only issue before the Court is whether Petitioner was prejudiced by his counsel's deficient performance. Petitioner argues that he was prejudiced because counsel's error allowed the trier of fact to hear damaging information to which it was not technically entitled. He asserts that the Ohio Supreme Court unreasonably applied *Strickland*'s prejudice component in concluding otherwise. The essence of Petitioner's argument is that the

59

Ohio Supreme Court's reasoning for its conclusion that he was not prejudiced by counsel's error–namely, that the prosecution would have been able to introduce Ms. King's statement under Ohio R. Evid. 803(5) as past recollection recorded–involved an unreasonable application of *Strickland*'s prejudice component because "the State did not make this argument, and the Ohio Supreme Court cannot assume the State would have." (Doc. # 42, at 30-31.) The problem with Petitioner's argument is that he has not cited, and the Court is not aware of, any case supporting the notion that a state court may not find lack of prejudice under *Strickland* in the manner in which the Ohio Supreme Court did.

As noted earlier, to establish prejudice, the second prong of the *Strickland* test, a Petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A state court can reasonably conclude that there is no reasonable probability that the result of the proceeding would have been different, but for counsel's deficient performance in failing to object to an alleged error, by concluding that any such objection was unlikely to succeed in keeping from the trier of fact the evidence or prosecutorial argument to which counsel failed to object. *See, e.g., Howard v. Boucher*, 405 F.3d 459, 481-85 (6th Cir. 2005), *cert. denied*, 546 U.S. 1100 (2006) (citing *Keller v. Larkins*, 251 F.3d 408, 419 (3d Cir. 2001)).

For the foregoing reasons, the Court finds that the ineffective assistance claim set forth in sub-part (I) of Part I of Petitioner's first ground for relief is without merit. Petitioner has not shown and the Court is not otherwise persuaded that the Ohio Supreme Court unreasonably applied controlling federal law when it concluded that Petitioner had suffered no prejudice from

60

counsel's failure to object to the prosecution's improper impeachment of its own witness.

**J.**      **Counsel rendered ineffective assistance when they did not oppose expert opinion testimony expressed in terms that failed to specify a more probable than not outcome.**

Petitioner argues in sub-part (J) of Part I of his first ground for relief that his trial attorneys were ineffective for failing to oppose expert testimony that was expressed in terms that failed to specify a more probable than not outcome. (Doc. # 18 ¶¶ 38-43.) Explaining that "[t]he admissibility of expert testimony in criminal cases is contingent upon the expression of an opinion that is stated in terms of reasonable certainty or probability," (*Id*. ¶ 38), and that an expression of an opinion in those terms relates to the competence of the evidence and not its weight, Petitioner complains that the testimony of three experts failed to satisfy that condition precedent. Petitioner complains that Ronald Dye, BCI firearms expert, expressed an opinion in terms of a "reasonable degree of scientific certainty" that the bullet (State Exhibit 40) recovered from Antorio Hunter was fired from a Colt revolver (State Exhibit 36) that Petitioner left at Malaika Williamson's house. (*Id*. ¶ 40, citing Tr.Vol. IX, at 184.) Petitioner further complains that Dr. Keith Norton testified as to the cause of death of Terrance Walker and that Dr. Patrick Fardal testified as to the cause of death of Antorio Hunter in terms of a "reasonable degree of medical certainty." (*Id*. ¶¶ 41-42, citing Tr.Vol. X, at 21 and 36.) Petitioner argues that counsel's failure to oppose the admission of expert testimony that was not expressed in terms of probability falls below any objective standard of reasonableness. Petitioner further argues that he was prejudiced because the admission of incompetent testimony concerning significant issues in his case–cause of death and identification of the murder weapon–denied him a fair trial.

The Supreme Court of Ohio rejected this claim on direct appeal. Finding that the expert

opinions at issue were properly expressed, the Ohio Supreme Court found no ineffectiveness on

the part of Petitioner's attorneys in failing to object to those opinions. Specifically, the court

stated:

> An expert opinion is competent if it is held to a reasonable degree of scientific or
> medical certainty. *State v. Benner* (1988), 40 Ohio St. 3d 301, 313, 533 N.E.2d
> 701, 714. In this regard, we have found that "reasonable certainty" is
> synonymous with the term "probability." *Id.*

*Jackson*, 92 Ohio St. 3d at 448. Petitioner appears to challenge the Ohio Supreme Court's

decision in two respects. First, he argues that because the terms "certainty" and "probability" are

not one and the same, according to *Webster's New World Dictionary* (3rd College Edition 1988),

the Ohio Supreme Court's decision rejecting his claim of ineffective assistance for the failure to

object to expert testimony expressed in terms that failed to specify a more probable than not

outcome involved an unreasonable application of clearly established federal law. (Doc. # 42, at

32-33.) Second, Petitioner states that "the Ohio Supreme Court's decision not finding counsel

ineffective is an unreasonable determination of the facts in light of the evidence presented." (*Id.*

at 32-33.) Neither challenge is availing and, quite frankly, the Court finds Petitioner's argument

difficult to follow.

   In both his amended petition and traverse, Petitioner states that "[t]he admissibility of

expert testimony in criminal cases is contingent upon the expression of an opinion that is stated

in terms of *reasonable certainty* or *probability*." (Doc. # 18 ¶ 38; Doc. # 42, at 31) (emphasis

added.) Petitioner then assails BCI firearms expert Ronald Dye for expressing an expert opinion

in terms of "*reasonable* degree of scientific *certainty*," and Drs. Keith Norton and Patrick Fardal

for expressing opinions in terms of "*reasonable* degree of medical *certainty*." In short, the Court

in unclear as to which word in those phrases Petitioner finds questionable. It cannot be the word

"certainty," because Petitioner himself states that expert opinions must be expressed in terms of reasonable certainty or probability. It cannot be the word "reasonable," for Petitioner himself uses that word, too, to qualify certainty or probability. It cannot be the word "degree," because Petitioner's traverse focuses solely on the differences between the definitions of "certainty" and "probability." Surely, it cannot be the words "scientific" or "medical"; those words simply referenced the area of expertise of the witness testifying.

Petitioner argues that counsel should have opposed the admission of the expert testimony on the basis that the testimony was "not expressed in terms of probability." (Doc. # 42, at 32.) Although his argument is somewhat difficult to decipher, Petitioner appears to be arguing that the expert witnesses should have been required to state their expert opinions with less certainty, so as to permit the jury to weigh those opinions as mere possibilities or even probable possibilities instead of essentially requiring the jury to accept those opinions as virtual facts. Petitioner cites no authority for this argument. As such, it cannot be said that his attorneys performed deficiently for failing to raise an objection that has no apparent basis in the law.

Controlling Ohio law at the time of Petitioner's trial required expert medical testimony to be expressed in terms of "reasonable medical certainty," *State v. Holt*, 17 Ohio St. 2d 81, 85 (1969), and stated that "reasonable certainty" meant "probability," *State v. Benner*, 40 Ohio St. 3d 301, 313 (1988). In *State v. D'Ambrosio*, 67 Ohio St. 3d 185 (1993), in response to a challenge by a defendant-appellant that expert testimony expressed in terms of possibility instead of reasonable certainty or probability should have been disallowed as too speculative, the Supreme Court of Ohio held that "[w]hile several decisions from this court indicate that speculative opinions by medical experts are inadmissible since they are based on possibilities

and not probabilities, ... we believe that the better practice, especially in criminal cases, is to let experts testify in terms of possibility." *Id*. at 191. *See also State v. Jones*, 90 Ohio St. 3d 403, 415-16 (2000) (rejecting challenge to expert testimony that was made because the expert testimony was not based on widely accepted knowledge, facts, and principles); *State v. Allen*, 73 Ohio St. 3d 626, 635-36 (1995) (rejecting challenge to expert testimony that was made because the expert testimony was expressed in terms of possibility). Those cases, unlike the present case, involved challenges to the competence or admissibility of expert testimony on grounds that the testimony was too speculative. Petitioner, on the other hand, appears to challenge the expert testimony in his case as being too certain. In any event, *D'Ambrosio*, *Jones*, and *Allen* state that expert testimony expressed in terms of possibility is allowed or even preferred, but not required.

Thus, whatever merit might exist to Petitioner's suggestion that experts should be prohibited or discouraged from expressing their opinions with such certainty as to virtually require the trier of fact to accept those opinions as facts, his argument is nothing if not novel, and he will not be heard to argue that his counsel's failure to make an objection based on a novel theory fell "below any objective standard of effective assistance." (Doc. # 42, at 32.) The terms by which the experts in this case expressed their opinions fell right in line with controlling law, meaning that neither deficient performance nor prejudice resulted from counsel's failure to object. For the reasons discussed above, the Court is not persuaded that the Ohio Supreme Court's decision rejecting this claim of ineffective assistance involved an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence that was presented. Sub-part (J) of Part I of Petitioner's first ground for relief is without merit.

64

**K.** **Trial counsel failed to object to erroneous jury instructions
telling the jury that they must unanimously acquit a person of
the crime and the specifications before they may consider
lesser offenses.**

Petitioner argues in sub-part (K) of Part I of his first ground for relief that his trial

attorneys were ineffective for failing to object to improper "unanimity" jury instructions.  (Doc.

# 18 ¶¶ 44-46.)  Citing *State v. Thomas*, 40 Ohio St. 3d 213 (1988), Petitioner states that a jury is

not required to unanimously find that a defendant is not guilty of the crime charged before it can

consider lesser included offenses.  Petitioner argues that the trial court violated that principle

each time it instructed the jury during the trial phase on the specifications with which Petitioner

was charged as follows:

> If you find that the State has proved all parts of the specification beyond a
> reasonable doubt, you must find the defendant guilty of the specification.
>
> If you find that the State failed to prove beyond a reasonable doubt any part of
> specification number one, you must find the defendant not guilty of that
> specification.

(Tr.Vol. X, at 196-97.)  Petitioner argues that his trial attorneys rendered ineffective assistance in

failing to object to the "form and substance" of this instruction each time the trial court gave it.

The Ohio Supreme Court rejected this ineffective assistance claim on direct appeal.  The

Ohio Supreme Court held that counsel's failure to object was not error because, "unlike the

instructional error that occurred in *Thomas*, in this case the jury were [sic] not instructed to

unanimously acquit the accused of an offense before moving to any lesser offense." *Jackson*, 92

Ohio St. 3d at 446.  Petitioner presents a "hybrid" challenge to the Ohio Supreme Court's

decision under 28 U.S.C. § 2254(d), arguing that it was an unreasonable application of

*Strickland* in light of the facts and evidence presented.  (Doc. # 42, at 33.)  This Court disagrees.

65

The Ohio Supreme Court concluded that the jury instructions at issue did not violate the holding in *Thomas* that "[t]he jury is not required to determine unanimously that the defendant is not guilty of the crime charged before it may consider a lesser included offense."  40 Ohio St 3d 213, at paragraph three of the syllabus.  Notwithstanding the settled principle that it is not for this Court to question the pronouncement of a state court on matters of state law, *Seymour v. Walker*, 224 F.3d 542, 558 (6th Cir. 2000), it does not appear to this Court that the jury instructions at issue violated *Thomas*, insofar as they did not expressly require the jury unanimously to acquit Petitioner of the specification charged before considering lesser included offenses.  *Cf. Mapes v. Coyle*, 171 F.3d 408, 416-17 (6th Cir. 1999); *see also Jamison v. Collins*, 100 F. Supp. 2d 647, 769 (S.D. Ohio 2000), *aff'd*, 291 F.3d 380 (6th Cir. 2002).  In any event, neither deficient performance nor prejudice result from counsel's failure to object to jury instructions that the state courts find correct under state law.  *Davis v. Mitchell*, 89 F. App'x 932, 937 (6th Cir. 2003) ("If the jury instructions were proper, as we must assume, then Davis's counsel could not have rendered ineffective assistance by failing to object to them.").  Because the jury instructions at issue did not violate *Thomas*, not only in this Court's view, but more importantly, in the opinion of the Ohio Supreme Court, Petitioner's counsel did not perform deficiently or to his prejudice in failing to object to them.  Petitioner has not demonstrated that the Ohio Supreme Court's decision rejecting his claim of ineffective assistance involved an unreasonable application of *Strickland* or an unreasonable determination of the facts in light of the evidence that was presented.  Sub-part (K) of Part I of Petitioner's first ground for relief is without merit.

**Part II: Mitigation Phase Ineffectiveness**

66

A.      **Counsel failed to properly respond to the extraneous influence
          upon Juror Maureen Huddle.**

Petitioner argues in sub-part (A) of Part II of his first ground for relief that his trial

attorneys were ineffective by failing to respond properly to an extraneous influence on juror

Maureen Huddle prior to the beginning of the mitigation phase of Petitioner's trial.  (Doc. # 18

¶¶ 48-50.)  Regarding the facts relevant to his claim, Petitioner recounts that on Tuesday,

January 27, 1998, before his mitigation hearing began, the trial court learned that on Friday,

January 23, 1998, juror Maureen Huddle had returned home to find two men standing in her

driveway and her garage door open with its bolts lying on the garage floor.  (Tr.Vol. XI, at 19.)

Later that evening, Petitioner continues, police knocked on Ms. Huddle's door to inform her that

her garage door was open again.  Ms. Huddle informed the trial court of the incidents, prompting

the trial court to ask her a single question– namely, whether she believed that she could still give

her full attention to the case–to which Ms. Huddle responded, "Yes."  (Doc. # 18 ¶ 48, quoting

Tr.Vol. XI, at 20.)

Because the trial court did not conduct a more in-depth colloquy to determine the scope

and effect of the incident on Ms. Huddle or admonish her not to discuss the incident with her

fellow jurors, Petitioner argues that his trial attorneys were ineffective for not taking any steps to

discover the impact of the incident on Ms. Huddle or whether it might affect her determination of

his sentence, and for not requesting the trial court to instruct Ms. Huddle not to discuss the

incident with her fellow jurors.  Petitioner states that, prior to the mitigation phase, Ms. Huddle

entered the jury room crying and proceeded to inform her fellow jurors not only of the incident

involving the men in her driveway and her open garage door, but also of some "bizarre" phone

calls she had received.  (Doc. # 18 ¶ 49, citing Postconviction Exhibit 4.)  Petitioner further

states that another person had to drive Ms. Huddle home one evening because of her fear stemming from the incidents and phone calls.  Because of counsel's ineffectiveness in pursuing the matter, Petitioner argues, Ms. Huddle brought into the jury room extraneous information that ultimately allowed impermissible factors to influence the jury's determination of Petitioner's sentence.  Petitioner argues that he was prejudiced by counsel's deficient performance, insofar as evidence suggesting attempts to frighten the jurors was factored into the determination of his sentence.

Petitioner presented this claim to the state courts in his postconviction action.  He argued in his sixteenth claim for relief that his sentence was unconstitutional because extraneous influences had been brought upon it, in his seventeenth claim that the trial court erred by not conducting a more in-depth colloquy or full hearing and in failing to admonish Ms. Huddle not to discuss the incident with fellow jurors, and in his eighteenth claim that trial counsel were ineffective for not taking any steps to investigate the impact on Ms. Huddle or other jurors and for not asking the trial court to admonish Ms. Huddle not to mention the incident to the other jurors.  (J.A. Vol. III, P.C., Trial, Part A, at 67-75.)  He supported the claims with the affidavit of juror James Cahill, III, wherein Mr. Cahill averred in the third paragraph:

> Prior to the mitigation phase, Juror Maureen Huddle informed the remaining jurors as to the bizarre phone calls that she received at her home and as to the incident that occurred near her home the night prior to the trial phase jury deliberations.  Juror Huddle came in crying after these incidents and was taken home by someone one evening due to her fear.

(*Id*. at 128.)

The last state court to issue a reasoned decision on these claims was the state appellate court.  It rejected the claims as follows:

The record reflects that Huddle informed the court of the incident and that the court and counsel interviewed her in an effort to ascertain the circumstances. Juror Huddle informed the court that she did not believe there was any connection between the incident and appellant's trial, and she stated that the incident would have no impact on her capacity to serve as a juror. Even assuming that Cahill's affidavit is admissible, in it Cahill says nothing about the impact of Huddle's statements upon the jury and it does not add any material information. We conclude that the incident involving Huddle was part of the trial record, and any arguments pertaining to this incident could have been addressed at trial or on direct appeal. Accordingly, appellant's 16th, 17th, and 18th grounds for relief are barred by the doctrine of res judicata.

*Jackson*, 2002 WL 1379001, at \*11. Petitioner argues that this Court should review his claim *de novo* because the state appellate court not only improperly rejected claims relating to the Huddle incidents on the basis of *res judicata*, but also failed entirely to address the claim of ineffective assistance relating to the matter. (Doc. # 42, at 36-37.) Petitioner further argues that, even under the standard of review set forth in 28 U.S.C. § 2254(d), he should prevail on this claim of ineffective assistance because the state appellate court's decision denying the claim involved an unreasonable determination of the facts in light of the evidence that was presented. (*Id.*)

In this instance, the state appellate court primarily rejected Petitioner's claim not on the merits, but on the basis of a state procedural rule. In its Opinion and Order of September 27, 2004, this Court concluded that Petitioner's claim was properly before it in this habeas corpus proceeding and that Petitioner had not committed procedural default in raising the claim in his state postconviction action instead of on direct appeal, given that the claim relied on and was supported by evidence outside the trial record: the affidavit of juror James Cahill. (Doc. # 27, at 51-58.) Finding that James Cahill's affidavit was prohibited under Ohio R. Evid. 606(B), the state courts concluded that Petitioner's claim was barred by *res judicata* because it was

unsupported by any evidence outside the record and could have been raised on direct appeal.[7]
This Court questioned whether James Cahill's affidavit violated Ohio R. Evid. 606(B), as the
state courts concluded it had, given that the statements at issue in the affidavit merely provided
evidence of a possible extraneous influence on the jury and Mr. Cahills' observations of Ms.
Huddle's demeanor and reactions, but did not put forth evidence or statements about any juror's
mental processes or deliberations.  (Doc. # 27, at 56-58.)  Because the state courts rejected all of
Petitioner's claims relating to juror Maureen Huddle, including the claim that Petitioner's
attorneys were ineffective for failing to inquire of Ms. Huddle or to ask the trial court to instruct
her not to discuss the incident with fellow jurors, on the basis of a state procedural rule instead of
on the merits, Petitioner urges this Court to conduct *de novo* review of the claims.

It is true, as this Court has already noted, that a federal habeas court's review of a
constitutional claim is not circumscribed by a state court decision that was not an adjudication on
the merits.  *See, e.g., Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (citing *Wiggins v.
Smith*, 539 U.S. 510, 534 (2003)).  To the extent, however, that the state appellate court rendered

---

[7]        Ohio R. Evid. 606(B) forbids jurors from testifying about any matters or statements occurring
during deliberations, about anything that may have influenced a juror to assent to a verdict, or about his mental
processes in connection with reaching the verdict. Rule 606(B) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter
> or statement occurring during the course of the jury's deliberations or to the effect of anything
> upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the
> verdict or indictment or concerning his mental processes in connection therewith.  A juror may
> testify on the question whether extraneous prejudicial information was improperly brought to the
> jury's attention or whether any outside influence was improperly brought to bear on any juror, only
> after some outside evidence of that act or event has been presented.  However a juror may testify
> without the presentation of any outside evidence concerning any threat, any bribe, any attempted
> threat or bribe, or any improprieties of any officer of the court.  His affidavit or evidence of any
> statement by him concerning a matter about which he would be precluded from testifying will not
> be received for these purposes.

Ohio R. Evid. 606(B).

factual findings en route to its ultimate conclusion that Petitioner's claim was barred under Ohio's rule of *res judicata*, this Court shall presume those findings correct, absent clear and convincing evidence to rebut them. 28 U.S.C. § 2254(e). *See, e.g., Smith v. Phillips*, 455 U.S. 209, 218 (1982). In any event, this Court finds that under either *de novo* review or deferential review under § 2254(d), Petitioner's claim does not warrant habeas corpus relief.

When credible evidence suggests that a juror has been exposed to improper extraneous influence, the trial court must conduct a hearing to determine the facts and circumstances, the impact on the juror, and whether the events at issue were prejudicial. *See Remmer v. United States*, 347 U.S. 227, 229-30 (1954); *see also Smith v. Phillips*, 455 U.S. 209, 215 (1982). The defendant bears the burden of proving actual bias or prejudice. *See, e.g., State v. Zelinka*, 862 F.2d 92, 95-96 (6th Cir. 1988); *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984). Thus, it stands to reason that any such hearing must afford the defendant the opportunity to question the juror. *See Smith*, 455 U.S. at 215; *Remmer*, 347 U.S. at 230.

The facts relevant to this claim are as follows. On the morning of Tuesday, January 27, 1998, just prior to the commencement of the mitigation hearing, juror Maureen Huddle was brought in and examined outside the presence of the jury:

> The Court:    Please be seated. Ms. Huddle, you have indicated that there are a couple of things that concerned you when you left Friday that you encountered over the weekend, and I have shared those with counsel, and I want to make sure for the record that we have it on the record.
>
> Why don't you, if you could, just simply relate what you encountered when you got home on Friday?
>
> Juror Huddle:    When I went home on Friday, I turned down our street and two people were standing right at the end of my street. I live in a house next to the corner. They were following right in the middle of the street, following my car, and as soon as I pulled up to my house and I saw my garage door was open, I

71

decided not to pull into the driveway, no one is home.

So I went to a neighbor's like three doors down, and I turned around and looked and those two men stood right there at my driveway. So I went straight to the police. And they came over and looked through the house. They said there had been a van parked there about an hour before, and they described the van. They didn't tell me anything else. They described it. I had never seen a van like that in our neighborhood. Then last night the police knocked on our door at 2:00 in the morning, someone – our garage door was a foot open sometime between 1:00 and 2:00.

The Court:    Has there been an arrest made that you are aware of?

Juror Huddle:    No, not at all.

The Court:    I have consulted with counsel, and we are certain there is no reason to think any of that activity is associated in any way with this case. However, I want to make sure that you can focus on the task at hand here.

Do you believe that despite the fact that these incidents have happened over the course of the weekend, that you can still give us your full attention in this matter?

Juror Huddle:    Yes.

The Court:    Okay. Does counsel wish to inquire?

Mr. Stead [on behalf of the state]:    Did you bring this to our attention because you had a concern that it was somehow connected to this case?

Juror Huddle:    I honestly think it is all coincidence, but I just thought I would mention it to them. I didn't mean to cause anything.

Mr. Stead:    No.

The Court:    You haven't.

Mr. Stead:    That is no problem. I'm just concerned that because you brought it up that you – I mean, obviously the lawyers have, through the judge, have told you we don't think it is connected.

Juror Huddle:    I don't think it is either.

Mr. Stead:    Did you think it was connected?

72

Juror Huddle: No. We never had anything like that in our neighborhood happen. I was a little bit concerned about that Friday night. I was also all alone, that did scare me. But I was fine after they came and looked in the house. Plus, all the bolts were missing out of the top of the garage on the track. They were all laying on the floor in our garage. So who knows. It is probably our garage door is broken, it goes up by itself. Who knows.

Mr. Stead: But I'm assuming from what you're saying that that experience won't affect how you view the evidence in this case?

Juror Huddle: No.

Mr. Stead: It won't affect how you judge the things you're going to have to judge?

Juror Huddle: No.

Mr. Stead: Nothing else.

Mr. Schumacher [on behalf of the defense]: I don't believe I have anything.

The Court: Stay out here and we'll get the rest of the jury.

(Tr. Vol. XI, at 18-22).

The failure to request a hearing or for the trial court to otherwise investigate credible evidence of improper extraneous influences on jurors can constitute ineffective assistance of counsel. *Government of the Virgin Islands v. Weatherwax*, 20 F.3d 572, 578-79 (3rd Cir. 1994). But in assessing counsel's performance in this instance, the Court hastens to reiterate that "[j]udicial scrutiny of performance is highly deferential, and [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time.'" *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000) (quoting *Strickland,* 466 U.S. at 689). Recently, in *Hasan v. Ishee*, the Honorable Magistrate Judge

73

Michael Merz found neither deficient performance nor prejudice on the part of a Petitioner's counsel for failing to ask questions of jurors regarding their exposure to protests by capital punishment opponents outside the courthouse:

> [U]nder *Remmer* and its progeny, a defendant is entitled to question jurors on the impact of extraneous information.  *Remmer*, 347 U.S. at 230; *Smith v. Phillips*, 455 U.S. at 216; *United States v. Pennell*, 737 F.2d at 532.  Hasan's counsel, however, acquiesced to the trial court's questioning of the jurors, such as it was. (Trial Tr. At 1848.)  Entitlement to question the jurors does not impose an obligation on counsel to pursue such questioning in all cases, but even if it did, Hasan had made no attempt to demonstrate how he was prejudiced by his counsel's failure to *voir dire* the jury on the effect, if any, of the extraneous information.  Instead, he contends that since prejudice was inadequately inquired into by the trial judge at the time, he has been forever deprived of the ability to show prejudice for purposes of his ineffective assistance of trial counsel claim. (Traverse, Doc. No. 22 at 25-27.)  In habeas corpus, however, prejudice may be shown by testimony, affidavits, deposition, or other similar documentation obtained after trial.  For instance, Hasan could have contacted any jurors who were influenced by the extraneous information and formalized their bias by way of an affidavit, deposition, or testimony at an evidentiary hearing.  That, Hasan did not do, however, and his failure to demonstrate prejudice from his attorneys' alleged ineffective assistance is consequently attributable to his own inaction rather than the trial court's limited *voir dire* of the jury at the time of trial.

*Hasan v. Ishee*, No. 1:03-cv-280, 2006 WL 3253081, at *19 (S.D. Ohio Aug. 14, 2006).

Viewing the facts from the perspective of Petitioner's counsel at the time, this Court cannot find that counsel's failure to inquire further of Ms. Huddle was "outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  A review of Ms. Huddle's testimony during the trial court's colloquy reveals that Ms. Huddle was relatively dismissive about the import of the incidents once she had had time to consider them and that for all she knew, some bolts that she had later found on the garage floor may have been causing her garage door to open on its own.  She confirmed that she did not believe the incidents were connected to Petitioner's trial and stated that she did not intend "to cause anything" by bringing them to the

court's attention.  She stated three times during the short colloquy that the incidents would not affect her ability to serve as a juror in Petitioner's case.  Here, as in *Hasan*, counsel were reasonable in acquiescing to the questioning conducted by the trial court and prosecution and the trial court's determination that Ms. Huddle was not biased, prejudiced, or otherwise affected by the incidents.  If anything, the trial court's questioning in the instant case was more probing than the trial court's questioning in *Hasan*, making counsel's reliance on it that much more reasonable.

      Referencing James Cahill's affidavit, Petitioner argues that had counsel gone beyond the questioning posed by the trial court and the prosecution, counsel would have discovered that Ms. Huddle, contrary to what she stated during the trial court's *voir dire* of her, *was* upset about the incidents, as evidenced by the fact that she went into the jury room crying and had to be driven home one evening due to her fear, and that she *did* discuss with fellow jurors not only the incidents involving her garage door, but also "bizarre" phone calls that she never even mentioned to the trial court.  (Doc. # 42, at 36.)  Petitioner's allegation smacks of the very hindsight that *Strickland* cautions against.  The fact remains that counsel's performance, when viewed from their perspective at that time, was reasonable.  The Court is mindful, as Petitioner points out, of Justice O'Connor's admonition in *Smith v. Phillips* that "[d]etermining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it."  455 U.S. at 221-22 (O'Connor, J., concurring).  That said, in assessing the reasonableness of the choice by Petitioner's counsel not to inquire further of Ms. Huddle, this Court notes that "[a] juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court."

*Phillips v. Bradshaw*, No. 5:03 CV 875, 2006 WL 2855077, at *25 (N.D. Ohio Sept. 29, 2006)

(citing *Smith v. Phillips*, 455 U.S. at 217 n.7, and *Zelinka*, 862 F.2d at 95-96). Nothing in Mr.

Cahill's affidavit is sufficient to call into question the reasonableness of counsel's decision,

viewed from counsel's perspective at that time, not to inquire further of Ms. Huddle.

Of course, here, unlike *Hasan*, Petitioner made an effort to demonstrate prejudice in

precisely the manner prescribed by Magistrate Judge Merz. However, Petitioner's efforts fall

short of establishing prejudice from counsel's alleged deficient performance. The affidavit of

juror James Cahill consists of two sentences regarding the matter:

> Prior to the mitigation phase, Juror Maureen Huddle informed the remaining
> jurors as to the bizarre phone calls that she received at her home and as to the
> incident that occurred near hear home the night prior to the trial phase jury
> deliberations. Juror Huddle came in crying after these incidents and was taken
> home by someone one evening due to her fear.

(J.A. Vol. III, P.C., Trial, Part A, at 128.) This does not establish that Ms. Huddle, James Cahill,

or any other jurors felt that the incidents reported by Ms. Huddle were related to Petitioner's

trial–although Petitioner made that unfounded statement in his postconviction action (*Id*. at 57, ¶

184)–or that Ms. Huddle, Mr. Cahill, or any other jurors were in any manner improperly

influenced by the incidents reported by Ms. Huddle or the manner in which she reacted to them.

That said, Mr. Cahill's affidavit presented sufficient cause for concern to persuade this Court to

grant Petitioner's request to depose Ms. Huddle and Mr. Cahill to further develop the record.

(Doc. # 41, at 24-28, 40-45.) On August 25, 2005, Petitioner filed a notice stating, "Undersigned

counsels have approached the aforementioned witnesses and have discovered that none of them

are able to add any information that would be helpful to this Court in resolving the issues before

it." (Doc. # 44, at 2.) Left with only Mr. Cahill's affidavit, this Court cannot conclude that

76

Petitioner was prejudiced by his counsel's failure to inquire further of Ms. Huddle or to request the trial court to admonish Ms. Huddle not to discuss the incidents with her fellow jurors.

For the foregoing reasons, the Court concludes from its own review of the record and relevant case law that Petitioner has shown neither deficient performance nor prejudice stemming from defense counsel's failure to inquire further of Ms. Huddle or to ask the trial court to instruct her not to discuss the incident with her fellow jurors. Even under the deferential standard of review set forth in 28 U.S.C. § 2254(d), the Court further concludes that the state appellate court's decision rejecting Petitioner's claim did not contravene or unreasonably apply federal law or involve an unreasonable determination of the facts in light of the evidence that was presented. Sub-part (A) of Part II of Petitioner's first ground for relief is without merit.

**B.    Defense counsel failed to adequately investigate Mr. Jackson's family and social history for mitigating factors.**

In sub-part (B) of Part II of his first ground for relief, Petitioner argues that his trial attorneys were ineffective for failing to conduct an adequate investigation into Petitioner's family and social history for mitigating factors. (Doc. # 18 ¶¶ 51-56.) Petitioner argues that counsel in capital cases have a duty to investigate their client's background for mitigating factors and that only after a full investigation can counsel make an informed, tactical decision about what mitigating evidence to present. Petitioner complains that trial counsel, ostensibly because they were unduly focused on urging Petitioner to accept a plea deal, either did not interview or failed to interview adequately many of Petitioner's friends and family members, and, as a result, failed to present available mitigating evidence. (Doc. # 42, at 38, citing Postconviction Exhibits 1, 8, 9, 10, 11, 12, 13, 14, and 37, at J.A. Vol. III, P.C., Trial, Part A, at 96-115, 162-187 and J.A. Vol. III, P.C., Trial, Part D, at 136-37.) For example, Petitioner argues, counsel did not formally

77

interview Petitioner's girlfriend Sheila Hamiter or Petitioner's cousin William Woods before either appeared as a witness for Petitioner, instead conducting cursory interviews that included no questions about Petitioner's background or character.  Petitioner offers as another example the assertion that counsel spoke with Petitioner's parents before they testified, but failed to focus on Petitioner's family history or development.  As a result of their failure to investigate, according to Petitioner, counsel did not discover the following mitigating evidence:

1.    Mr. Jackson's mother, Robbie, was subjected to the domestic violence and drinking of her parents as a child.  These family dynamics continued for another generation as Robbie gave birth to Mr. Jackson on March 5, 1974.

2.    As a child, Mr. Jackson witnesses his father, Michael's, obnoxious drunken and abusive behavior towards his mother.  His parents' on-again-off-again relationship continued until Mr. Jackson was six years old.

3.    Mr. Jackson's father never provided the foundation Mr. Jackson needed because he was preoccupied with drinking, doing drugs, and fighting with Mr. Jackson's mother.

4.    Mr. Jackson lived in an environment which lacked responsible adult role leadership, which led to his poor judgment and socially unacceptable behaviors.

5.    Mr. Jackson relocated with his parents 18 times before he turned 6 years old. He attended five schools between kindergarten and eighth grade.  During the third grade, he was absent for a total of 34.5 days.  Mr. Jackson's grades progressively declined through the fifth grade.

6.    The family experienced intense financial stress.  Mr. Jackson was left alone for extended periods as a child.  This prompted Mr. Jackson's search for alternative 'parental figures' in a local gang.

7.    Mr. Jackson's mother attempted to restrict Mr. Jackson's activities while attending high school and prohibited him from having friends or girlfriends.

8.    While Mr. Jackson was attending high school, his mother would lock him out of the house for the evening if he was not home when she wanted.  Mr. Jackson was then left to find a place to stay for the night.  Mr. Jackson began staying with friends, who ultimately became the replacements for his familial support.

78

9.    Mr. Jackson's grandmother was the person who represented the only stability that he had ever known in his life.  After her death, Mr. Jackson saw his life as having lost all of its foundation.

(Doc. # 18 ¶55, at 21-22; Doc. # 42, at 39-40.)

Petitioner presented this claim to the state courts in his postconviction action.  The last state court to issue a reasoned decision was the state appellate court, and it rejected Petitioner's claim on the merits.  Specifically, the state appellate court concluded, contrary to Petitioner's claim that counsel failed to investigate his family and social background for mitigating evidence, that defense counsel had employed an investigator and a psychologist and had in fact interviewed all but two of the people who submitted affidavits on Petitioner's behalf in postconviction.  *Jackson*, 2002 WL 1379001, at *10.  The state appellate court further noted, with respect to Petitioner's complaint that defense counsel failed to go over with their witnesses the questions that they would be asking, that there is no case law requiring counsel to discuss questions and answers with witnesses in advance and that it may very well have been a tactical decision on counsel's part not to do so in order to avoid their witnesses appearing "rehearsed." *Id*.  Finally, the state trial court noted that Ms. Felder's grandson submitted no affidavit regarding the incident during which Petitioner saved him from drowning in a pool, thereby negating any claim on Petitioner's part that defense counsel were ineffective for calling him to testify.  (J.A. Vol. III, P.C., Trial, Part F, at 496).  The state appellate court ultimately concluded that "trial counsel pursued a tactical strategy of emphasizing appellant's positive attributes in mitigation, rather than focusing on negative influences.  We conclude that appellant has not established that his counsel's tactics with respect to mitigation were unreasonable."  (*Id*. at 311.) Petitioner argues that this finding was "unreasonable in light of the facts and evidence

presented." (Doc. # 42, at 38.)  This Court disagrees.

The Court has already noted that one of counsel's most important responsibilities is the duty to investigate.  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691; *see also Carter v. Bell*, 218 F.3d 581, 600 (6th Cir. 2000).  The importance of competent representation during the penalty phase of a capital trial cannot be understated, especially with respect to the duty to investigate, because, as a practical matter, all that stands between a defendant who has been convicted of capital murder and a death sentence is whatever mitigation evidence he can muster.  *Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999).

> Under the Ohio statute, a capital defendant found guilty of a death specification
> has to present some mitigating evidence in order to avoid the death penalty.  If a
> jury has nothing to weigh against the aggravating circumstance, it almost
> certainly must find that the aggravating circumstance outweighs the (nonexistent)
> mitigating circumstances, and recommend death.

*Id*. at 426.  *See also Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005) (incorporating the 2003 American Bar Association ("ABA") Guidelines regarding competent representation in capital cases); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (discussing the duty to investigate mitigating evidence and incorporating the 1989 ABA Guidelines regarding competent representation in capital cases).  The Sixth Circuit has noted, with respect to counsel's duty to investigate in connection with the mitigation phase of a capital trial, that "[t]he sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility." *Carter v. Bell*, 218 F.3d at 596.  Thus, the Sixth Circuit has not hesitated to hold that "failure to investigate possible mitigating factors and failure to present mitigating evidence

80

at sentencing *can* constitute ineffective assistance of counsel under the Sixth Amendment."
*Martin v. Mitchell*, 280 F.3d 594, 612 (6th Cir. 2002) (citing *Carter v. Bell,* 218 F.3d at 600, and
*Skaggs v. Parker*, 235 F.3d 261, 271 (6th Cir. 2000)).

Although failure to investigate possible mitigating evidence can constitute ineffective
assistance, there initially appeared to be an important distinction in the Sixth Circuit between
those cases in which *no* investigation was conducted and those in which Petitioner complains
that *not enough* investigation was conducted. In *Campbell v. Coyle*, 260 F.3d 531 (6th Cir.
2001), the Sixth Circuit explained:

> [W]e note that the cases where this Court has granted the writ for failure of
> counsel to investigate potential mitigating evidence have been limited to those
> situations in which defense counsel have totally failed to conduct such an
> investigation. In contrast, if a habeas claim does not involve a failure to
> investigate but, rather, Petitioner's dissatisfaction with the degree of his
> attorney's investigation, the presumption of reasonableness imposed by
> *Strickland* will be hard to overcome.

*Id*. at 552. Thus, early Sixth Circuit precedent suggested that where counsel essentially conducts
no investigation and presents no mitigating evidence, his performance can amount to
constructive denial of counsel and prejudice will be presumed. *Rickman v. Bell*, 131 F.3d 1150,
1157 (6th Cir. 1997). Where, on the other hand, counsel performs something of an investigation
and presents something in the form of mitigation, then a Petitioner will be required to
demonstrate not only that his attorney's performance was deficient, but also that counsel's
deficient performance prejudiced the outcome of the Petitioner's sentencing proceeding. *Martin*,
280 F.3d at 613.

More recent cases from the Sixth Circuit have made "clear that conducting a partial, but
ultimately incomplete, mitigation investigation does not satisfy *Strickland*'s requirements."

81

*Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006).  The Sixth Circuit has explained:

> In *Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005), a case applying the pre-
> AEDPA standard of review, this Court found counsel's performance at sentencing
> deficient based on counsel's failure to investigate, even though counsel had
> conducted various interviews of the Petitioner's family and acquaintances and had
> sought other information, including two competency evaluations.  The Court held
> that counsel's performance was deficient because they failed to conduct a
> thorough investigation of the Petitioner's mental health and family background,
> despite indications of his mental illness and troubled childhood.  *Id.*

*Dickerson*, 453 F.3d at 695.

In the instant case, defense counsel obviously conducted an investigation and managed to

put forth meaningful testimony during the mitigation hearing.  They requested and utilized the

services of a mitigation investigator and psychologist.  (J.A. Vol. I, Trial, Part A, at 126, 140;

J.A. Vol. I, Trial, Part B, at 94.)  They interviewed friends and members of Petitioner's family.

Consequently, as in *Martin*, Petitioner's trial attorneys managed to present "something of a

mitigating nature" at Petitioner's sentencing hearing.  *Martin*, 280 F.3d at 613 (quoting

*Coleman*, 244 F.3d at 544).  Moreover, as prescribed in *Dickerson*, Petitioner's trial attorneys

conducted an adequate investigation into Petitioner's background.

Defense counsel asserted through their opening statement, among other things, that the

essence of their case in mitigation would be to emphasize Petitioner's background.  Defense

counsel explained that "[m]itigating factors, as will be presented to you, are things that we

submit to you should be considered as to why Kareem Jackson is who he is, why he came to be

the person he is, and things which were, to at least some extent, out of his control."  (Tr.Vol. XI,

at 31.)

Trial counsel went on to present details from Petitioner's upbringing and development

primarily through the testimony of Petitioner's father, Michael Taylor, and Petitioner's mother,

82

Robbie Jackson.  Although that testimony presented some positive attributes about Petitioner's

character and positive features regarding his upbringing, the picture of Petitioner's upbringing,

development, and background portrayed by their testimony was largely one of deprivation, the

minimal presence of loving role models, and a young man who drifted away from his family,

church, and home.  For instance, testimony by Petitioner's parents conveyed the fact that

Petitioner's parents loved him and wanted him to live and the fact that Petitioner tried to support

his children.  Their testimony also conveyed some positive features regarding his upbringing,

such as Petitioner's closeness with his grandmother, his active involvement in church until his

mid to late teens, and the fact that his mother did not permit drugs or alcohol and never

entertained men in their home.  But Mr. Taylor conceded that he moved out of the family home

after the first several years of Petitioner's life, gradually had less and less contact with Petitioner

until he lost contact with him altogether during Petitioner's adolescence, and provided no

financial support for Petitioner.  (Tr.Vol. XI, at 39-41.)  Petitioner's mother admitted that she

and Petitioner's father split up because Petitioner's father had been physically abusive toward

her, that Petitioner's father was largely absent from his life, that their household finances were

tough and forced them to move often, and that she had not had much contact with Petitioner or

his children in recent years.  (*Id*. at 56, 57-58, 61-62, 69-70.)

In an apparent effort to demonstrate some redeemable qualities in Petitioner, which the

state appellate court recognized as a key component of their mitigation strategy *Jackson*, 2002

WL 1379001, at *11, defense counsel also presented the testimony of Pastor Edgar A. Posey

regarding Petitioner's active involvement in church from the time he was a young child until his

mid teens, and of Ophelia Felder concerning an incident during which Petitioner had saved her

grandson, John Johnson, from drowning in a pool.  Petitioner conveyed through his unsworn statement that he had dropped out of school but had obtained a GED with the highest score in the course, that he had had quite a few jobs but had never been fired, that his family relationships were not sporadic, and that although he accepted the jury's verdict, he was of the view that "a lot of one-sided views ha[d] been presented."  (Tr.Vol. XI, at 141-45.)  In closing arguments, defense counsel emphasized, among other things, that Petitioner, like everyone, was a product of his family, environment, and where he came from.  (Tr.Vol. XI, at 173.)

Petitioner has not demonstrated, and it is not apparent to this Court, that his attorneys failed to investigate his family and social background for mitigating factors.  Further, to the extent that Petitioner is arguing that his counsel performed deficiently for not employing a different theory–namely, one that placed even more emphasis on the negative features of his upbringing and no emphasis at all on any positive features in his background or character–his argument does not establish that counsel's performance was outside the wide range of professionally competent assistance.  *See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) (holding that a claim of ineffective assistance of counsel "cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").

To satisfy the prejudice prong of *Strickland*, Petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Campbell v. Coyle*, 260 F.3d at 552 (citing *Strickland*, 466 U.S. at 695).  Thus, in *Martin*, the Sixth Circuit found that Petitioner was not prejudiced by defense counsel's deficient performance because most of the evidence that Petitioner argued defense counsel should have presented, had he

84

conducted a reasonable investigation, essentially had been introduced during the penalty hearing. 280 F.3d at 614-15.

The question before the Court is whether there is a reasonable probability that the jury would have concluded that the aggravating circumstance did not outweigh the mitigating factors beyond a reasonable doubt, had defense counsel interviewed and presented the witnesses whom Petitioner alleges counsel were ineffective for overlooking.  Even assuming that defense counsel's performance may be characterized as deficient under the first prong of *Strickland*–an assumption that is difficult to indulge, considering that defense counsel obviously conducted *some* investigation and that the decision of which witnesses to call is largely a matter of trial strategy–the Court concludes in any event that Petitioner has not demonstrated prejudice.

In support of his state postconviction action, Petitioner submitted numerous affidavits from relatives and acquaintances purporting to establish what they would have testified to, had defense counsel contacted them or put them on the stand.  (Doc. # 42, at 38, citing Postconviction Exhibits 1, 8, 9, 10, 11, 12, 13, 14, and 37, at J.A. Vol. III, P.C., Trial, Part A, at 96-115, 162-187 and J.A. Vol. III, P.C., Trial, Part D, at 136-37.)  Review of the record reveals that the information that, according to Petitioner, was never presented to the jury due to counsel's failure to investigate adequately his family and social background, is largely cumulative to testimony that was presented at Petitioner's mitigation hearing or is of such marginal value that its omission cannot reasonably be said to have resulted from deficient performance on counsel's part or to have affected the outcome of Petitioner's sentencing hearing sufficient to undermine confidence in that outcome.

During Petitioner's mitigation hearing, testimony was presented regarding Petitioner's

85

mother suffering domestic violence at the hands of Petitioner's father. (Tr. Vol. XI, at 55-56.)
To the extent Petitioner complains that no evidence was presented regarding domestic violence
his mother may have experienced or observed as a child, that evidence strikes this Court as
marginally relevant at best. Testimony was also presented that Petitioner witnessed his father's
abusive behavior toward his mother. (*Id*. at 56.) Further, significant testimony was presented
demonstrating that Petitioner's father played less and less of a role in Petitioner's life as
Petitioner grew from a young boy into adolescence. (*Id*. at 57-58, 39-40.) In that regard,
testimony was also presented suggesting that Petitioner lacked responsible, male role models in
his life. (*Id*. at 96.) Petitioner complains that the jury was not presented with evidence that he
relocated eighteen times before he turned six-years-old and that his school performance suffered
as a result, but testimony was presented demonstrating that Petitioner and his mother moved very
frequently due to financial hardships and that Petitioner was an average student, at best. (*Id*. at
61-62, 58.) In that regard, Petitioner's mother testified openly about the financial hardships that
they endured (*Id*. at 61); testimony was also presented that Petitioner's father provided no
financial help (*Id*. at 41). Petitioner complains that no testimony was presented regarding his
mother's attempts to restrict his activities and friendships or about how his mother allegedly
locked him out of the house if he failed to get home by his curfew. Such testimony would have
been marginally valuable at best, and possibly even damaging, insofar as it might have conveyed
to the jury that Petitioner actually had a parent who was active in his life and who attempted to
keep him on the straight and narrow path.

      Petitioner also complains that testimony was not presented showing that he was prompted
to search for alternative "parental figures" in a local gang and stayed with friends who became

the replacements for his familial support.  Such testimony would have been of marginal or no value, however, in view of the fact that Petitioner himself appeared to emphasize during his unsworn statement that his family relationships were not sporadic.  (Tr.Vol. XI, at 143.)  Finally, Petitioner complains that no testimony was presented demonstrating how close he was to his grandmother and how profoundly her death affected him.  Actually, Petitioner's mother did testify that Petitioner was especially close to his grandmother, who often lived with them.  (*Id*. at 63.)  Petitioner's assertion about how the death of his grandmother affected him is directly contradicted by his mother's testimony that Petitioner showed very little reaction to the passing of his grandmother.  (*Id*. at 60-70.)

Of course, the affidavits that Petitioner submitted in state postconviction and that he refers to herein paint a more complete picture of Petitioner, his background, deprivations during his upbringing, and his troubled relationship with his parents; but that will almost always be the case with after-the-fact affidavits.  That said, this is not a case in which defense counsel conducted no investigation, overlooked compelling and obvious mitigation evidence, or presented absolutely nothing against which the jury could have weighed the aggravating circumstance.  The most that the affidavits submitted by Petitioner demonstrate is that defense counsel could have done more, which will almost always be the case.  In the end, the Court is not persuaded that there is a reasonable probability that, with the proffered evidence, the jury might have concluded that the balance of aggravating circumstances and mitigating factors did not warrant death.  *Campbell*, 260 F.3d at 552.  Mindful that a reasonable probability is a "probability sufficient to undermine confidence in the outcome," *Strickland*, 466 U.S. at 694, this Court cannot find that Petitioner was prejudiced by counsel's failure to conduct a more

thorough investigation of Petitioner's family and social background for mitigating factors.

For the foregoing reasons, this Court finds that Petitioner has not established deficient performance or prejudice stemming from his counsel's alleged failure to investigate adequately his family and social background for mitigating factors. The Court therefore rejects Petitioner's assertion that the state appellate court's decision denying this claim was unreasonable in light of the facts and evidence presented. Sub-part (B) of Part II of Petitioner's first ground for relief is without merit.

**C.     Defense counsel failed to adequately investigate Mr. Jackson's psychological background and failed to present psychological evidence.**

Petitioner argues in sub-part (C) of Part II of his first ground for relief that his trial attorneys performed unreasonably and to his prejudice by failing to investigate adequately his psychological background and by failing to present psychological evidence. (Doc. # 18 ¶¶ 57-63.) Petitioner argues that counsel sought funds and assistance from a clinical psychologist, Dr. Kathleen Burch, but then failed to adequately investigate, prepare, and present the testimony of Dr. Burch. Petitioner points out that even though counsel were appointed on April 9, 1997, they did not seek funds for or contact Dr. Burch until October 28, 1997. Petitioner complains that, prior to Dr. Burch meeting with him on November 21, 1997, counsel failed to contact Dr. Burch or provide her with any background records. Petitioner further complains that Dr. Burch conducted a clinical interview with him, but was unable to complete a full battery of psychological testing because Petitioner was evasive and closed. Petitioner argues that given Dr. Burch's failure to complete that testing and the time constraints that existed, she concluded that she would not be able to present a valid, comprehensive portrayal of Petitioner's personality

functioning.  Petitioner complains that counsel conducted a phone conference with Dr. Burch two months after she had conducted her interview with him and after his capital trial had already begun, and at some point informed her that they would not need her testimony for Petitioner's mitigation hearing.

The essence of Petitioner's argument is that counsel undermined Dr. Burch.  He argues that he was evasive and closed with Dr. Burch as a result of the fact that he did not trust his defense counsel and their constant push for him to accept a plea deal, that Dr. Burch did not have time to establish an independent relationship with him due to counsel's delay in contacting her, and that she was forced to try to interview him without the benefit of background information or records.

Petitioner argues that he was prejudiced because, as a result of counsel's deficient performance, the trier of fact never heard a comprehensive evaluation of Petitioner's psychological functioning.  Referencing sub-part (F) of Part II of his first ground for relief, Petitioner explains that because of counsel's deficient performance, the prosecution essentially was able to assert that Petitioner had a normal childhood when, in fact, it was fraught with domestic violence, drug abuse, and instability in his life.  (Doc. # 42, at 51, citing Postconviction Exhibits 6, 9, 10, and 11.)  Petitioner explains that, under *Wiggins v. Smith*, 539 U.S. 510 (2003), prejudice from counsel's unreasonable failure to investigate and present psychological evidence is assessed by reweighing the evidence in aggravation against the totality of available mitigating evidence to determine whether there is a reasonable probability that at least one juror would have struck a different balance.  *Id*. at 534-35, 537.  Petitioner argues that he can show prejudice because juror James Cahill stated in his affidavit:

> At Mr. Jackson's mitigation hearing, counsel presented no evidence as to his father's substance abuse, the domestic violence that occurred in his family, the importance of his grandmother in his life, and the cultural issues faced by Mr. Jackson.  It would have made a difference to my determination of Mr. Jackson's sentence, if trial counsel had presented evidence of this nature.  Because there was no such mitigation evidence presented, I had no choice but to sentence Mr. Jackson to death.

(J.A. Vol. III, P.C., Trial, Part A, at 127-28.)

Petitioner presented this claim of ineffective assistance to the state courts in his postconviction action.  The last state court to issue a reasoned decision on the claim was the state appellate court, and it rejected the claim on the merits.  The state appellate court observed that although the affidavits of mental health expert Dr. Hugh Turner and cultural expert Dr. Kwaw Whittaker contended that trial counsel should have argued in mitigation that psychological, sociological, and cultural factors influenced Petitioner's actions, the evidence that trial counsel did offer in the mitigation hearing undermined those theories.  *Jackson*, 2002 WL 1379001, at *11.  The appellate court explained:

> Appellant's mother testified that appellant grew up in a relatively stable household where his mother tried to provide for his physical and emotional needs.  Mitigation evidence also demonstrated that appellant had a strong religious foundation, attending church, Sunday School and Bible study for most of his youth and adolescence and competing on a national level for the church's Bible bowl team.
>
> Although appellant now argues that his life was fraught with domestic violence, drug abuse, chaos and neglect, the record belies this contention.  Appellant's mother, for example, testified that she was physically abused by appellant's father, but she stated that appellant was a very small child when the abuse occurred.  We also note that trial counsel's ability to present psychological evidence was impeded by appellant's failure to cooperate with Dr. Burch, the psychologist retained by the defense team to assist with the development of mitigation evidence.  Dr. Burch noted that appellant was evasive and provided unusable responses to testing, undermining Dr. Burch's ability to develop useful evidence.

90

In light of this evidence, trial counsel pursued a tactical strategy of emphasizing appellant's positive attributes in mitigation, rather than focusing on negative influences.  We conclude that appellant has not established that this counsel's tactics with respect to mitigation were unreasonable.

*Jackson*, 2002 WL 1379001, at *11.  Petitioner argues that the state appellate court's finding that

Petitioner's counsel were not ineffective was "an unreasonable determination of the facts in light

of the evidence presented."  (Doc. # 42, at 43.)

It is axiomatic that counsel has a duty to conduct a thorough investigation into a

Petitioner's family, social, and medical background for mitigating evidence.  *Dickerson v.*

*Bagley*, 453 F.3d 690, 693 (6th Cir. 2006) ("Carrying forward the 'effective assistance of

counsel' principles first established in capital cases in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct.

55, 77 L.Ed. 158 (1932), and *Strickland*, the Supreme Court, in the last three years, in two

different death penalty ineffective assistance of counsel cases, has made it clear and come down

hard on the point that a thorough and complete mitigation investigation is absolutely necessary in

capital cases.").  Thus, "[c]ounsel's failure to make a reasonable investigation of a defendant's

psychiatric and family background, and to present mitigating evidence to the jury at sentencing,

can constitute ineffective assistance."  *Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005)

(citing *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003)).  The American Bar Association

("ABA") Guidelines articulating standards for capital defense work–"standards to which we long

have referred as 'guides to determining what is reasonable,' " *Wiggins*, 539 U.S. at

524–emphasize the importance of testimony by a psychologist or mental health expert at the

mitigation phase of death penalty cases.  *See Clark v. Mitchell*, 425 F.3d at 294 (Merritt, J.,

dissenting) ("the defendant's psychological and social history and his emotional and mental

health are often of vital importance to the jury's decision at the punishment phase." (quoting

91

Commentary to § 4.1 of the ABA Guidelines)).  That said, counsel does not have an absolute

duty to present the testimony of a psychologist at the mitigation hearing.  *Cf. Carter v. Mitchell*,

443 F.3d 517, 527 (6th Cir. 2006) ("Counsel does not perform unreasonably merely by not ruling

out every possible psychological mitigator through specialized evaluations"), *cert. denied*, 127

S.Ct. 955 (2007) (citing *Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006)).  And as

important as such testimony often is in death penalty mitigation hearings, counsel may certainly

make a tactical decision not to present the testimony of a psychologist at the mitigation hearing.

*Hartman v. Bagley*, 492 F.3d 347, 358-61 (6th Cir. 2007) (finding no deficient performance in

counsel electing to present mitigating circumstances through the testimony of relatives, rather

than a psychologist who had identified ten mitigating circumstances but who also would have

presented arguably damaging evidence); *Moore v. Parker*, 425 F.3d 250, 254 (6th Cir. 2005)

(finding neither deficient performance nor prejudice in counsel's decision not to present the

testimony of a psychologist that "would likely have made [the Petitioner] look even worse to the

jury"), *cert. denied*, 127 S.Ct. 557 (2006).

In the instant case, Petitioner's trial counsel elected not to present the testimony of Dr.

Burch, the clinical psychologist they had retained for mitigation purposes.  Petitioner argues that

counsel's failure to present Dr. Burch's testimony was the product not of an informed, tactical

decision, but of counsel's deficient performance in failing to prepare her to testify.  For the

following reasons, the Court finds that Petitioner has not sustained his burden of "overcom[ing]

the presumption that, under the circumstances, the challenged action might be considered sound

trial strategy."  *Strickland*, 466 U.S. at 689.

The Court notes as a threshold matter that the record before the Court on this issue hinges

in large part on an unsigned affidavit by Dr. Burch.  (J.A. Vol. III, P.C., Trial, Part B, at 10.)
There is some doubt as to whether this Court can consider such a document.  *See, e.g.*, *Nassif
Ins. Agency, Inc. v. Civic Property and Cas. Co.*, No. 03-2618, 2005 WL 712578, at *3 (6th Cir.
Mar. 30, 2005) (declining to consider an unsigned affidavit in the summary judgment context).
But, even assuming arguendo that the Court need not sua sponte strike Dr. Burch's affidavit and
that it can consider Dr. Burch's affidavit, that document does not provide a basis for relief.

The record before the Court, which is not nearly as developed as this Court would prefer–
even with Dr. Burch's unsigned affidavit–reveals the following.  Petitioner's trial attorneys
received funds to employ a clinical psychologist on October 28, 1997.  (J.A. Vol. I, Trial, Part A,
at 126, 140.)  According to an unsigned affidavit by Dr. Burch, she was contacted by defense
counsel's mitigation specialist, Jim Crates, on that same day.  (J.A. Vol. III, P.C., Trial, Part B,
at 10.)  Dr. Burch further states in her unsigned affidavit that although Mr. Crates provided her
with some background information regarding Petitioner, defense counsel themselves never spoke
to her before she met with Petitioner on November 21, 1997.  Dr. Burch explains in her unsigned
affidavit that due to Petitioner being guarded and evasive during her interview and attempt to
conduct a full battery of psychological testing, as well as to the time constraints placed on her,
she was unable to present a valid and comprehensive picture of Petitioner's personality
functioning that could have been used to prepare mitigation testimony.  According to the
unsigned affidavit, Dr. Burch recalled speaking with Jim Crates and defense counsel in a
telephone conference on January 19, 1998, during which she recounted the details of her visit
with Petitioner, even though she could not recall the specifics of the conversation.  Counsel's
billing records tend to corroborate Dr. Burch's recollection, reflecting that counsel engaged in

93

investigation and conferences on that day. (J.A. Vol. III, P.C., Trial, Part B, at 4.) It appears that

on the same day, Dr. Burch received background records from Mr. Crates consisting solely of

three pages of Petitioner's school records. Dr. Burch states in her unsigned affidavit that at some

point after her interview with Petitioner, she was informed by defense counsel that they would

not need her to testify. Dr. Burch concluded in her unsigned affidavit:

> If I had been provided with sufficient background information, and if I had more
> time to establish a relationship with Mr. Jackson, it is possible that I would have
> been able to obtain a valid and comprehensive understanding of Mr. Jackson's
> personality functioning that could have been used to prepare mitigation
> testimony.

(*Id*. at 11-12.)

It is undisputed that trial counsel subsequently did not present the testimony of Dr. Burch

or any other mental health expert at Petitioner's mitigation hearing. As discussed more fully

above in connection with sub-part (B) of Part II of Petitioner's first ground for relief, trial

counsel presented a mitigation theory emphasizing Petitioner's background and presented the

testimony of Petitioner's mother, father, former pastor, and Ophelia Felder, as well as an

unsworn statement by Petitioner.

Regarding the allegedly deficient performance of counsel regarding Dr. Burch, this Court

begins, as it must, with the strong presumption that counsel's challenged conduct was sound trial

strategy. *Strickland*, 466 U.S. at 689; *see also Carter v. Mitchell*, 443 F.3d at 532 (stating that in

the absence of evidence of counsel's failure to investigate, "we must assume that counsel did

investigate"). Based on Dr. Burch's unsigned affidavit, it is clear that counsel's failure to

present her testimony at Petitioner's mitigation hearing was the result of an affirmative decision,

as opposed to mistake or oversight. Although the record is less than comprehensive as to what

94

sort of investigation or information supported defense counsel's decision, it nonetheless permits the inference that counsel undertook *some* investigation in reaching the decision not to call Dr. Burch.  Dr. Burch could not recall the specifics of the telephone conference in which she, Jim Crates, and trial counsel participated, and there is no other documentation in the record of what was discussed.  It is fair to presume, however, that Dr. Burch had gleaned *something* of an idea about Petitioner's mental health and personality functioning from her November 21, 1997 interview with him and that she conveyed her impressions, however incomplete, to trial counsel. This presumption is corroborated by the affidavit of Dr. Hugh Turner, who evaluated Petitioner in connection with his postconviction proceedings.  Dr. Turner stated that "[t]he psychological test results conducted by Dr. Burch prior to Kareem's trial" were consistent with the detailed conclusions he had set out in his affidavit.  (J.A. Vol. III, P.C., Trial, Part A, at 136.)  Counsel may very well have made a tactical decision not to call Dr. Burch if they were of the view that there was not much in the way of compelling evidence that Petitioner suffered from mental health or personality disturbances, that her testimony might have contradicted or undermined their other mitigation witnesses, or that her testimony might have confused or even alienated the jurors. *Durr v. Mitchell*, 487 F.3d 423, 437-38 (6th Cir. 2007) (finding no ineffective assistance in failing to call psychologist whose testimony would have been contradicted by testimony of Petitioner's family members and where expert found no discernable psychological problems on part of the Petitioner), *r'hng and r'hng en banc denied* (Sept. 7, 2007).

Noting in its May 10, 2005 Opinion and Order granting discovery that there was "very little evidence on the record about the level of investigation that supported counsel's decision not to call Dr. Burch, and no evidence demonstrating whether counsel's decision not to call Dr.

95

Burch was a reasoned decision," the Court granted Petitioner leave to depose his trial attorneys. (Doc. # 41, at 34-36.)  On August 25, 2005, Petitioner filed a notice stating that "[u]ndersigned counsels have approached the aforementioned witnesses, and have discovered that none of them are able to add any information that would be helpful to this Court in resolving the issues before it."  (Doc. # 44, at 2.)  This Court is therefore left with the record as it exists.

Although the record is not nearly as developed as this Court would prefer regarding whatever reasons counsel may have had for not presenting the testimony of a psychologist or the extent of the investigation that supported their decision, neither is the record sufficient to overcome the strong presumption that counsel's conduct in this regard was sound trial strategy and within the scope of reasonably professional assistance.  This is especially so because of the role that Petitioner himself played, through his recalcitrance to cooperate with Dr. Burch, in the failure of his trial counsel to present the testimony of a psychologist.  The trial court noted that a psychologist was made available to Petitioner, that any background information needed by the psychologist was within Petitioner's knowledge, and that Petitioner's refusal to cooperate with the psychologist negated any argument on his part that his attorneys were somehow ineffective in connection with their failure to present psychological testimony.  (J.A. Vol. III, P.C., Trial, Part F, at 497-98.)  The appellate court likewise noted that "trial counsel's ability to present psychological evidence was impeded by appellant's failure to cooperate with Dr. Burch, the psychologist retained by the defense team to assist with the development of mitigation evidence."  (J.A. Vol. IV, at 310).  This Court finds nothing unreasonable about the state courts' rejection of Petitioner's attempt to blame his failure to cooperate with Dr. Burch on deficient performance by his counsel.

Even assuming that this Court were to find that counsel performed deficiently in their decision not to call Dr. Burch, this Court could not find that that deficient performance prejudiced Petitioner. To demonstrate prejudice, Petitioner must show that but for counsel's deficient performance, there is a reasonable probability that the outcome of his mitigation hearing would have been different. *Wiggins*, 539 U.S. at 535; *Strickland*, 466 U.S., at 694; *Dickerson v. Bagley*, 453 F.3d at 697.

In support of his argument that he was prejudiced by counsel's failure to present the testimony of a psychologist, Petitioner offers not only the affidavit of Dr. Hugh Turner, who evaluated Petitioner in connection with his state postconviction proceedings, but also the affidavit of juror James Cahill. Mr. Cahill stated that counsel had presented no evidence regarding substance abuse by Petitioner's father, the domestic violence that occurred in his family, the importance of his grandmother in his life, and the cultural issues faced by Petitioner; that such evidence would have made a difference to Mr. Cahill's determination of Petitioner's sentence; and that because no such evidence was presented, he had had no choice but to sentence Petitioner to death. (J.A. Vol. III, P.C., Trial, Part A, at 127-28.)

Dr. Hugh Turner, Psy.D. evaluated Petitioner in 1999 in connection with Petitioner's postconviction proceedings in state courts. Specifically, according to Dr. Turner's *signed* affidavit, he reviewed background information, records, prior psychological testing, and other documents relating to the crimes; conducted one clinical interview with Petitioner, and administered four tests: Minnesota Multiphasic Personality Inventory–II, Rorschach Inkblot Test, Projective Drawings, and Sixteen Personality Factors Test. (J.A. Vol. III, P.C., Trial, Part A, at 132.) Based on the foregoing, Dr. Turner concluded "that Kareem Jackson's cognitive,

97

emotional, and cultural development were poorly represented to the trier of fact." (*Id*. at 132-33.) Dr. Turner noted that dysfunctional family dynamics precluded Petitioner's parents or anyone else from instilling in him as a child feelings of trust, compassion, insight, or sympathy. (*Id*. at 133.) Dr. Turner opined that Petitioner's parents demonstrated a lack of good judgment, noting that Petitioner's father constantly abused Petitioner's mother, abused alcohol and/or drugs, and failed to maintain employment, and that Petitioner's mother somehow rationalized that behavior, which ultimately created on her a part a need to control behavior to an irrational extent. (*Id*. at 133-34.) Dr. Turner also observed indications of an early abandonment by Petitioner's mother of Petitioner "to the system" and the possibility that the poor relationship she had had with Petitioner's father caused her to interact with Petitioner in a love-hate manner. (*Id*. at 134-35.) Dr. Turner stated that Petitioner was shuttled from one chaotic environment to another and that his performance in school progressively worsened. (*Id*. at 135.) Dr. Turner further concluded that Petitioner suffered a harsh upbringing characterized by periods of isolation and solitude, due to his mother's controlling behavior, and that Petitioner suffered frequent trauma at school because he often had to wear inadequate clothes or did not have enough money to eat. (*Id*.) Dr. Turner observed that, during his adolescence, Petitioner gravitating to others who encouraged negative pursuits. In spite of all of this, according to Dr. Turner, Petitioner demonstrated a resilience, was described as witty and popular, and showed glimpses of excelling in sports until his mother prohibited him from continuing in them because she was of the view that they were too violent. (*Id*. at 135-36.) Dr. Turner observed that, like his parents, Petitioner began rationalizing and projecting blame on others for his difficulties and shortcomings. (*Id*. at 136.)

In summation, Dr. Turner made the following conclusions:

> Based upon my review of his developmental history, and the psychological testing I conducted, I am able to conclude that Kareem was born into a chaotic, and pathological environment, that appears to have severally [sic] restricted his ability and opportunity to develop the adequate coping, decision making, and strategizing skills that are necessary to lead a productive life. Additional information developed during review of transgenerational life styles and behaviors suggests that Kareem may have inherited tendencies toward poor impulse control, addictive behaviors, and views of reality that may not consistently conform to the requirements of reality.
>
> The psychological test results conducted by Dr. Burch prior to Kareem's trial are consistent with my conclusion. Those tests suggest that Kareem may have been experiencing significant psychological distress at the time of his earlier evaluation while incarcerated in the county jail. The evaluation further suggests that Kareem may have deficits in psychological functioning that determine his ability to correctly assess reality. Kareem's trial counsel and their expert psychologist, Dr. Burch, appear to have been remiss in failing to report these facts to the court.
>
> Moreover, in terms of mitigating evidence presented during the sentencing phase of Mr. Jackson's trial, the available documents show that his cognitive, emotional, and cultural development were poorly represented to the triers of fact. A review of family and developmental history, along with supporting psychological test results suggests that, had this information been presented to the jury, it would have weighed in favor of a sentence other than the death penalty.

(*Id*. at 136-37.)

Taking Dr. Turner's observations and conclusions into all due consideration, this Court is not of the view that the they portrayed a mitigation case that bore no relation to the case that defense counsel actually presented to the jury sufficient to undermine confidence in the outcome of the mitigation hearing. *See Dickerson*, 453 F.3d at 697 (finding prejudice from counsel's deficient performance where the evidence that counsel failed to investigate and present amounted to " 'a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury' " (quoting *Rompilla v. Beard*, 545 U.S. 374, 393 (2005))). Although Dr.

Turner presented a more detailed, more vivid picture of Petitioner's background, upbringing, and personality deficiencies than that presented through the testimony of Petitioner's mother, father, former pastor, and unsworn statement, this Court cannot find that that picture differed dramatically from what defense counsel did argue and present–namely, that Petitioner was the product of an environment and upbringing that was less than ideal, to say the least, and that this fact warranted a sentence less than death. *See Clark v. Mitchell*, 425 F.3d 270, 278 (6th Cir. 2005) (finding no prejudice from counsel's failure to investigate and present certain mitigating evidence where virtually all of that evidence was essentially presented during the mitigation hearing); *Smith v. Mitchell*, 348 F.3d 177, 200-201 (6th Cir. 2003) (same).  Dr. Turner offered no real diagnoses of mental or personality disorders to speak of, much less a correlation between those and the acts the jury found Petitioner had committed.  It is therefore difficult to view his observations as so significant that without them, this Court cannot have confidence in the jury's decision that the aggravated circumstances outweighed the mitigating factors beyond a reasonable doubt.  Additionally, to the extent that Dr. Turner's testimony might have been helpful in furthering defense counsel's mitigation case, the testimony also might have hindered the mitigation with observations such as Petitioner's poor impulse control and penchant for rationalizing and blaming others for his difficulties and shortcomings, as well as observations that contradicted testimony by Petitioner's mother, father, and Petitioner himself.

Nor is Petitioner's argument for a finding of prejudice bolstered significantly, if at all, by the affidavit of juror James Cahill.  Much of the evidence that Mr. Cahill complained was not presented and would have made a difference in his determination of Petitioner's sentence actually was presented by defense counsel.  Petitioner's mother testified about the domestic

violence that she suffered at the hands of Petitioner's father (Tr.Vol. XI, at 56) and about

Petitioner's closeness with his grandmother (Tr.Vol. XI, at 62-63).  To the extent that defense

counsel did not present evidence that Petitioner's father abused alcohol or of the cultural issues

that Petitioner faced, it tests the limits of credulity to believe that such evidence would have

tipped the scales in favor of a sentence less than death as far as Mr. Cahill was concerned.

In short, this simply was not a case where counsel's unreasonable failure to investigate

resulted in a failure to present the trier of fact with compelling evidence of mental or personality

defects that almost surely would have mitigated the Petitioner's culpability and without which

the Court cannot have confidence in the reliability of Petitioner's sentencing proceeding.  *See*

*Wiggins*, 539 U.S. at 536; *Williams*, 529 U.S. 362, 398 (2000); *Dickerson*, 453 F.3d at 697-98;

*Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995).

For the foregoing reasons, the Court rejects sub-part (C) of Part II of Petitioner's first

ground for relief.  Petitioner has not shown deficient performance as defined by *Strickland* in his

trial counsel's failure to call Dr. Burch or another psychologist at Petitioner's mitigation hearing.

Further, Petitioner has not shown that he was prejudiced by the allegedly deficient performance.

This Court therefore rejects Petitioner's argument that the state appellate court's decision

rejecting this claim of ineffective assistance was an unreasonable determination of the facts in

light of the evidence presented.  (Doc. # 42, at 43.)

   **D.**     **Defense counsel failed to adequately prepare mitigation**
              **witnesses.**

In sub-part (D) of Part II of his first ground for relief, Petitioner argues that his trial

attorneys performed deficiently and to his prejudice by failing to adequately prepare witnesses to

testify at Petitioner's mitigation hearing.  (Doc. # 18 ¶¶ 64-67.)  Petitioner explains that, after his

trial had already begun, defense counsel conducted a meeting with Petitioner's mother, father, and aunt.  Defense counsel met with each of them for one half hour, but failed to explain anything about the mitigation hearing or what questions they would be asked.  Petitioner asserts that instead of focusing during the meeting on family generational history, counsel focused almost exclusively on trying to persuade Petitioner's family members to urge him to accept a plea deal.  (Doc. # 42, at 44.)  Petitioner argues that the witnesses who testified were ill-prepared, thereby diminishing the effectiveness of their testimony.  Petitioner also argues that counsel's failure to prepare adequately witnesses was evident in the testimony of Ophelia Felder.  Mrs. Felder testified about an incident during which Petitioner saved her grandson, John Johnson, from drowning in a pool, but she was unable to answer questions in detail about the incident.  Because John Johnson was actually in the courtroom and could have offered more detailed testimony about the incident, Petitioner argues that counsel either should have called Mr. Johnson or should have better prepared Mrs. Felder.  Had she been better prepared, Petitioner argues, Mrs. Felder could have humanized Petitioner for the jury, which is crucial in the mitigation phase of a death penalty trial.  Petitioner argues that he was prejudiced because counsel's deficient performance resulted in the trier of fact not being provided with viable, relevant mitigating evidence, thereby undermining confidence in Petitioner's death sentence.

Petitioner presented this claim of ineffective assistance to the state courts in his postconviction action.  The state trial court rejected Petitioner's claim, finding defense counsel had interviewed all of affiants in preparation for the mitigation phase, thereby negating any assertion that counsel had abdicated their duty in that regard.  (J.A. Vol. III, P.C., Trial, Part F, at 525.)  The state trial court further found that there was no case law supporting the position that

counsel is required to go through, in advance, the questions that will be presented to a witness and that counsel may have decided that doing so would have made the witnesses appear "rehearsed" to the jury. (*Id*. at 525-26.) Finally, the trial court noted that Petitioner's failure to provide in postconviction an affidavit by John Johnson rendered unpersuasive any argument by Petitioner as to what Mr. Johnson could have testified to. (*Id*. at 526.)

The state appellate court affirmed the trial court's decision rejecting Petitioner's claim, finding that, contrary to Petitioner's assertion, the record demonstrated that trial counsel had employed an investigator and psychologist to assist them in preparing a mitigation strategy and had interviewed prospective witnesses. *Jackson*, 2002 WL 1379001, at *10. The state appellate court further concluded, as the trial court had, that "[a]lthough appellant has provided affidavits of fact witnesses who criticize counsel for failing to review questions and answers with them prior to their testimony, appellant has cited no case law which requires such measures and we conclude that trial counsel may have decided as a matter of trial tactics to avoid the appearance that testimony had been rehearsed." *Id*. Petitioner argues that the finding by the state appellate court that his trial counsel were not ineffective was "an unreasonable determination of the facts in light of the evidence presented." (Doc. # 42, at 47.) Petitioner offers nothing in the way of clear and convincing evidence to rebut the state courts' factual findings and fails to otherwise demonstrate that the state appellate court's decision rejecting his claim contravened or unreasonably applied controlling Supreme Court precedent.

In support of his claim that counsel were ineffective for failing to adequately prepare witnesses to testify at the mitigation hearing, Petitioner cites to the affidavits of lay witnesses Connie Smith (maternal aunt who did not testify in mitigation), Sheila Hamiter (former girlfriend

103

who did not testify in mitigation), Robbie Jackson Ellison (mother), Michael Taylor (father), and William Woods (cousin who did not testify in mitigation).  A review of those affidavits reveals that counsel interviewed every one of those affiants.  (J.A. Vol. III, P.C., Trial, Part A, at 175, 179, 180, 186-87; J.A. Vol. III, P.C., Trial, Part D, at 136.)  The fee records of counsel and their investigator, Jim Crates, tend to corroborate that counsel met with and spoke to witnesses.  (J.A. Vol. III, P.C., Trial, Part B, at 2-4, 8-9.)  To the extent that these interviews were not as long or comprehensive as Petitioner asserts they should have been, that fact does not establish that counsel's performance fell below an objective standard of reasonableness.  *Cf. Martin v. Mitchell*, 280 F.3d 594, 613 (6th Cir. 2002) (no ineffective assistance where counsel had had limited contact with family members in preparing for mitigation hearing).

Both the trial court and appellate court concluded that counsel has no duty to go over questions and answers with witnesses before their testimony and may even make a tactical decision to avoid having testimony appear "rehearsed."  Petitioner has not demonstrated that the state courts' conclusion in this regard contravened or unreasonably applied controlling federal law or involved an unreasonable determination of the facts.  That is, Petitioner has not cited, and this Court is not aware of, any case holding that counsel has a duty to explain questions and answers to witnesses before their testimony.  Petitioner's reliance on *Bigelow v. Williams*, 367 F.3d 562 (6th Cir. 2004), is misplaced, as that case involved counsel's alleged failure to conduct further investigation after an alibi witness came forward and whether such investigation would have revealed the existence of three additional alibi witnesses who would have been stronger than the witness who had come forward.  *Id*., at 562-75.  Whatever else that case stands for, it does not support the proposition that counsel has a duty to go over questions and answers with

witnesses before their testimony.  In other words, Petitioner has not shown that counsel's performance regarding the preparation of mitigation witnesses was objectively unreasonable.

Even assuming that counsel performed deficiently as Petitioner alleges, Petitioner has not shown that he was prejudiced.  With respect to Petitioner's assertion, citing to postconviction affidavits, as to the mitigation information the witnesses could have more completely and more effectively presented had counsel adequately prepared them, this Court has already considered and rejected that assertion.  In its discussion above of sub-part (B) of Part II of Petitioner's first ground for relief, this Court concluded that the information set forth in those affidavits was largely cumulative to testimony that was presented at Petitioner's mitigation hearing or was of such marginal value that its omission could not reasonably be said to have resulted from deficient performance on counsel's part or to have affected the outcome of Petitioner's sentencing hearing sufficient to undermine confidence in that outcome.

For the foregoing reasons, the Court rejects sub-part (D) of Part II of Petitioner's first ground for relief.  Petitioner has shown neither deficient performance nor prejudice stemming from trial counsel's alleged failure to adequately prepare mitigation witnesses.  This Court therefore rejects Petitioner's argument that the state appellate court's decision rejecting this claim of ineffective assistance was an unreasonable determination of the facts in light of the evidence presented.  (Doc. # 42, at 47.)

### E.    <u>Defense counsel failed to present testimony from a cultural expert.</u>

In sub-part (E) of Part II of his first ground for relief, Petitioner argues that his trial attorneys performed deficiently and to his prejudice in failing to present the testimony of a cultural expert at Petitioner's mitigation hearing.  (Doc. # 18 ¶¶ 68-71.)  Petitioner states that

"[t]he United States Supreme Court specifically lists 'cultural influences' as one of the topics counsel should consider presenting at mitigation."  (Doc. # 42, at 47, (citations omitted)).  Citing to several excerpts from the affidavit of Dr. Kwaw David Whittaker, Petitioner argues that testimony from a cultural expert would have been outcome-determinative regarding his sentence because it would have provided the trier of fact with important mitigation information that was available to defense counsel at the time of his trial.[8]  According to Dr. Whittaker, " '[c]onsideration of cultural implications for African-Americans–especially males–is essential to a complete and fair evaluation of Kareem's conduct....' " (Doc. # 18 ¶ 68, citing Postconviction Exhibit 7.)  Petitioner further notes Dr. Whittaker's opinion that " '[a]bsent a clear sense of the African-American circumstance and experience, the white jurors could only evaluate Kareem from their personal perspectives, thereby making them qualitatively less than a jury of his peers . . . .' " (*Id.* ¶69.)  Continuing to quote Dr. Whittaker, Petitioner explains:

> Culturally speaking, Kareem was virtually doomed to failure before his birth. Two generations of problems preceded his birth.  His death will carry these same problems into a third generation.  The lives of the victims were important and should not have been quieted.  However, this is not a situation where the theory of "an eye-for-an-eye" applies.  In point of fact, all of these young people are victims of the same cultural nullification.

(*Id.* ¶ 69.)  Citing *Wiggins v. Smith*, 539 U.S. at 534-35, for the argument that "[t]he prejudice prong is satisfied 'if there is a reasonable probability that at least one juror would have struck a different balance' " (Doc. # 42, at 49), Petitioner argues that he was prejudiced by counsel's failure to present such testimony because juror James Cahill stated in his postconviction affidavit

---

[8]    In that regard, Petitioner argues that his trial counsel requested funds to employ Dr. Whittaker as a cultural expert for the mitigation hearing and that the trial court denied the request.  In so arguing, however, Petitioner cites to "Tr.Vol. XIV, at 146," (Doc. # 42, at 47), which is a volume that exists in neither the joint appendix nor transcript before this Court.

106

that testimony about the cultural issues faced by Petitioner would have made a difference to his

determination of Petitioner's sentence.  (Doc. # 42, at 48-49, citing Postconviction Exhibit 4.)

Petitioner presented this claim to the state courts during postconviction.  The trial court

rejected it, finding neither deficient performance on the part of counsel for failing to present the

testimony of a cultural expert nor prejudice from that allegedly deficient performance.  The trial

court explained that counsel had made a strategic choice to present a "good kid lead [sic] astray"

theory instead of a "doomed from birth" theory.  (J.A. Vol. III, P.C, Trial, Part F, at 496.)  The

trial court continued that counsel's decision not to present that testimony was a trial tactic that

should not be second-guessed with the benefit of hindsight, given that "[t]he strong probability

existed that any mitigation effort by the defense to characterize Defendant as doomed from birth

would be undercut by Plaintiff's introduction of his religious upbringing."  (*Id.*)

The state appellate court affirmed the trial court's decision rejecting this claim of

ineffective assistance.  That appellate court observed that although the affidavits of mental health

expert Dr. Hugh Turner and cultural expert Dr. Kwaw Whittaker contended that trial counsel

should have argued in mitigation that psychological, sociological, and cultural factors influenced

Petitioner's actions, the evidence that trial counsel did offer in the mitigation hearing

undermined those theories.  *Jackson*, 2002 WL 1379001, at *10.  The appellate court stated:

> Appellant's mother testified that appellant grew up in a relatively stable
> household where his mother tried to provide for his physical and emotional needs.
> Mitigation evidence also demonstrated that appellant had a strong religious
> foundation, attending church, Sunday School and Bible study for most of his
> youth and adolescence and competing on a national level for the church's Bible
> bowl team.
>
> Although appellant now argues that his life was fraught with domestic
> violence, drug abuse, chaos and neglect, the record belies this contention.
> Appellant's mother, for example, testified that she was physically abused by

> appellant's father, but she stated that appellant was a very small child when the abuse occurred. We also note that trial counsel's ability to present psychological evidence was impeded by appellant's failure to cooperate with Dr. Burch, the psychologist retained by the defense team to assist with the development of mitigation evidence. Dr. Burch noted that appellant was evasive and provided unusable responses to testing, undermining Dr. Burch's ability to develop useful evidence.
>
> In light of this evidence, trial counsel pursued a tactical strategy of emphasizing appellant's positive attributes in mitigation, rather than focusing on negative influences. We conclude that appellant has not established that this counsel's tactics with respect to mitigation were unreasonable.

*Id.* at 11. Petitioner argues that this finding by the state appellate court that Petitioner's counsel were not ineffective was "an unreasonable determination of the facts in light of the evidence presented." (Doc. # 42, at 49.) This Court disagrees. Petitioner has not shown that his attorneys performed unreasonably or to his prejudice in failing to present the testimony of cultural expert, much less that the state courts' decisions rejecting this claim involved unreasonable applications of federal law or an unreasonable determination of the facts.

The state courts concluded that trial counsel had elected as a matter of strategy to present a mitigation case that emphasized some positive attributes of Petitioner, as well as negative influences and factors that led him astray, instead of a mitigation case stressing the negative factors in his background and upbringing that essentially doomed him from birth. The testimony of Dr. Whittaker, however persuasive it might appear in hindsight, would have been largely inconsistent with and undermined by the mitigation evidence that defense counsel did present. Petitioner has not demonstrated that his attorneys, in choosing the mitigation theory that they chose, performed in a manner that fell outside of the wide range of professionally competent assistance. The Court reiterates that " '[w]hen, as here, counsel has presented a meaningful concept of mitigation, the existence of alternate or additional mitigation theories does not

108

establish ineffective assistance.' " *Jamison v. Collins*, 100 F. Supp. 2d 647, 732 (S.D. Ohio

2000) (quoting *State v. Combs*, 100 Ohio App. 3d 90, 105 (Ohio App. 1st Dist. 1994)); *see also*

*Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) (holding that a claim of ineffective

assistance of counsel "cannot survive so long as the decisions of a defendant's trial counsel were

reasonable, even if mistaken.").  In fact, the record and controlling Sixth Circuit precedent

support the state courts' conclusion in this case that counsel performed reasonably in not

presenting the testimony of a cultural expert.  *See Durr v. Mitchell*, 487 F.3d 423, 438 (6th Cir.

2007) (holding that decision not to retain experts proposed by the Petitioner was a sound, if not

prudent, one where testimony of the proposed experts likely would have done more harm than

good), *r'hng and r'hng en banc denied* (Sept. 7, 2007); *see also Carter v. Mitchell*, 443 F.3d

517, 528 (6th Cir. 2006) (finding no ineffective assistance in counsel's failure to call expert on

cross-cultural issues where many of the expert's findings were questionable in light of the

testimony presented by the Petitioner's family members), *cert. denied*, 127 S.Ct. 955 (2007).  In

short, Petitioner has not shown that defense counsel failed in any duty they owed to Petitioner.

   For the same reason–namely, the likelihood that the information set forth in Dr.

Whittaker's affidavit would have done more harm than good by, among other things,

contradicting the testimony of Petitioner's mother and father–the Court is not persuaded that

counsel's failure to present the testimony undermines confidence in the outcome of Petitioner's

mitigation hearing.  *See Carter*, 443 F.3d at 528.  This Court is mindful of the assertions in the

affidavit of juror James Cahill suggesting that evidence of "the cultural issues faced by Mr.

Jackson," along with evidence as to Petitioner's father's substance abuse, the domestic violence

that occurred in Petitioner's family, and the importance of Petitioner's grandmother in his life,

"would have made a difference to my determination of Mr. Jackson's sentence, if trial counsel had presented evidence of this nature."  (J.A. Vol. III, P.C., Trial, Part A, at 127-28.)  To put it bluntly, however, this Court takes Mr. Cahill's affidavit with a grain of salt.  The Court noted above in its discussion of sub-part (C) of Part II of Petitioner's first ground for relief, much of the evidence that Mr. Cahill complained was not presented and would have made a difference in his determination of Petitioner's sentence actually *was* presented by defense counsel.  Petitioner's mother testified about the domestic violence that she suffered at the hands of Petitioner's father (Tr.Vol. XI, at 56) and about Petitioner's closeness with his grandmother (Tr.Vol. XI, at 62-63).  Further, to the extent that defense counsel did not present evidence that Petitioner's father abused alcohol or of the cultural issues that Petitioner faced, it tests the limits of credulity to believe that such evidence would have tipped the scales in favor of a sentence less than death as far as Mr. Cahill was concerned.  *Cf. Durr v. Mitchell*, 487 F.3d at 438 (finding no prejudice from the failure to present expert on cross-cultural issues where many of the expert's opinions and conclusions were too speculative about possible impact on jury).

For the foregoing reasons, the Court rejects sub-part (E) of Part II of Petitioner's first ground for relief.  Petitioner has shown neither deficient performance nor prejudice stemming from trial counsel's failure to present the testimony of a cultural expert.  This Court therefore rejects Petitioner's argument that the state appellate court's decision rejecting this claim of ineffective assistance was an unreasonable determination of the facts in light of the evidence presented.  (Doc. # 42, at 49.)

      **F.**     **<u>Defense counsel failed to protect Mr. Jackson's Eighth Amendment right to have the jury consider all relevant mitigation evidence.</u>**

In sub-part (F) of Part II of his first ground for relief, Petitioner argues that his attorneys performed unreasonably and to his prejudice in failing to present available psychological information that was critical to Petitioner's defense and had great mitigating value.  (Doc. # 18 ¶¶ 72-77.)  Petitioner explains that the Sixth, Eighth, and Fourteenth Amendments require a sentencing authority to consider and give effect to all relevant mitigating evidence before imposing a death sentence.  According to Dr. Hugh Turner, who conducted a psychological evaluation of Petitioner during his state postconviction proceedings and provided a detailed affidavit setting forth his observations and conclusions, "in terms of mitigating evidence presented during the sentencing phase of Mr. Jackson's trial, the available documents show that his cognitive, emotional, and cultural development were poorly represented to the triers of fact." (*Id*. ¶ 75.)  Dr. Turner further stated that "[a] review of the family and developmental history, along with supporting psychological test results suggests that, had this information been presented to the jury, it would have weighed in favor of a sentence other than the death penalty." (*Id*.)  Petitioner complains that defense counsel essentially did nothing to rebut repeated assertions by the State that Petitioner had a normal childhood, when in reality, Petitioner's life was fraught with domestic violence, drug abuse, chaos, and neglect.  (*Id*. ¶¶ 75-76.)

Referencing the affidavit by juror James Cahill, who suggested that such evidence would have affected his determination of Petitioner's sentence had trial counsel presented it, Petitioner argues that he was prejudiced by counsel's deficient performance because, under *Wiggins*, "[t]he prejudice prong is satisfied if 'there is a reasonable probability that at least one juror would have struck a different balance.' " (Doc. # 42, at 52, quoting *Wiggins v. Smith*, 539 U.S. at 537.) Thus, Petitioner argues, "for the Ohio courts to find there was no prejudicial failure of counsel to

investigate and present this mitigating evidence is an unreasonable determination of the facts in light of the evidence presented." (Doc. # 42, at 52.)

The Court has already considered and rejected these allegations. Specifically, in its discussion of sub-part (C) of Part II of Petitioner's first ground for relief, the Court concluded that trial counsel had not performed deficiently in declining to call Dr. Burch to testify or in allegedly undermining her ability to develop a valid and comprehensive picture of Petitioner's personality functioning. The Court further concluded, after fully considering the affidavits of Dr. Hugh Turner and juror James Cahill, that Petitioner had not shown a reasonable probability that, but for counsel's allegedly deficient performance in not presenting Dr. Burch or another mental health expert, the outcome of his mitigation hearing would have been different. For the reasons discussed more fully above in connection with Petitioner's claim that his trial attorneys performed deficiently and to his prejudice in declining to call Dr. Burch, the Court concludes that Petitioner has shown neither deficient performance nor prejudice from the alleged failure of defense counsel to have the jury consider all relevant mitigating evidence–available psychological information. The Court further concludes that the state appellate court's decision finding no ineffective assistance did not contravene or unreasonably apply controlling federal law or involve an unreasonable determination of the facts. The ineffective assistance claim set forth in sub-part (F) of Part II of Petitioner's first ground for relief is without merit.

**G.** **Counsel were ineffective when they argued to the jury that it must first decide whether to impose the death penalty, and if it is not appropriate, to then consider the life sentence options.**

In sub-part (G) of Part II of his first ground for relief, Petitioner argues that his trial attorneys performed unreasonably and to his prejudice in making an "acquittal first" argument to

112

the jury.  (Doc. # 18 ¶¶ 78-80.)  Petitioner complains that trial counsel argued, "If you cannot say that you have found beyond a reasonable doubt that death is the appropriate penalty, *then you must go on* and consider the other life verdicts.  That is the law."  (*Id*. at 78, quoting Tr.Vol. XI, at 164 (emphasis added).)  Citing *State v. Brooks*, 75 Ohio St. 3d 148 (1996), Petitioner argues that "acquittal first" is not a component of Ohio law with respect to life sentence options.  Petitioner argues that he was prejudiced by counsel's argument "because it invited the jurors not to consider mitigating circumstances unless they first agreed that death was inappropriate."  (Doc. # 18 ¶ 79.)  Petitioner explains that acquittal first arguments create a risk that the death penalty will be imposed in spite of factors that call for a less severe penalty, which is unacceptable and incompatible with the Eighth and Fourteenth Amendments to the United States Constitution.

      The Ohio Supreme Court rejected Petitioner's claim on direct appeal, stating:

> Appellant contends that counsel erred in making an acquittal first argument, since it invited the jurors to disregard mitigating circumstances unless they first found that death was inappropriate.  Appellant argues that this type of argument is inappropriate under *State v. Brooks*, 75 Ohio St. 3d at 160, 661 N.E.2d at 1041.  We disagree and do not find that defense counsel made an acquittal first argument.  Instead, defense counsel subsequently argued appellant's mitigating factors in advocating that the jury reject the sentence.

*Jackson*, 92 Ohio St. 3d at 446.  Petitioner argues that "[t]he Ohio Supreme Court was wrong when it found Jackson's trial attorneys did not argue 'acquittal first.'  *Jackson*, 92 Ohio St. 3d at 446, 751 N.E.2d at 960.  This is an unreasonable determination of the facts in light of the evidence presented above."  (Doc. # 42, at 53.)

      In the Sixth Circuit, it is well established that "acquittal first" jury instructions are unconstitutional.  *Spisak v. Mitchell*, 465 F.3d 684, 709 (6th Cir. 2006), *petition for cert. filed*, 75

U.S.L.W. 3638 (U.S. May 16, 2007) (NO. 06-1535); *Williams v. Anderson*, 460 F.3d 789, 810-813 (6th Cir. 2006); *Davis v. Mitchell*, 318 F.3d 682, 698 (6th Cir. 2003); *Mapes v. Coyle*, 171 F.3d 408, 416-417, 427-28 (6th Cir. 1999). "An acquittal first jury instruction is 'any instruction requiring that a jury unanimously reject the death penalty before it can *consider* a life sentence....' " *Williams*, 460 F.3d at 810 (quoting *Davis*, 318 F.3d at 689). Such instructions violate the Eighth Amendment by precluding the trier of fact from giving effect to mitigating evidence. *Spisak*, 465 F.3d at 708-09 (discussing *Mills v. Maryland*, 486 U.S. 367, 374-75 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 443 (1990)). Petitioner's claim fails for several reasons.

First, the instant claim involves an allegation not that the trial court gave an acquittal first instruction, but that counsel made an acquittal first argument. The Court disagrees with the notion that attorney argument precludes the jury from doing anything, in view of the fact that the jury is required to follow the law–the trial court's instructions–not the non-binding discourse of counsel. Even assuming for purposes of this discussion that an acquittal first argument by counsel could violate the Eighth Amendment by precluding the sentencer from giving effect to mitigating evidence in the same manner as an acquittal first instruction by the trial court, the Court is simply not persuaded that the argument at issue herein did so.

This Court agrees with the Ohio Supreme Court's determination that Petitioner's trial counsel did not make an "acquittal first" argument during closing arguments. As noted above, Petitioner's trial counsel stated during mitigation phase closing arguments, "If you cannot say that you have found beyond a reasonable doubt that death is the appropriate penalty, then you must go on and consider the other life verdicts. That is the law." (Id. at 78, quoting Tr.Vol. XI,

at 164.)  That statement did not constitute an "acquittal first" argument in violation of the Eighth or Fourteenth Amendments because it did not improperly imply that the jury had to unanimously acquit Petitioner of death before considering a life sentence.  *Cf. Spisak*, 465 F.3d at 710; *see also Williams*, 460 F.3d at 812 (condemning an "acquittal first" *instruction* that "improperly implied that the jury must unanimously acquit the Petitioner of death before considering a life sentence").  Rather, it informed the jury that it could render a life verdict as a result not of first unanimously rejecting the death sentence, but of not being unanimous in finding beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors.  *Cf. Spisak*, 465 F.3d at 710 (finding that a proper *instruction* "clearly informs the jurors that a life verdict can be rendered by a jury that has not first unanimously rejected the death penalty"); *see also Montgomery v. Bagley*, 482 F. Supp. 2d 919, 958 (N.D. Ohio 2007) (finding *instruction* proper where it did not require the jurors to first acquit the Petitioner of the death penalty, but "merely informed them that if they could not all agree on a death sentence, then they must consider and unanimously find which life sentence was appropriate").  To be clear, this Court finds no error, much less unreasonable error, in the Ohio State Supreme Court's determination that counsel's argument was not an improper "acquittal first" argument.

Even assuming that it were, however, this Court could not find that Petitioner was prejudiced by the argument because the jury instructions and verdict forms correctly stated the law.  The trial court properly instructed the jury that if it were not unanimously convinced by proof beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors, then it had to choose one of the life sentences.  (Tr.Vol. XI, at 200.)  Nowhere did the trial court's instructions suggest to the jury that it had to unanimously find that the aggravating

circumstances did not outweigh the mitigating factors before considering the life sentence options. Likewise, it appears that the verdict forms for the various life sentence options contained wording reflecting not that the jurors had unanimously found that the aggravating circumstances did not outweigh the mitigating factors, but only that the jurors had not been unanimous in finding that the aggravating circumstances outweighed the mitigating factors. (Tr.Vol. XI, at 210.) Thus, even assuming that the single statement in closing arguments highlighted by Petitioner implied to the jurors that they had to unanimously acquit Petitioner of the death penalty before choosing one of the life sentences–a finding that this Court explicitly rejects–the Court is not persuaded that there is a reasonable probability that but for counsel's error in that regard, the outcome of Petitioner's mitigation hearing would have been different. The jury instructions and verdict forms were proper and jurors are presumed to follow the instructions of the court. *See, e.g., Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001) (citing *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985)).

Petitioner has not demonstrated, and this Court is not persuaded from its own review of the record and controlling case law, that the Ohio Supreme Court's decision rejecting his claim of ineffective assistance for making an "acquittal first" argument contravened or unreasonably applied controlling federal law or involved an unreasonable determination of the facts. The Court finds that Petitioner is not entitled to relief on sub-part (G) of Part II of his first ground for relief.

>    **H.** **In the penalty phase, counsel did not oppose the admission of prosecution evidence that did not relate to the proven aggravating circumstances.**

Petitioner argues in sub-part (H ) of Part II of his first ground for relief that his trial

116

attorneys performed unreasonably and to his prejudice in failing to object when the trial court, during the penalty phase, admitted all of the exhibits from the trial phase instead of just those exhibits that related to the aggravating circumstances. (Doc. # 18 ¶¶ 81-82.) Petitioner complains that trial counsel's lapse in this regard was amplified when the trial court instructed the jurors during the penalty phase that "[e]vidence is all of the testimony received from the witnesses, the exhibits admitted during the trial and the facts agreed to by counsel" and that "reasonable doubt is present when, after you have carefully considered and compared *all of the evidence*, you cannot say that you are firmly convinced that the aggravating circumstances outweigh the mitigating factors." (Doc. # 18 ¶ 82, quoting Tr.Vol. XI, at 201 (emphasis added).) Petitioner argues that counsel's lapse, combined with the trial court's instructions, allowed the jury to consider evidence, some of it gruesome, that bore no relationship to the aggravating circumstances. Petitioner expands on this argument in his traverse, setting out four pages "of the offensive evidence which the State sought to have readmitted" and emphasizing that although there were just two aggravating circumstances, the State sought to introduce more than forty exhibits that had nothing to do with either aggravating circumstance. (Doc. # 42, at 54-58, 59.) Petitioner argues that counsel's failure to object evinced their ignorance of Ohio case law and statutory law prohibiting the prosecution from relying on the homicide itself as an aggravating circumstance or suggesting that the nature and circumstances of the offense may be considered as aggravating circumstances. (*Id*. at 59.)

The Ohio Supreme Court rejected Petitioner's claim on direct appeal. Recognizing that "[t]he evidence includes a blowup sketch of the scene, photographs, including photographs of the scene, the seat cushion, bloody carpeting, plastic bags, a shotgun, and a rifle" (J.A. Vol. II,

D.A., OSC, Part B, at 103), the Ohio Supreme Court went on to hold that counsel were not

ineffective for failing to object:

> Under Evid.R. 401, we find that this evidence was relevant in that it pertains to
> the nature and circumstances of the aggravating circumstances. *See State v.*
> *Gumm* (1995), 73 Ohio St. 3d 413; 653 N.E.2d 253, syllabus. Furthermore, if any
> prejudice is associated with admitting this evidence, this can be cured by our
> independent sentence reassessment. *State v. Combs*, 62 Ohio St. 3d at 286, 581
> N.E.2d at 1079.

*Jackson*, 92 Ohio St. 3d at 447. Petitioner takes issue with this determination, arguing simply

that "[t]he Ohio Supreme Court was unreasonable in light of the facts presented." (Doc. # 42, at

54.)

The Court is not persuaded that counsel performed deficiently or to Petitioner's prejudice

in failing to object to the readmission at the penalty phase of all of the trial phase evidence, even

if the better practice would have been to object. Petitioner argues that counsel's failure to object

to the trial court's blanket admission during the penalty phase of all of the guilt phase evidence

evinced counsel's ignorance of the Ohio Supreme Court's holding in *State v. DePew*, 38 Ohio St.

3d 275, 282-83 (1988), and the requirements of Ohio Rev. Code § 2929.03(D)(1). (Doc. # 42, at

59-60.) The Court rejects that argument because neither *DePew* nor § 2929.03(D)(1) contain an

express prohibition against the re-admission in penalty phase of all of the evidence from the trial

phase, such that any reasonably competent attorney would have been on notice to object. In fact,

in *DePew*, the Ohio Supreme Court expressly recognized that its holding and Ohio's death

penalty statutes would "permit repetition of much or all that occurred during the guilt stage. . . ."

38 Ohio St. 3d at 282-83.

Regarding the allegedly deficient performance of Petitioner's trial counsel in failing to

object to the trial court's admission in the penalty phase of all of the trial phase evidence,

118

although Ohio law appears to invite or permit such an objection, it does not clearly compel one.

Section 2929.03(D)(1), which governs the imposition of sentence in a capital case, provides,

among other things, that the trial court and trial jury "shall consider . . . any evidence raised at

trial that is relevant to the aggravating circumstances the offender was found guilty of

committing . . . ."  In *DePew*, the Ohio Supreme Court said of § 2929.03(D)(1):

> We now hold that, pursuant to R.C. 2929.03(D)(1), the prosecutor, at the penalty
> stage of a capital proceeding, may introduce " *** any evidence raised at trial that
> is relevant to the aggravating circumstances the offender was found guilty of
> committing ***."  While this appears to permit repetition of much or all that
> occurred during the guilt stage, nevertheless, a literal reading of the statute given
> to us by the General Assembly mandates such a result, especially in light of the
> prosecution's obligation to demonstrate, by proof beyond a reasonable doubt, that
> the aggravating circumstances the defendant was found guilty of committing are
> sufficient to outweigh the factors in mitigation.  R.C. 2929.03(D)(1).

*DePew*, 38 Ohio St. 3d at 282-83; *see also State v. Fears*, 86 Ohio St. 3d 329, 345-45 (1999)

(holding that even though a trial court should exclude evidence irrelevant to the penalty phase,

the trial court in this case was not required to exclude the evidence of the killings, including

gruesome photographs, because § 2929.03(D)(1) requires the trial court must consider the nature

and circumstances of the offense and permits repetition of much or all that occurred during the

guilty stage (citing *DePew*, 38 Ohio St. 3d at 282-83)).  *But see State v. Getsy*, 84 Ohio St. 3d

180, 201 (1998) (holding that *State v. Gumm*, 73 Ohio St. 3d 413, syllabus (1994), "appears to

require the trial court to determine what evidence is relevant").  Given the less than bright-line

pronouncements by the Ohio Supreme Court on this issue, although a particularly astute defense

attorney might object to the wholesale readmission in penalty phase of guilt-phase evidence, it is

difficult to say that whatever duty Ohio law might impose on the trial court to determine the

relevancy of trial phase evidence in the penalty phase imposes on defense counsel a

corresponding duty, as defined by the deficient-performance standards set forth in *Strickland*, to object to each piece of trial phase evidence that the prosecution might seek to introduce in the penalty phase. *See State v. Hand*, 107 Ohio St. 3d 378, 415 (2006) (finding no ineffective assistance from counsel's failure to object to reintroduction of trial phase evidence in penalty phase "because reintroduction of guilt phase evidence is permitted by R.C. 2929.03(D)(1)"); *see also State v. Gapen*, 104 Ohio St. 3d 358, 377 (2004) (same).

In any event, even assuming that prevailing norms might have required Petitioner's trial counsel to object when the trial court admitted in the penalty phase all of the trial phase evidence, the Court cannot find that Petitioner was prejudiced by counsel's inaction in this case. First, to the extent that Petitioner suggests that the readmission of all of the trial phase evidence allowed the prosecution to rely on the homicide itself as an aggravating circumstance or to suggest to the jury that the nature and circumstances of the offense should be considered as aggravating circumstances, defense counsel persuasively argued, and trial court correctly instructed, that the murders themselves were not an aggravating circumstance. (Tr.Vol. XI, at 168, 197.) It also bears reminding that trial courts have considerable discretion in determining what evidence is relevant to the penalty phase and that reviewing courts are loath to interfere with the exercise of that discretion. *Cf. State v. Hancock*, 108 Ohio St. 3d 57, 76 (2006) (noting that trial judges are "clothed with a broad discretion" in determining the relevancy of trial phase evidence to the penalty phase). In that regard, the Court takes notice of the fact that even in *Getsy*, where the Ohio Supreme Court held that a trial court must determine what trial phase evidence is relevant in the penalty phase and that the trial court in that case admitted evidence that was not relevant, the Ohio Supreme Court nonetheless held in conclusory fashion that the

120

admission of that irrelevant evidence did not prejudice the outcome of the appellant's case. *Getsy*, 108 Ohio St. 3d at 201.

Further, in the instant case, the Ohio Supreme Court expressly found that the trial phase evidence was relevant to the penalty phase under Ohio R. Evid. 401. (J.A. Vol. II, D.A., OSC, Part B, at 103.) This Court is also aware of at least two district court cases holding that any possible error in readmitting trial phase evidence in the penalty phase, assuming it is error, was insufficient to warrant habeas corpus relief. *Davis v. Mitchell*, 110 F. Supp. 2d 607, 626 (N.D. Ohio 2000) (finding no violation of clearly established federal law in the trial court readmitting in the penalty phase all evidence from the trial phase), *rev'd on other grounds*, 318 F.3d 682 (6th Cir. 2003); *Morales v. Coyle*, 98 F. Supp. 2d 849, 885 (N.D. Ohio 2000) (holding that any possible violation of state law in admitting into evidence at the penalty phase all exhibits from the trial phase was insufficient to warrant habeas corpus relief).

For the foregoing reasons, this Court is constrained to find that counsel performed neither deficiently nor to Petitioner's prejudice in failing to object when the trial court admitted in the penalty phase all of the evidence from the trial phase. More particularly, this Court cannot find that the Ohio Supreme Court's decision rejecting Petitioner's claim of ineffective assistance contravened or unreasonably applied controlling federal law or involved an unreasonable determination of the facts in light of the evidence presented. That being so, the Court finds that sub-part (H) of Part II of Petitioner's first ground for relief is insufficient to warrant habeas corpus relief.

I.      **Trial counsel did not oppose instructions that permitted the jury to aggregate aggravating circumstances and collectively weigh aggravating circumstances against mitigating factors.**

121

Petitioner argues in sub-part (I) of Part II of his first ground for relief that his trial attorneys performed deficiently and to his prejudice when they failed to object to jury instructions that, according to Petitioner, improperly permitted the jury to aggregate the aggravating circumstances and collectively weigh the aggravating circumstances against the mitigating factors.  (Doc. # 18 ¶¶ 83-85.)  Specifically, Petitioner argues that counsel should have objected when the trial court instructed, "You shall sentence the defendant to death only if you find proof beyond a reasonable doubt that the aggravating circumstances [plural] outweigh the mitigating factors" and when the trial court went on to instruct, "Now reasonable doubt is present when, after you have carefully considered and compared all of the evidence, you cannot say that you are firmly convinced that the aggravating circumstances [plural] outweigh the mitigating factors."  (Doc. # 18 ¶ 83, quoting Tr.Vol. XI, at 200, 201.)  Petitioner further argues that the error of stating the aggravating circumstances in the plural was repeated in the verdict forms.  Petitioner argues that he was prejudiced by counsel's deficient performance in failing to object because the improper instructions and verdict forms allowed the jury to collectively weigh the aggravating circumstances against the mitigating factors instead of weighing each aggravating circumstance separately against the mitigating factors.

The Ohio Supreme Court rejected this claim of ineffective assistance on direct appeal. Specifically, the Ohio Supreme Court ruled that Petitioner's claim lacked merit because "[t]he court specifically charged the jury: 'The penalty for each individual count must be assessed separately.  Only the aggravating circumstances related to a given count may be considered in assessing the penalty for the count.' " *Jackson*, 92 Ohio St. 3d at 446.  Construing the jury instructions as a whole, the Ohio Supreme Court concluded, "we find no error with this charge.

122

Therefore, we reject appellant's argument that defense counsel's failure to object to this instruction was evidence of ineffective assistance of counsel." *Id*. at 446-47.

Petitioner argues that the Ohio Supreme Court's decision was contrary to and an unreasonable application of clearly established federal law.  (Doc. # 42, at 61.)  Specifically, Petitioner takes issue with the Ohio Supreme Court's determination that the following instruction corrected any error in the other instructions that permitted the jury to aggregate the aggravating circumstances: "[T]he penalty for each individual count must be assessed separately.  Only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count."  (Doc. # 42, at 61.)  Petitioner reasons that if a jury is presumed to follow the trial court's instructions, there is a reasonable likelihood that the jury in this case followed at least one of the three instances when the trial court incorrectly instructed it to consider the aggravating circumstances cumulatively against the mitigating factors.  (Doc. # 42, at 61, citing *Boyde v. California*, 494 U.S. 370, 380 (1990) (stating that the question is whether there is a reasonable likelihood that the jury applied the challenged instruction in a manner that violates the Constitution), and *Stringer v. Black*, 503 U.S. 222, 232 (1992) (cautioning that consideration of an improper aggravator in a weighing scheme amounts to an impermissible thumb on the scale of death)).

The issue before the Court is whether the Ohio Supreme Court's determination that Petitioner's trial attorneys were not ineffective for failing to object to the challenged jury instructions and verdict forms was contrary to or an unreasonable application of clearly established federal law.  The Court answers that query in the negative.  In so doing, the Court has reviewed every determination that the Ohio Supreme Court made in rejecting Petitioner's

123

claim and concludes that not one of them was contrary to or an unreasonable application of clearly established federal law.

First, the Ohio Supreme Court has held that jury instructions must be construed as a whole. That universally recognized principle is completely consistent with clearly established federal law. *United States v. Park*, 421 U.S. 658, 674-75 (1975); *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir. 1984); *State v. Thompson*, 33 Ohio St. 3d 1, 12-13 (1987). Even the case cited by Petitioner for the proposition that the question is whether there is a reasonable likelihood that the jury applied challenged jury instructions in a manner that violates the Constitution, *Boyde v. California*, recognized that jury instructions must be viewed as a whole. 494 U.S. at 378.

Second, the Ohio Supreme Court determined that the jury instructions, construed as a whole, set out the correct weighing process under Ohio law for the jury. This Court agrees and therefore concludes that the Ohio Supreme Court's decision did not contravene or unreasonably apply *Stringer v. Black*, 503 U.S. 222, 232 (1992), wherein the Supreme Court held that consideration of an improper aggravator in a weighing scheme (like Ohio's scheme) amounts to an impermissible thumb on the scale of death. In *State v. Cooey*, 46 Ohio St. 3d 20, paragraph three of the syllabus (1989), the Ohio Supreme Court held not only that when a capital defendant is convicted of more than one count of aggravated murder, the penalty for each count must be assessed separately, but also that only the aggravating circumstances related to a given count may be considered in assessing the penalty for that count. In *State v. Palmer*, 80 Ohio St. 3d 543, 573 (1997), the Ohio Supreme Court held that jury instructions in this regard are sufficient if they clearly convey both that the jury is required to consider each aggravated murder count

124

separately and that only those aggravating circumstances which relate to a particular count can be weighed against the mitigating factors when assessing the penalty for that count.  The jury instructions in the instant case, taken as a whole, complied with *Cooey* and *Palmer*.

Finally, the Ohio Supreme Court determined that Petitioner's trial attorneys were not ineffective for failing to object to the jury instructions challenged by Petitioner.  That determination did not contravene or unreasonably apply controlling federal law because counsel does not perform deficiently or to Petitioner's prejudice in failing to object to that which is not error.  *See, e.g., Campbell v. Coyle*, 260 F.3d 531, 558-59 (6th Cir. 2001) (finding no ineffective assistance from counsel's failure to object to jury instructions that, taken as a whole, did not threaten the Petitioner's constitutional rights).

For the foregoing reasons, the Court concludes that counsel did not perform deficiently or to Petitioner's prejudice in failing to object to the trial court's penalty phase instructions that allegedly permitted the jury to aggregate aggravating circumstances.  More specifically, the Court rejects Petitioner's assertion that the Ohio Supreme Court's decision rejecting this claim was contrary to and an unreasonable application of controlling federal law.  Accordingly, the Court finds that sub-part (I) of Part II of Petitioner's first ground for relief is without merit.

> **Second Ground for Relief**: Extraneous influences improperly affected the jury's determination of Mr. Jackson's sentence, thereby denying Mr. Jackson a fair and impartial sentence determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States.
>
> **Third Ground for Relief**: The trial court failed to ensure that extraneous influences did not improperly affect the jury's determination of Mr. Jackson's sentence, thereby denying Mr. Jackson the fair and impartial sentence determination to which he was entitled under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

125

Petitioner argues in his second ground for relief that extraneous influences improperly affected the jury's determination of his sentence and in his third ground for relief that the trial court failed to ensure that extraneous influences did not improperly affect the jury's determination of Petitioner's sentence, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.  (Doc. # 18 ¶¶ 86-94.)  Because these claims stem from the same incident, the Court will address them together.  Citing *Turner v. Louisiana*, 379 U.S. 466 (1965), and *Irvin v. Dowd*, 366 U.S. 717 (1961), Petitioner argues that the Sixth Amendment requires a jury to base its verdict solely on the evidence presented at trial and that the introduction to a jury of extraneous influences violates the Sixth Amendment.  (Doc. # 18 ¶ 86.)

Regarding the facts relevant to his claim, Petitioner recounts that on Tuesday, January 27, 1998, before his mitigation hearing began, the trial court learned that on Friday, January 23, 1998, juror Maureen Huddle had returned home to find two men standing in her driveway and her garage door open with its bolts lying on the garage floor.  (Doc. # 18 ¶ 87, citing Tr.Vol. XI, at 19.)  Later that evening, Petitioner continues, police knocked on Ms. Huddle's door to inform her that her garage door was open again.  Ms. Huddle informed the trial court of the incidents, prompting the trial court to ask her a single question–namely, whether she believed that she could still give her full attention to the case–to which Ms. Huddle responded, "Yes."  (Doc. # 18 ¶ 87, quoting Tr.Vol. XI, at 20.)

Because the trial court did not conduct a more in-depth colloquy to determine the scope and effect of the incident on Ms. Huddle or admonish her not to discuss the incident with her fellow jurors, Petitioner argues that Ms. Huddle brought into the jury room extraneous

126

information that allowed impermissible factors to affect the jury's determination of his sentence, thereby resulting in a death verdict that was the product of more than the dispassionate weighing process required by the Eighth Amendment. (Doc. # 42, at 63.) Petitioner states that, prior to the mitigation phase, Ms. Huddle entered the jury room crying and proceeded to inform her fellow jurors not only of the incident involving the men her driveway and her open garage door, but also of some "bizarre" phone calls she had received. (Doc. # 18 ¶ 88, citing Postconviction Exhibit 4.) Petitioner further states that another person had to drive Ms. Huddle home one evening because of her fear stemming from the incidents and phone calls. Petitioner asserts that, "[i]t is hard to conceive of a more frightening personal experience and it is impossible to imagine that it did not impact the jury." (Doc. # 42, at 63.)

Citing *Remmer*, 350 U.S. at 379, Petitioner takes the trial court to task for failing to conduct a more in-depth colloquy into the scope and effect of the incident on Ms. Huddle. Petitioner further faults the trial court for failing to admonish Ms. Huddle not to discuss the incident with her fellow jurors. According to Petitioner, "[a]sking whether Juror Huddle [could] still give her full attention [did] not even remotely address the multitude of issues that are raised by this type of influence." (Doc. # 42, at 65.) Petitioner reasons that the facts and circumstances surrounding this incident demanded a more thorough inquiry by the trial court because of the inherent difficulties in determining whether a juror is biased. (*Id*. at 66.) Because of the trial court's failure to conduct a more in-depth colloquy, Petitioner argues that Ms. Huddle brought into the jury room extraneous information suggesting that Petitioner was attempting to frighten or harm the jurors. (*Id*. at 67.)

Petitioner presented this claim to the state courts in his postconviction action. He argued

127

in his sixteenth claim for relief that his sentence was unconstitutional because extraneous influences had been brought upon it, in his seventeenth claim that the trial court erred in not conducting a more in-depth colloquy or full hearing and in not admonishing Ms. Huddle not to discuss the incident with fellow jurors, and in his eighteenth claim that trial counsel were ineffective for not taking any steps to investigate the impact on Ms. Huddle or other jurors and for not asking the trial court to admonish Ms. Huddle not to mention the incident to the other jurors. (J.A. Vol. III, P.C., Trial, Part A, at 67-75.) He supported the claims with the affidavit of juror James Cahill, III, wherein Mr. Cahill averred in the third paragraph:

> Prior to the mitigation phase, Juror Maureen Huddle informed the remaining jurors as to the bizarre phone calls that she received at her home and as to the incident that occurred near hear home the night prior to the trial phase jury deliberations. Juror Huddle came in crying after these incidents and was taken home by someone one evening due to her fear.

(*Id*. at 128.)

The trial court rejected Petitioner's claim, finding that there was no evidence of prejudice to Petitioner as a result of the incident. The trial court stated:

> There was no evidence of misconduct by this or any other juror. Moreover, despite Defendant's attempt to use Juror Cahill's affidavit to recast the facts, there was no outside communication and there was no issue of bias with this juror. Upon questioning by the Court, Juror Huddle stated her belief that the incident was unrelated to Defendant's case and informed the Court it would not affect her deliberations. Additionally, even if Juror Cahill's affidavit is able to be relied upon, the inferences Defendant draws from it are implausible. His statement that Juror Huddle was "crying after these incidents and was taken home by someone one evening due to her fear" is a far cry from Defendant's assertions, for example, that "[s]everal jury members worried that [Defendant's] fifth co-defendant was in contact with [Defendant] and learned their names through him." While someone may have made this statement, the Court is unable to find it in Juror Cahill's affidavit. Finally, based upon the questioning of Juror Huddle, the Court and counsel concluded that the incident was unrelated to Defendant's case. Therefore, an admonition was unnecessary as there was no prejudicial effect to taint the remaining jurors. *Phillips*, 74 Ohio St. 3d at 89.

128

(J.A. Vol. III, P.C., Trial, Part F, at 500-01.)

The last state court to issue a reasoned decision on these claims was the state appellate

court. It rejected the claims as follows:

> The record reflects that Huddle informed the court of the incident and that
> the court and counsel interviewed her in an effort to ascertain the circumstances.
> Juror Huddle informed the court that she did not believe there was any connection
> between the incident and appellant's trial, and she stated that the incident would
> have no impact on her capacity to serve as a juror. Even assuming that Cahill's
> affidavit is admissible, in it Cahill says nothing about the impact of Huddle's
> statements upon the jury and it does not add any material information. We
> conclude that the incident involving Huddle was part of the trial record, and any
> arguments pertaining to this incident could have been addressed at trial or on
> direct appeal. Accordingly, appellant's 16th, 17th, and 18th grounds for relief are
> barred by the doctrine of res judicata.

*Jackson*, 2002 WL 1379001, at *11. Petitioner argues that the state appellate court's decision to

deny the claim, by discounting Mr. Cahill's affidavit pursuant to Ohio R. Evid. 606(B) and

dismissing the claim pursuant to Ohio's *res judicata* rule, was based on an unreasonable

determination of the facts in light of the evidence presented. (Doc. # 42, at 64, 67-68.)

Petitioner insists that the state courts should not have discounted Mr. Cahill's affidavit under

Ohio R. Evid. 606(B) because the extraneous influences at issue occurred after the trial phase

deliberations had ended but before the penalty phase deliberations had begun and because Mr.

Cahill's affidavit did not implicate the thought processes that occurred during deliberations.[9]

---

[9]      Ohio R. Evid. 606(B) forbids jurors from testifying about any matters or statements occurring
during deliberations, about anything that may have influenced a juror to assent to a verdict, or about his mental
processes in connection with reaching the verdict. Rule 606(B) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter
> or statement occurring during the course of the jury's deliberations or to the effect of anything
> upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the
> verdict or indictment or concerning his mental processes in connection therewith. A juror may
> testify on the question whether extraneous prejudicial information was improperly brought to the
> jury's attention or whether any outside influence was improperly brought to bear on any juror, only
> after some outside evidence of that act or event has been presented. However a juror may testify

This Court essentially considered and rejected these allegations when it rejected Petitioner's claim that his trial attorneys were ineffective for failing to inquire of Ms. Huddle when the trial court gave them the opportunity. Much of that discussion is applicable here in rejecting Petitioner's claims that his death sentence was improperly affected by extraneous influences and that the trial court violated its duty to prevent that from happening.

When credible evidence suggests that a juror has been exposed to improper extraneous influence, a trial court must conduct a hearing to determine the facts and circumstances, the impact on the juror, and whether the events at issue were prejudicial. *See Remmer*, 347 U.S. at 229-30; *see also Smith*, 455 U.S. at 215. The defendant bears the burden of proving actual bias or prejudice. *See, e.g., Zelinka*, 862 F.2d at 95-96; *Pennell*, 737 F.2d at 532. Thus, it stands to reason that any such hearing must afford the defendant the opportunity to question the juror. *See Smith*, 455 U.S. at 215; *Remmer*, 347 U.S. at 230.

The Court set forth the facts relevant to this claim in its discussion of Petitioner's claim that his trial attorneys were ineffective for failing to question Ms. Huddle more thoroughly. The Court sees no need to recount them here. A review of Ms. Huddle's testimony during the trial court's colloquy reveals that Ms. Huddle was relatively dismissive about the import of the incidents once she had had time to consider them and that she had come to be of the view that some bolts that she had later found on the garage floor may have been related to why her garage

---

without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes.

Ohio R. Evid. 606(B).

door had been opening on its own.  She confirmed that she did not believe the incidents were

connected to Petitioner's trial and stated that she did not intend "to cause anything" by bringing

them to the court's attention.  She stated three times during the short colloquy that the incidents

would not affect her ability to serve as a juror in Petitioner's case.  Citing *Remmer*, Petitioner

complains in his traverse that "'[t]he trial court should not decide and take final action ex parte

..., but should determine the circumstances, the impact thereof upon the juror, and whether or not

it was prejudicial, in a hearing with all interested parties permitted to participate.'" (Doc. # 42, at

66, quoting *Remmer*, 347 U.S. at 229-230.)  This Court is satisfied from the facts set forth above

that the trial court in this instance did all that *Remmer* suggested was necessary.

Referencing James Cahill's affidavit, Petitioner argues that had the trial court gone

further, it would have discovered that Ms. Huddle, contrary to what she stated during the trial

court's *voir dire* of her, *was* upset about the incidents, as evidenced by the fact that she went into

the jury room crying and had to be driven home one evening due to her fear, and that she *did*

discuss with fellow jurors not only the incidents involving her garage door, but also "bizarre"

phone calls that she never even mentioned to the trial court.  (Doc. # 42, at 36.)  The Court is

mindful, as Petitioner points out, of Justice O'Connor's admonition in *Smith v. Phillips* that

"[d]etermining whether a juror is biased or has prejudged a case is difficult, partly because the

juror may have an interest in concealing his own bias and partly because the juror may be

unaware of it."  455 U.S. at 221-22 (O'Connor, J., concurring).  That said, this Court also notes

that "[a] juror's belief in his or her own impartiality is not inherently suspect and may be relied

upon by the trial court."  *Phillips v. Bradshaw*, No. 5:03 CV 875, 2006 WL 2855077, at *25

(N.D. Ohio Sept. 29, 2006) (citing *Smith v. Phillips*, 455 U.S. at 217 n.7, and *Zelinka*, 862 F.2d

at 95-96).  Nothing in Mr. Cahill's affidavit is sufficient to find that the jury's death verdict in this case was the product of, or was otherwise affected by, improper extraneous influences.

Petitioner made an effort to demonstrate actual bias or prejudice in precisely the manner recently prescribed by the Honorable Magistrate Judge Merz in *Hasan v. Ishee*, No. 1:03-cv-280, 2006 WL 3253081, at *19 (S.D. Ohio Aug. 14, 2006).  However, Petitioner's efforts fall short of establishing that the jury's death verdict was improperly affected by extraneous influences or that the trial court failed in its duty to prevent that from happening.  The affidavit of juror James Cahill consists of two sentences regarding the matter: "Prior to the mitigation phase, Juror Maureen Huddle informed the remaining jurors as to the bizarre phone calls that she received at her home and as to the incident that occurred near hear home the night prior to the trial phase jury deliberations.  Juror Huddle came in crying after these incidents and was taken home by someone one evening due to her fear."  (J.A. Vol. III, P.C., Trial, Part A, at 128.)  This does not establish that Ms. Huddle, James Cahill, or any other jurors felt that the incidents reported by Ms. Huddle were related to Petitioner's trial–although Petitioner made that and other unfounded statements in his postconviction action (*Id*. at 57, ¶ 184)–or that Ms. Huddle, Mr. Cahill, or any other jurors were in any manner improperly influenced by the incidents reported by Ms. Huddle or the manner in which she reacted to them.  That said, Mr. Cahill's affidavit presented sufficient cause for concern to persuade this Court to grant Petitioner's request to depose Ms. Huddle and Mr. Cahill to further develop the record.  (Doc. # 41, at 24-28, 40-45.)  On August 25, 2005, Petitioner filed a notice stating, "[u]ndersigned counsels have approached the aforementioned witnesses and have discovered that none of them are able to add any information that would be helpful to this Court in resolving the issues before it."  (Doc. # 44, at 2.)  Left with only Mr.

132

Cahill's affidavit, this Court cannot conclude that Petitioner's death sentence was improperly affected by extraneous influences on the jury.

For the foregoing reasons, the Court concludes from its own review of the record and relevant case law that Petitioner has failed to demonstrate that extraneous influences improperly affected the jury's determination of his sentence or that the trial court failed to ensure that extraneous influences did not improperly affect the jury's determination of Petitioner's sentence in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution. The Court cannot find that the state courts' decisions rejecting Petitioner's claims were contrary to or an unreasonable application of clearly established federal law. The Court therefore concludes that Petitioner's second and third grounds for relief are without merit.

**<u>Fourth Ground for Relief</u>: The trial court denied Mr. Jackson his right to present evidence of his relative culpability at his mitigation hearing, thereby denying Mr. Jackson his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner argues in his fourth ground for relief that the trial court denied him his rights under the Sixth, Eighth, and Fourteenth Amendments to present evidence of his relative culpability during the mitigation phase when it prohibited him from introducing the plea agreement of co-defendant Michael Patterson (who did not testify) and from making reference in closing arguments to the plea agreements of co-defendants Malaika Williamson and Derrick Boone, both of whose agreements had been admitted into evidence during the trial phase. (Doc. # 18 ¶¶ 95-98.) Petitioner explains that Detective Scott testified during the trial phase that plea negotiations with the co-defendant/cooperating witnesses included consideration of their levels of involvement in the offense. (*Id*. ¶ 68, citing Tr.Vol. X, at 230.) When defense counsel sought during the mitigation phase to introduce Michael Patterson's plea agreement, the trial court

133

refused to allow them to do so.  (*Id.*, citing Tr.Vol. XI, at 107, 119.)  The trial court also

prohibited defense counsel from referencing during penalty phase closing arguments the plea

agreements of Malaika Williamson and Derrick Boone, which had been admitted for other

purposes during the trial phase.  Petitioner argues that exclusion of the plea agreements of the

co-defendants/cooperating witnesses precluded him from rebutting evidence and arguments

presented against him concerning how and why the State chose to enter into plea agreements

with those witnesses.  (*Id.* ¶ 97.)  Citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974), Petitioner

argues that exclusion of the plea agreements also essentially denied him the opportunity to

confront his accusers.  (Doc. # 42, at 68.)  Petitioner insists that he needed those plea agreements

to enable him to establish that his co-defendants had ulterior motives to place the blame squarely

on his shoulders.  (*Id.* 69-70.)

      Petitioner argues that the Constitution prohibits the State from executing someone

without consideration of factors showing that death is not a " 'just and appropriate sentence.' "

(Doc. # 18 ¶ 96, quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).)  In that regard,

Petitioner argues that evidence concerning the degree of the defendant's participation in the

offense bears directly on the fundamental justice of imposing capital punishment.  (*Id.*, citing

*Skipper v. South Carolina*, 476 U.S. 1, 13-14 (1986).)  Petitioner reasons that assessment of co-

defendants' plea agreements permits the jury to make a reasoned inquiry into the relative

culpability of the defendant so that it can make an individualized assessment of the

appropriateness of the death penalty.  Citing *Gardner v. Florida*, 430 U.S. 349, 362 (1977),

Petitioner argues that a death sentence based in part on information that the defendant had no

opportunity to explain or deny violates due process.

Petitioner presented this claim to the state courts on direct appeal, where the Ohio

Supreme Court rejected it on the merits, stating:

> In *McKoy v. North Carolina* (1990), 494 U.S. 433, 441, 110 S.Ct. 1227, 1232, 108 L.Ed.2d 369, 380, the United States Supreme Court held that mitigating evidence must be admitted if the sentencer could "reasonably find that it warrants a sentence less than death."  As applied to this case, there is no evidence that the introduction of these plea agreements into mitigation evidence would warrant the finding of a sentence less than death.  The evidence clearly established that appellant was the sole triggerman who alone decided to shoot the two victims.  He was also one of the key people who planned the robbery.  Thus, appellant's culpability differed from that of Patterson, Boone, or Williamson only in that it was greater.  Consequently, the plea agreements do not provide a reasonable basis for the jury to have recommended a sentence less than death.  Moreover, the plea agreement of Patterson was properly excluded.  Since he did not testify at trial, his plea agreement was irrelevant.

*Jackson*, 92 Ohio St. 3d at 449-50.  Petitioner argues that the Ohio Supreme Court's decision not

only was an unreasonable application of clearly established federal law, but also involved an

unreasonable determination of the facts in light of the evidence presented.  (Doc. # 42, at 68.)

Specifically, Petitioner takes issue with the Ohio Supreme Court's determinations that Petitioner

was more culpable than his co-defendants and that the plea agreements did not provide a

reasonable basis for the jury to have recommended a sentence less than death.

During the mitigation hearing and just before closing arguments, the trial court overruled

defense counsel's motion to introduce as evidence of a mitigating factor the plea agreements of

Michael Patterson, Malaika Williamson, and Derrick Boone.  (Tr.Vol. XI, at 136-37, 139-40.)

Pursuant to their pleas to lesser offenses, Ms. Williamson had received a sentence of ten years

and Mr. Boone and Mr. Patterson had received sentences of fifteen years.  Defense counsel had

argued that the disparity in sentences received by the other three co-defendants, relative to what

Petitioner was facing, was a valid area of mitigation in view of the fact that all four individuals

135

had been involved in setting the events in motion and had shared in the proceeds. The

prosecution had argued in response that it would have been unfair to allow the defense to make

that argument and offer the plea agreements in support, if the prosecution were prohibited from

commenting on the two primary reasons why those three co-defendants had received plea

offers–namely, that they had cooperated after their arrests, whereas Petitioner had invoked his

right to remain silent, and that they had not had prior criminal records, whereas Petitioner had.

The trial court overruled defense counsel's motion to offer all three plea agreements as

evidence of the mitigating factor of disparity in sentencing. Specifically, the trial court overruled

defense counsel's motion to introduce Mr. Patterson's plea agreement on grounds that it only

would have confused the jury, in view of the fact that Mr. Patterson had not testified or

otherwise been a part of the trial and that there had been tactical and ethical reasons why Mr.

Patterson had not testified on which the trial court wanted to let the record stand. As for the plea

agreements of Ms. Williamson and Mr. Boone, which had already been admitted during the trial

phase and reintroduced by the prosecution during the penalty phase, the trial court overruled

defense counsel's motion to offer them as evidence of a mitigating factor during closing

arguments on grounds that doing so for the purpose of showing disparity in sentencing was

unfair when the prosecution was prohibited from explaining why those co-defendants had

received plea offers and Petitioner had not.

Referencing *McKoy v. North Carolina*, 494 U.S. at 441, the Ohio Supreme Court rejected

Petitioner's claim that the trial court had prohibited Petitioner from introducing evidence that

would have assisted the jury in making a reasoned inquiry into Petitioner's relative culpability.

Recognizing that *McKoy* required the admission of mitigating evidence if the sentencer could "

136

'reasonably find that it warrants a sentence less than death' " *Jackson*, 92 Ohio St. 3d at 449, the Ohio Supreme Court found that the plea agreements would not have provided a reasonable basis for the jury to have recommended a sentence less than death because the evidence at trial clearly established that Petitioner, as the sole triggerman who alone decided to shoot the two victims and one of the key people who planned the robbery, was more culpable than Patterson, Boone, or Williamson. Petitioner takes issue with those two findings by the Ohio Supreme Court–namely, that the plea agreements provided no basis for the jury to recommend a sentence less than death and that Petitioner was more culpable than the others–but this Court cannot find that those determinations were unreasonable.

It was reasonable to find that the plea agreements would not have provided a reasonable basis for the jury to recommend a sentence less than death because the record permits the inference that the jury essentially had considered and rejected the type of mitigation for which defense counsel had sought to introduce the plea agreements–the disparity in sentences. Defense counsel drove that point home repeatedly and emphatically not only during cross examination of Ms. Williamson and Mr. Boone, but also during trial phase closing arguments and penalty phase opening statements. In short, as the trial court recognized when it overruled defense counsel's motion to introduce the plea agreements as mitigation exhibits, there was already evidence before the jury regarding the disparity in sentences. (Tr.Vol. XI, at 136.)

During Ms. Williamson's testimony, the prosecution elicited on direct examination that Ms. Williamson was serving a ten-year sentence following her guilty pleas to one count of aggravated robbery, two counts of involuntary manslaughter, and a firearm specification. (Tr.Vol. VIII, at 191-92.) Subsequently, on cross examination, defense counsel elicited that Ms.

137

Williamson had faced ten charges when she was originally indicted.  (*Id*. at 228-29.)  Defense

counsel proceeded to go through with Ms. Williamson each of those ten counts and what the

maximum penalty was for each of those counts.  (*Id*. at 229-30.)  Defense counsel also elicited

that Ms. Williamson would have faced more prison time, as much as thirty years, had she not

cooperated with authorities and agreed to testify.  (*Id*. at 230-31.)  Finally, regarding her level of

involvement or degree of culpability, defense counsel attempted to cast doubt on her testimony

during direct examination that she had not realized the seriousness of the events when she got

involved in them and that she had not realized that the use of guns could result in somebody

getting fatally hurt.  (*Id.* at 231.)

When Derrick Boone testified, the prosecution elicited during direct examination that he

was serving a fifteen-year sentencing stemming from his guilty pleas to two counts of

involuntary manslaughter, one count of aggravated robbery, and a firearm specification.  (Tr.Vol.

IX, at 16-17, 71-72.)  Defense counsel then elicited during cross examination that Mr. Boone had

originally faced fourteen charges, including some for which he could have received the death

penalty.  (*Id*. at 75.)  Mr. Boone admitted that he had received a favorable deal out of his plea

agreement, receiving a fifteen-year sentence instead of a death sentence.  (*Id*.)  Defense counsel

then proceeded to go through with Mr. Boone each count that he had faced and the maximum

penalty that each of those counts carried.  (*Id*. at 75-76.)  Finally, defense counsel emphasized

throughout his cross examination that Mr. Boone repeatedly had lied to authorities about his

level of involvement in the offenses and that Mr. Boone had incentive to place the blame on

someone else.

During trial phase closing arguments, defense counsel emphasized that the prosecution

138

was asking the jury to find Petitioner guilty based largely on the testimony of witnesses who were not credible. (Tr.Vol. X, at 144-45.) Defense counsel proceeded to cast doubt on the testimony of Ms. Williamson and Mr. Boone regarding what they knew or were able to recall about the firearms and ammunition that authorities recovered. (*Id*. at 145-47.) Defense counsel also emphasized that the cooperating witnesses had made deals with the State that locked the witnesses into stories that the State wanted and that placed the blame squarely on Petitioner. (*Id*. at 149-51.) Finally, defense counsel reminded the jurors that accomplice testimony is subject to grave suspicion and must be weighed with great caution. (*Id*. at 153.) During penalty phase opening statements, in explaining what the jury should consider in determining what sentence Petitioner deserved, defense counsel stressed to the jury that "we are going to ask you to consider the co-defendants and where they are today, and why, and how that fits with what should happen to Kareem Jackson." (Tr.Vol. XI, at 33.)

As the foregoing demonstrates, and as the trial court recognized when it overruled defense counsel's motion to introduce the plea agreements as mitigation exhibits, there was already evidence and argument before the jury regarding the disparity in sentences. (Tr.Vol. XI, 136.) That defense counsel were prohibited from introducing the actual plea agreements as evidence of that mitigating factor does not make unreasonable the Ohio Supreme Court's finding that the plea agreements would not have provided a reasonable basis upon which the jury could recommend a sentence less than death. Petitioner has not alleged, much less demonstrated, what information those plea agreements might have contained that was materially different from what defense counsel established during cross examination and emphasized during trial phase closing arguments and penalty phase opening statements–namely, that Petitioner's co-defendants had

139

some culpability for the offenses, had received significantly less severe sentences than what Petitioner was facing, and had a motive for placing the blame squarely on Petitioner's shoulders while downplaying their own involvement.  Accordingly, this Court cannot find as unreasonable the Ohio Supreme Court's determination that the plea agreements would not have provided a reasonable basis upon which the jury could recommend a sentence less than death.

Further, it was also reasonable to find that Petitioner was more culpable than Patterson, Boone, or Williamson because the prosecution presented sufficient evidence at trial establishing beyond a reasonable doubt that Petitioner had been a key person in the planning of the robbery, that Petitioner had been the sole triggerman, and that Petitioner alone had decided to kill the two victims.

To the extent that Petitioner also argues that the Ohio Supreme Court's decision was an unreasonable application of clearly established federal law, the Court rejects that argument for the same reasons set forth above.  The Court is not persuaded that Petitioner was  prohibited either from offering valid, relevant mitigating evidence or from confronting his accusers and rebutting evidence used against him.  Petitioner cites *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), in which the Supreme Court found that North Carolina's mandatory death penalty for first degree murder violated the Eighth and Fourteenth Amendments because it did not allow for consideration of the character and record of the offender or the circumstances of a particular offense.

Petitioner also cites *Skipper v. South Carolina*, 476 U.S. 1 (1986), in which the Supreme Court held that exclusion from the mitigation hearing of testimony regarding the defendant's good behavior in prison prior to his trial violated his right to place before the sentencer relevant

140

mitigating evidence. Petitioner emphasized a remark by Justice Powell in his concurring opinion that "[e]vidence concerning the degree of the defendant's participation in the crime, or his age and emotional history, thus bear directly on the fundamental justice of imposing capital punishment." (*Id*. at 13-14.) Petitioner cites *Gardner v. Florida*, 430 U.S. 349, 362 (1977), in which the Supreme Court held, in connection with confidential information in a presentence investigation report of which neither the defendant nor defense counsel were aware, that a death sentence imposed, at least in part, on information that the defendant has no opportunity to deny or explain violates due process. Finally, Petitioner cites *Davis v. Alaska*, 415 U.S. 308, 316 (1974), where the Supreme Court held that the trial court's refusal to allow defense counsel to cross examine a key witness for the state about his probationary status denied the defendant his right to confront his accusers.

Those cases do not establish that the Ohio Supreme Court's decision unreasonably applied controlling federal law because the facts in this case do not establish that Petitioner was sentenced to death without consideration of his character and record or the circumstances of the offense, that Petitioner was prevented from placing before the sentencer relevant evidence in mitigation of punishment, that Petitioner's death sentence was based in part on information that he had no opportunity to explain or deny, or that Petitioner was denied his opportunity to confront his accusers or evidence used against him. As the Court explained more fully above, there was evidence before the jury regarding the disparity in sentences that Petitioner's co-defendants received. Defense counsel elicited during cross examination of Ms. Williamson and Mr. Boone–and emphasized during trial phase closing arguments and penalty phase opening statements–that Petitioner's co-defendants had some culpability for the offenses, had received

significantly less severe sentences than what Petitioner was facing, and had a motive for placing the blame squarely on Petitioner's shoulders while downplaying their own involvement.

For the foregoing reasons, this Court cannot sustain Petitioner's claim that the trial court denied him his rights under the Sixth, Eighth, and Fourteenth Amendments to present evidence of his relative culpability during the mitigation phase when it prohibited him from introducing the plea agreement of co-defendant Michael Patterson and from making reference in closing arguments to the plea agreements of co-defendants Malaika Williamson and Derrick Boone.  The Ohio Supreme Court's decision rejecting that claim did not involve an unreasonable application of clearly established federal law and did not involve an unreasonable determination of the facts in light of the evidence that was presented.  This Court therefore concludes that Petitioner's fourth claim for relief is without merit.

> **Fifth Ground for Relief: Prosecutorial misconduct in the mitigation phase denied Mr. Jackson due process and a fair trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.**

Petitioner argues in his fifth ground for relief that the prosecution engaged in a pattern of misconduct during final argument in the penalty phase.  (Doc. # 18 ¶¶ 99-110.)  Petitioner focuses on two areas of the prosecution's final argument, the first of which involved the prosecution urging the jury to consider a statutory aggravating circumstance that was neither charged nor proven beyond a reasonable doubt.  (Doc. # 18 ¶¶ 100-05.)  This Court determined in its September 27, 2004 Opinion and Order that Petitioner had procedurally defaulted that component of his fifth ground for relief.  (Doc. # 27, at 62-70.)  Thus, that component of Petitioner's fifth ground for relief is not before this Court for a review on the merits.

The second area of the prosecution's final argument that Petitioner challenges involves

the weighing process as described by the prosecution.  (Doc. # 18 ¶¶ 106-09.)  Petitioner

challenges the following remarks:

> Ask yourself, first of all, what was proven to you, because the judge is going to
> give you instructions just like at the first phase, that you judge the credibility of
> the witnesses, and decide, first of all, what you want to believe.  And the next
> thing you need to do is decide, is that mitigation?  Is that something that makes
> you believe that something less than the death penalty is appropriate?
>
> Then if you decide that there is mitigation, you decide how much weigh to give to
> it.  And it is only then that you engage in the balancing that we have been talking
> about all these weeks.

(Doc. # 18 ¶ 106, quoting Tr.Vol. XI, at 155.)  First, Petitioner argues that it is not a correct

statement of law to tell the jury that it can decide what evidence is mitigating because the Ohio

General Assembly has already determined that the circumstances enumerated in Ohio Rev. Code

§ 2929.04(B) have mitigating value and because the Supreme Court held in *Saffle v. Parks*, 494

U.S. 484, 489 (1990), that a sentencer may not refuse to consider relevant mitigating evidence.

Second, Petitioner argues that it is also inaccurate to tell the jury that it decides how much

weight to accord any evidence it finds mitigating because the Ohio General Assembly, in

enacting § 2929.04(C) required that the factors enumerated in subsection (B) be given some

weight and because the Supreme Court held in *Eddings v. Oklahoma*, 455 U.S. 104, 113-14

(1982), that although a sentencer is free to determine the weight to give relevant mitigating

evidence, it may not give the evidence no weight by excluding that evidence from its

consideration.  Petitioner concludes that it is impossible to determine whether the jurors in his

case found some of the statutory mitigating factors to exist, but then decided, in light of the

prosecution's comments set forth above, to give them no weight.

Petitioner presented this claim on direct appeal, and the Ohio Supreme Court rejected it

on the merits.  The Ohio Supreme Court stated:

> Furthermore, we do not find any error in the prosecutor arguing to the jury that they should give little weight to the appellant's upbringing as a mitigating factor.  We have held that a prosecutor can freely argue that "defense mitigation evidence is worthy of little or no weight."  *State v. Wilson* (1996), 74 Ohio St. 3d 381, 399, 659 N.E.2d 292, 309.  Therefore, these remarks were not improper.

*Jackson*, 92 Ohio St. 3d at 443.  Petitioner argues that the Ohio Supreme Court's decision not only was unreasonable in light of the facts and evidence presented (Doc. # 42, at 70), but also was an unreasonable application of clearly established federal law.  (*Id*. at 73).

It is well settled that "[t]o grant habeas relief based on prosecutorial misconduct that does not violate a specific guarantee under the Bill of Rights, the misconduct must be so egregious as to deny the Petitioner due process."  *Lorraine v. Coyle*, 291 F.3d 416, 439 (6th Cir. 2002) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974)).  In the Sixth Circuit, once a court finds that the challenged conduct was improper, the court must determine whether the misconduct was so flagrant as to deny the Petitioner a fundamentally fair trial.  *See, e.g., Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006), *cert. denied*, 127 S.Ct. 2977 (2007).  A court makes that determination by considering the following four factors:

> (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.

*Bates v. Bell*, 402 F.3d 635, 641 (6th Cir.) (citations omitted), *cert. denied*, 546 U.S. 865 (2005).

Petitioner appears to argue that the prosecution's remarks set forth above were improper because they incorrectly stated Ohio law in a manner that permitted the jury, in violation of clearly established Supreme Court precedent, to refuse to consider relevant mitigating evidence. (Doc. # 42, at 71, citing *Saffle v. Parks*, 494 U.S. at 489, and *Eddings v. Oklahoma*, 455 U.S. at

144

113-14.)  In *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), a plurality of the Supreme Court held

that the Eighth and Fourteenth Amendments require that the sentencer not be precluded from

considering as a mitigating factor any aspect of the defendant's character or record and any of

the circumstances of the offense.  *See also Eddings v. Oklahoma*, 455 U.S. at 113-14 (holding

that sentencing judge's refusal, as a matter of law, to consider mitigating evidence concerning

family history and upbringing violated the defendant's constitutional rights).  *Lockett* and its

progeny prevent a State, through statutes or judicial instruction, from precluding the sentencer

from hearing, considering, or giving effect to relevant mitigating evidence.  *See, e.g., Johnson v.

Texas*, 509 U.S. 350, 359 (1993) (holding that instruction on future dangerousness did not

preclude consideration of the defendant's youth); *see also Saffle v. Parks*, 494 U.S. 484, 489

(1990) (holding that "antisympathy" instruction did not preclude sentencer from giving effect to

relevant mitigating evidence).

Ohio law is clear that the decision of how much weight, if any, to assign evidence that

the defendant presents in mitigation is for the jury to decide.  *See, e.g. State v. Steffen*, 31 Ohio

St. 3d 111, paragraph two of the syllabus (1987) ("The fact that an item of evidence is admissible

under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight"); *see

also State v. Holloway*, 38 Ohio St. 3d 239, 241 (1988) ("When found not mitigating, a factor

may be given little or no weight against the aggravating circumstances" (citations omitted)).

That the jury may decide how much weight to assign mitigating evidence does not offend

*Lockett* and its progeny because "those cases and others in that decisional line do not bar a State

from guiding the sentencer's consideration of mitigating evidence."  *Johnson v. Texas*, 509 U.S.

at 362.

145

Thus, the challenged remarks in this case did not, as Petitioner alleges, invite the jury to wholly remove from its consideration a mitigating factor or evidence offered in support of a mitigating factor; rather, the challenged remarks urged the jury to give what evidence was offered little or no weight.  That sort of argument offends neither Ohio law nor the Eighth Amendment.  Even assuming the challenged remarks crossed the line as Petitioner alleges, this Court cannot find that the remarks were so egregious that they denied Petitioner a fundamentally fair sentencing process.  Any risk that the challenged remarks invited the jury to refuse even to consider a mitigating factor or evidence offered in mitigation was minimal.  The remarks were isolated and benign in nature, even if they were arguably deliberate.  Finally, the evidence establishing the aggravating circumstances was strong relative to the mitigation that Petitioner offered.  In short, this Court cannot find that the remarks, even if improper, effectively denied Petitioner his right to a fair sentencing proceeding.

To be clear, however, this Court is not of the view that the challenged remarks were even arguably improper.  Indulging Petitioner every benefit of the doubt, this Court simply cannot find that the challenged remarks put relevant mitigating evidence "beyond the effective reach of the sentencer." *Graham v. Collins*, 506 U.S. 461, 475 (1993).

For the foregoing reasons, concludes that the allegations of prosecutorial misconduct set forth in paragraphs 106 through 109 of Petitioner's fifth ground for relief are without merit. More specifically, the Court rejects Petitioner's argument that Ohio Supreme Court's decision rejecting the claim was an unreasonable application of clearly established federal law or involved an unreasonable determination of the facts.  The Court having already dismissed as procedurally defaulted the other portions of Petitioner's fifth ground for relief, paragraphs 100

146

through 105, the Court concludes that Petitioner's fifth ground for relief does not warrant habeas corpus relief.

> **Sixth Ground for Relief: Mr. Jackson was deprived of his right to due process and a fair trial, contrary to the Fifth and Fourteenth Amendments, when the State deliberately caused a witness to refuse to testify.**

Petitioner argues in his sixth ground for relief that his right under the Fifth and Fourteenth Amendments to the United States Constitution were violated when the State intimidated and coerced Michael Patterson not to testify on Petitioner's behalf.  (Doc. # 18 ¶¶ 111-15.)  Mr. Patterson participated in the planning and robberies of the victims and, as a result, was charged with involuntary manslaughter and aggravated robbery.  He entered into a plea agreement that, among other things, required him to testify truthfully if called by the State, and ultimately he received a fifteen-year prison sentence.  At some point prior to or during Petitioner's trial, defense counsel learned that Mr. Patterson purportedly had sent a letter to Petitioner offering "to tell the truth" about what had happened during the incident.  (J.A. Vol. II, D.A., OSC, Part B, at 121.)  Petitioner's defense counsel provided the prosecutors with a copy of the letter and contacted Mr. Patterson's attorney for the purpose of setting up a meeting with Mr. Patterson.  When defense counsel met with Mr. Patterson, Mr. Patterson indicated that he no longer was willing to speak to them because he understood that he was in jeopardy of losing his plea agreement and that he intended, on his counsel's advice, to invoke his Fifth Amendment privilege against self-incrimination if called to testify at Petitioner's trial.  He also apparently failed to authenticate the letter.  Subsequently, over Petitioner's objection, defense counsel declined to call Mr. Patterson as a witness or to attempt to introduce the letter into evidence. (Tr.Vol. X, at 103-04.)

147

Relying on *Washington v. Texas*, 388 U.S. 14, 19 (1967), Petitioner asserts that an accused has a right to present testimony on his behalf without undue interference from the State. Petitioner argues that by threatening Mr. Patterson, the prosecution violated Petitioner's right to freely present defense witnesses.  (Doc. # 42, at 74-75, citing *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997).)  Petitioner also argues that the prosecution went beyond mere recitation of information or advice and used coercive and intimidating language that substantially interfered with Mr. Patterson's decision to testify.

Petitioner presented this claim on direct appeal and the Ohio Supreme Court rejected it on the merits.  Specifically, the Ohio Supreme Court stated:

> The record does not support the contention that the state coerced or threatened Patterson into not testifying for the defense.  In fact, defense counsel advised the trial court that, for tactical reasons, it did not intend to call Patterson as a witness because Patterson said that he would invoke the Fifth Amendment. When alerted that there was "a potential problem," the prosecutor met with Patterson and Patterson refused to discuss the case.  The prosecutor informed Patterson that his lack of cooperation could lead to the revocation of the plea agreement.  There is no indication that the state threatened or prevented Patterson from testifying, as appellant asserts.  In this case, the prosecutor simply reiterated the terms of Patterson's plea agreement and did not commit prosecutorial misconduct or deprive appellant of a fair trial by his actions.

*Jackson*, 92 Ohio St. 3d at 443.  Petitioner argues that the Ohio Supreme Court's decision not only unreasonably ignored the facts of the case, but also unreasonably applied controlling Supreme Court precedent.  (Doc. # 42, at 74.)  Specifically, Petitioner takes issue with the Ohio Supreme Court's determination that the facts did not support Petitioner's contention that the prosecution had intimidated or coerced Michael Patterson.

This Court essentially considered and rejected these allegations when it rejected Petitioner's claim that his trial attorneys were ineffective for failing to call Mr. Patterson as a

148

witness. Much of that discussion is applicable here in rejecting Petitioner's claim that the State coerced Mr. Patterson not to testify in violation of Petitioner's right to present witnesses in his defense without undue interference from the government.

In rejecting Petitioner's claim of ineffective assistance, the Court set forth the following facts relevant to Petitioner's claim. A few weeks into Petitioner's trial, just before the defense called its final witness during its case-in-chief, Petitioner's trial attorneys placed on the record facts concerning Petitioner's receipt of a letter purporting to be from co-defendant Michael Patterson and defense counsel's reasons, ultimately, for declining to call Mr. Patterson as a defense witness. Defense counsel Mr. Schumacher explained that Petitioner had, at some point during the pendency of his trial, received and shown to counsel a letter from Mr. Patterson indicating his willingness to tell the truth about what had happened. This version of the events was contrary to what he had told the State to obtain his plea agreement. (Tr.Vol. X, at 95-96.) The letter was marked as defendant's exhibit A, not to be shown to the jury, but for purposes of appellate review. (*Id*. at 96.) Recognizing that the letter could be beneficial to Petitioner's case, according to Mr. Schumacher, defense counsel provided the letter to the prosecutors in compliance with discovery and then contacted Mr. Patterson's attorney, David Kentner, in order to set up a meeting. Mr. Kentner, in turn, spoke to Mr. Patterson and then relayed to Petitioner's defense attorneys that Mr. Patterson was amenable to meeting them. When Mr. Schumacher, co-counsel Mr. Rigg, and Mr. Kentner went to talk to Mr. Patterson at the county jail where, apparently, Mr. Patterson had been transported due to the prosecution's intention to call him to testify against Petitioner (Tr.Vol. X, at 99), Mr. Patterson indicated that he no longer wished to discuss the case with Petitioner's defense attorneys because he understood that he was in

149

jeopardy of losing his plea agreement.  Mr. Patterson refused to say anything to authenticate the letter or its contents and declined to discuss what he would say in court beyond invoking his Fifth Amendment privilege against self-incrimination.  (*Id*. at 97.)

       To this, prosecuting attorney Mr. Stead added that Michael Patterson had a plea agreement that required him to cooperate and provide truthful testimony if the State needed him.  According to Mr. Stead, the prosecution had already brought Mr. Patterson from the Lebanon Correctional Institute to the Franklin County jail so the prosecution could call him to testify at Petitioner's trial when Mr. Stead learned "there was a potential problem" regarding Mr. Patterson's testimony.  (*Id*. at 99.)  Mr. Stead, accompanied by co-counsel Ms. Kurilchick and Detective Larry Winters, met with Mr. Patterson, at which point Mr. Patterson refused to discuss the case with them.  Mr. Stead stated that he informed Mr. Patterson that he (Stead) was of the view that Mr. Patterson was not living up to his plea agreement and that Mr. Patterson should talk to his lawyer.  Mr. Stead stated that he, too, spoke to Mr. Patterson's lawyer, Mr. Kentner, to inform him that the prosecution was of the view that Mr. Patterson was not living up to his end of the bargain and that the prosecution had a basis for seeking to have the plea agreement set aside.  Mr. Stead stated to Mr. Kentner that the prosecution had not decided for certain whether it would, in fact, seek to have Mr. Patterson's plea agreement set aside.  (*Id*. at 99-100.)  Mr. Kentner substantiated the representations made by Mr. Schumacher and Mr. Stead.  (*Id*. at 98, 100.)

       Mr. Schumacher then explained, on the record, defense counsel's reasons for declining to call Mr. Patterson as a defense witness over their client's objection.  First, according to Mr. Schumacher, defense counsel were of the view that it would be unethical to call Mr. Patterson to

the stand solely for the purpose of having the jury hear him invoke his privilege against self-incrimination. (*Id*. at 100-101.) Beyond that, Mr. Schumacher continued, defense counsel decided "as a tactical reason" not to call to the stand a witness who was on record with the prosecution with a statement that involved Petitioner in the crime.[10] (*Id*. at 101.) Mr. Schumacher emphasized that defense counsel would have considered calling Mr. Patterson if they had had any inkling that he might say something contrary his previous statement to authorities, but that with "absolutely no idea what" Mr. Patterson would say, defense counsel would have been "foolhardy" to have called Mr. Patterson. (*Id*. at 101-102.) Co-counsel Mr. Rigg emphasized that Mr. Patterson would not tell defense counsel what he would say if called to the stand and that Mr. Rigg was reluctant to call a witness without knowing what that witness would say, "especially since he had said damaging things against Mr. Jackson before." (*Id*. at 103.) Finally, at the trial court's invitation, Petitioner Jackson stated on the record that he did not understand why his attorneys could not put the letter into evidence, to which Mr. Schumacher responded that defense counsel were of the view that the Rules of Evidence precluded admission of the letter, not only because it had not been authenticated but also because of hearsay rules. (*Id*. at 103-04.)

Turning to Petitioner's claim that the State coerced Mr. Patterson not to testify, the United States Supreme Court has held that judicial or prosecutorial actions aimed at discouraging defense witnesses from testifying deprive a defendant of his right to due process. *Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curiam). In *Webb*, the Supreme Court condemned the unsolicited and heavy-handed warning by the trial judge to the defendant's only witness that

---

[10]    Patterson's statement was marked as defendant's exhibit B, not to be shown to the jury, but for purposes of appellate review. (Tr.Vol. X, at 101.) That statement is not part of the record before this Court.

if the witness lied under oath, the judge would personally see to it that the matter was taken to

the grand jury and the witness prosecuted and punished.  *See also United States v. Thomas*, 488

F.2d 334, 335-36 (6th Cir. 1973) (per curiam) (finding reversible error where secret service

agent warned a defense witness that he would be prosecuted for misprision of a felony if he

testified).   Prosecutors do not commit a *Webb* error, however, merely by warning defense

witnesses about the consequences of testifying.  *See United States v. Pierce*, 62 F.3d 818, 832-33

(6th Cir. 1995).  The touchstone is whether the prosecutors or the agents communicate a threat

over and above what is necessary and appropriate.  *Id*.; *see also Thomas*, 488 F.2d at 336.

The Ohio Supreme Court found no evidence in the record that the prosecution had unduly

coerced Patterson not to testify on Petitioner's behalf.  *Jackson*, 92 Ohio St. 3d at 443.  Petitioner

asserts that the Supreme Court's finding constitutes an unreasonable determination of the facts in

light of the evidence presented in the state courts.  But Petitioner offers nothing beyond pure

speculation to cast doubt on that finding, much less the "clear and convincing evidence"

necessary to rebut the presumption of correctness to which state court findings are entitled in

habeas corpus.  28 U.S.C. §§ 2254(d)(2) and (e)(1).

Regarding the circumstances surrounding the prosecutor's meeting with Mr. Patterson,

the record indicates that the prosecution would have talked to Mr. Patterson regardless of

whether defense counsel had informed them about Mr. Patterson's letter to Petitioner.  The

prosecution had brought Mr. Patterson from the correctional facility where he was incarcerated

to the county jail for the purpose of calling him to testify against Petitioner, consistent with his

plea agreement wherein he had promised to cooperate with the State and provide testimony in

any trial for which the State called him.  (Tr.Vol. X, at 99.)  When the lead prosecutor, Mr.

152

Stead, learned that "there was a potential problem,"–when he learned of Mr. Patterson's letter to Petitioner–Mr. Stead met with Mr. Patterson, who refused to discuss the case at all.  (*Id.*)  It was at that point that Mr. Stead advised Mr. Patterson that his refusal to cooperate could result in the revocation of his plea agreement.  (*Id.* at 99-100.)  The Ohio Supreme Court found no indication that the prosecution had threatened or prevented Mr. Patterson from testifying as a defense witness and found that the prosecution had merely reiterated the terms of Mr. Patterson's plea agreement.  Petitioner has not shown, and this Court is not otherwise persuaded after its own review of the record, that the Ohio Supreme Court's determination of the facts was unreasonable in light of the evidence presented.

Even assuming that Petitioner could show that the prosecution somehow intimidated Mr. Patterson not to testify–a notion that this Court absolutely rejects–the fact remains that it would be impossible for the Court to determine, based on the record as it exists, that Petitioner's right to a fundamentally fair trial was violated.  Prosecutorial misconduct involving the intimidation of defense witnesses is subject to harmless error review.  *Wynne v. Renico*, 279 F. Supp. 2d 866, 887-88 (E.D. Mich. 2003) (citing *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997), and *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255-56 (1988)).  "A defendant who claims that he was denied due process of law through government intimidation of defense witnesses must establish, as a 'threshold matter,' that the actions of the government 'worked to deprive him of a witness who would have testified on his behalf.' " *Wynne*, 279 F. Supp. 2d at 888 (quoting *United States v. Stewart*, 820 F.2d 370, 375 (11th Cir. 1987)).  In rejecting Petitioner's claim that his trial attorneys were ineffective for failing to call Mr. Patterson, the Ohio Supreme Court concluded with respect to the prejudice prong of *Strickland* that "there was no showing

that the testimony of Patterson would have aided [Jackson] in his defense."  *Jackson*, 92 Ohio St.

3d at 447.  This Court agrees and therefore finds harmless any possible impropriety on the part

of the prosecutor in dissuading Mr. Patterson from testifying.  Without knowing what Mr.

Patterson would have testified to, this Court cannot conclude that Petitioner has shown that the

actions of the prosecutor deprived him of a witness who would have testified on his behalf.

In his purported letter to Petitioner, Mr. Patterson stated, among other things, that "I got

to tell the truth," and "I got to tell them that Boone did it."  (J.A. Vol. II, D.A., OSC, Part B, at

121.)  Mr. Patterson's letter was never authenticated, and Petitioner has never offered a shred of

evidence beyond that letter, such as an affidavit or postconviction testimony, to demonstrate

what Mr. Patterson might have testified to or substantiate the cryptic reference in the letter "that

Boone did it."  This Court thus cannot find unreasonable the Ohio Supreme Court's

determination that Petitioner failed to show that Mr. Patterson's testimony would have been

favorable to his defense, which the Ohio Supreme Court had made in connection with its

rejection of Petitioner's claim of ineffective assistance for the failure to call Mr. Patterson as a

witness and which informs this Court's decision that any possible misconduct on the part of the

prosecutor was harmless.

The Court rejects Petitioner's argument that the Ohio Supreme Court's decision denying

his claim that the State deprived him of his due process right to present witnesses on his behalf

was an unreasonable application of clearly established federal law or involved an unreasonable

determination of the facts.  Accordingly, this Court finds that Petitioner's sixth ground for relief

is without merit.

**Seventh Ground for Relief: Mr. Jackson was denied due process and a fair
trial because the State improperly bolstered its case by referring to matters**

154

**outside the record which unfairly prejudiced Mr. Jackson.**

In his seventh ground for relief, Petitioner argues that he was denied his rights to due process and a fair trial when the State improperly bolstered one of its expert witnesses by referring to matters outside the record. (Doc. # 18 ¶¶ 116-18.) Petitioner explains that firearms expert Ronald Dye opined during direct examination that State's Exhibit 40, which was the bullet recovered from the body of Antorio Hunter, had been fired from a Colt Revolver belonging to Petitioner. Petitioner takes issue with the exchange that followed that testimony, when the prosecutor asked:

> Q. Sir, these conclusions that you have arrived at, are there other people in your field here in the State of Ohio?
>
> A. Yes, sir, there are.
>
> Q. Could your work be double checked if it was felt necessary?
>
> A. Yes, sir, it could be.

(Doc. # 18 ¶ 116, quoting Tr.Vol. IX, at 185-86.) Petitioner argues that the questioning improperly conveyed to the jury that the State had full confidence that its expert's conclusion was correct, which improperly and significantly increased the credibility of the expert. Petitioner goes on to argue that because a criminal defendant does not have the burden of proving his innocence, the improper questioning set forth above was a violation of Petitioner's right to due process under the Fifth and Fourteenth Amendments.

Petitioner raised this claim on direct appeal, and the Ohio Supreme Court rejected it on the merits. Specifically, the court held that "[t]his line of questioning is permissible to show that the expert's opinion went unchallenged." *Jackson*, 92 Ohio St. 3d at 442. Quoting *State v. Williams*, 23 Ohio St. 3d 16, 20 (1986), the Ohio Supreme Court explained that " 'the

155

prosecution is not prevented from commenting upon the failure of the defense to offer evidence in support of its case.' " *Jackson*, 92 Ohio St. 3d at 442.  The Ohio Supreme Court also noted alternatively that Petitioner had waived the claim by not objecting at trial and that the questions, even if they had been improper, did not rise to the level of plain error.  Petitioner argues that the Ohio Supreme Court's decision not only involved an unreasonable determination of the facts in light of the evidence presented, but also was an unreasonable application of clearly established federal law.  (Doc. # 42, at 76.)  For the reasons that follow, this Court can find nothing erroneous, much less unreasonable, about the Ohio Supreme Court's decision rejecting Petitioner's claim.

As noted above, when reviewing a claim of prosecutorial misconduct, the Court must first determine whether the challenged conduct was improper and, if so, whether the improper conduct was so flagrant as to deprive the Petitioner of a fundamentally fair trial.  *See, e.g., Slagle v. Bagley*, 457 F.3d at 516.  If the Court determines that the conduct was improper, the Court makes the determination whether the improper conduct deprived of a fundamentally fair trial by considering (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant.  *Bates v. Bell*, 402 F.3d at 641.

Petitioner's claim fails at the initial stage of the inquiry because this Court cannot find that the questioning challenged by Petitioner was improper.  Improper bolstering occurs when the prosecutor implies that the witness's testimony is or can be corroborated by evidence known to the prosecutor but not known to the jury.  *See United States v. Francis*, 170 F.3d 546, 551 (6th

156

Cir. 1999) (citing *United States v. Sanchez*, 118 F.3d 192, 198 (4th Cir. 1997)). That said, "[a] prosecutor may ask a government agent or other witnesses whether he was able to corroborate what he learned in the course of a criminal investigation." *Francis*, 170 F.3d at 551. Only if the prosecutor pursues the line of questioning must he also draw out testimony explaining how information was or could be corroborated. *Id*. Applying the foregoing to the instant case, this Court cannot find that the prosecutor's questions to firearms expert Ronald Dye were improper. The line of questioning consisted of two brief questions, the import of which was vague at best. That being so, the Court cannot find merit in Petitioner's argument challenging the reasonableness of the Ohio Supreme Court's determination that the line of questioning was permissible.

Furthermore, even assuming the questions were improper as alleged by Petitioner, by improperly bolstering the State's firearm expert and/or improperly shifting the burden of proof onto Petitioner to prove his innocence–an assumption this Court rejects–Petitioner cannot show that the questioning was so egregious as to render his trial fundamentally unfair. There is little likelihood that the questions misled the jury or prejudiced Petitioner, especially in light of jury instructions informing the jury that Petitioner was presumed innocent and that the jury had to acquit Petitioner of an offense if the State failed to prove every essential element of the offense beyond a reasonable doubt. (Tr.Vol. X, at 177.) Further, the questions were brief, isolated, and benign in nature. Even assuming the questions were deliberate, the evidence against Petitioner at trial was substantial. In short, this Court cannot find that the questions, even had they been improper, deprived Petitioner of fundamental fairness. *Cf. Beam v. Foltz*, 832 F.2d 1401, 1407-08 (6th Cir. 1987) (finding that prosecutorial argument tending to suggest that the defendant had

a duty to prove his innocence was not so egregious as to render trial fundamentally unfair);

*Hawkins v. Coyle*, No. C-1-97-296, 2005 WL 1684022, at *22 (S.D. Ohio July 19, 2005)

(rejecting argument that improper prosecutorial argument about Petitioner's failure to challenge

fingerprint expert was flagrant enough to shift burden of proof onto Petitioner in violation of due

process rights). To be clear, however, this Court is not of the view that the challenged questions

were even arguably improper.

For the foregoing reasons, the Court rejects Petitioner's claim that the State improperly

bolstered its firearms expert by referring to matters outside the record in violation of Petitioner's

rights to a fair trial and due process. More specifically, the Court rejects Petitioner's argument

that the Ohio Supreme Court's decision rejecting the claim was an unreasonable application of

clearly established federal law or involved an unreasonable determination of the facts. The

Court therefore concludes that Petitioner's seventh ground for relief is wholly without merit.

> **Eighth Ground for Relief**: Mr. Jackson's jury was required to unanimously rule out the death penalty before considering a life sentence, contrary to the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

> **Ninth Ground for Relief**: Mr. Jackson's jury was required to unanimously recommend a life sentence, which violated Mr. Jackson's right to a fair trial and due process of law under the Fourteenth Amendment to the United States Constitution.

In his eighth ground for relief, Petitioner argues that the trial court violated his rights

under the Sixth, Eighth, and Fourteenth Amendments when it gave an improper "acquittal first"

jury instruction during the penalty phase. (Doc. # 18 ¶¶ 119-22.) In his ninth ground for relief,

Petitioner argues that the jury instructions and life sentence verdict forms improperly required

the jury to unanimously recommend a life sentence. (Doc. # 18 ¶¶ 123-27.) Because these

158

claims are closely related, the Court will address them together.

In his eighth ground for relief, alleging that the trial court gave an improper acquittal first jury instruction, Petitioner challenges the following instructions:

> You shall sentence the defendant to death only if you unanimously find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.
>
> If you do not so find, you shall consider either a sentence of life without parole eligibility, a life sentence with parole eligibility after serving 30 full years of imprisonment, or a sentence of life with parole eligibility after serving 25 full years of imprisonment.

(Doc. # 18 ¶ 119, quoting Tr. Vol. XI, at 200.)  Petitioner argues that his trial attorneys "unbelievably compounded this error" when they essentially made an acquittal first remark during closing arguments.  (Doc. # 42, at 77.)  Petitioner complains that "acquittal first" instructions are improper and that he was prejudiced by such an instruction in this case because it told the jurors not to consider mitigating factors unless they first agree that death is inappropriate.  Citing *Mills v. Maryland*, 486 U.S. 367, 376 (1988), Petitioner argues that the risk that death will be imposed in spite of factors that warrant a less severe penalty is unacceptable and incompatible with the Eighth Amendment.  (Doc. # 18 ¶ 121.)  Petitioner also points out that the Sixth Circuit found in *Mapes v. Coyle*, 171 F.3d 408, 416 (6th Cir. 1999), that "an instruction strikingly similar to the instruction given by the trial court in this case" was contrary to Ohio law.  (Doc. # 18, at 78.)  Several years later, according to Petitioner, the Sixth Circuit again concluded that a trial court must avoid instructing a jury in the mitigation phase that it cannot consider a life sentence until it has rejected a sentence of death.  (Doc. # 42, at 79, citing *Davis v. Mitchell*, 318 F.3d 682, 692 (6th Cir. 2003).)

In his ninth ground for relief, Petitioner takes issue with the following jury instructions

159

that the trial court gave in explaining the various life sentence verdict forms:

> We the jury in this case, being dully impaneled and sworn having found the defendant guilty do not unanimously find beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty outweigh the mitigating factors, and we further unanimously find that the sentence to be imposed is a term of life imprisonment....

(Doc. # 18 ¶ 124, quoting Tr.Vol. XI, at 212.)  Petitioner insists that unanimity is not required for a jury to recommend a life sentence under Ohio law.  Petitioner quotes from the Ohio Supreme Court's decision of *State v. Brooks* as follows:

> In Ohio a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors.  Jurors from this point on should be so instructed.

(Doc. # 42, at 80, quoting *State v. Brooks*, 75 Ohio St. 3d 148, 162 (1996) (emphasis added).)

Petitioner complains that the jury instructions and verdict forms requiring any of the life sentence recommendations to be unanimous left his jury unaware that a single juror could prevent a death sentence recommendation by finding that the aggravating circumstances did not outweigh the mitigating factors.  Petitioner argues that because a jury is presumed to follow the trial court's instructions, where an inaccuracy in the instructions undermines the jury's understanding of the sentencing procedures, there is a reasonable likelihood that the jury has applied the challenged instructions in a way that prevents consideration of relevant evidence.

(Doc. # 42, at 80, citing *Boyde v. California*, 494 U.S. 370, 380 (1990).)  Relying on *Caldwell v. Mississippi*, 472 U.S. 320, 336 (1985), Petitioner further argues that his death sentence is unconstitutional because a death sentence is reliable only if the trier of fact has been correctly charged as to the sentencing procedure.  (Doc. # 42, at 81.)

Petitioner presented these challenges to the penalty phase instructions on direct appeal,

160

and the Ohio Supreme Court rejected them on the merits as follows:

> Appellant contends that the instruction is similar to one we struck down in *State v. Brooks* (1996), 75 Ohio St. 3d 148, 159-160, 661 N.E.2d 1030, 1040-1041, which told [the] jury that they were required "to determine unanimously that the death penalty is inappropriate before you can consider a life sentence." We disagree. Unlike the instruction in *Brooks*, which instructed the jury that they had to unanimously reject the death penalty before they could consider a life sentence, the instruction in the case at bar specifically advises the jury that if they cannot reach a unanimous recommendation of death, then they shall consider life sentences. This instruction is proper.

*Jackson*, 92 Ohio St. 3d at 445. Petitioner argues that the Ohio Supreme Court's decision not only ignored the facts and denied Petitioner a fair sentencing hearing, but also constituted an unreasonable application of clearly established federal law. (Doc. # 42, at 77, 79, 80, 82.)

The Court has already considered and rejected the arguments set forth in Petitioner's eighth and ninth grounds for relief. Specifically, in its discussion of sub-part (G) of Part II of Petitioner's first ground for relief, this Court rejected Petitioner's claim that he was prejudiced by an alleged "acquittal first" remark made by his trial counsel during closing arguments, in part based on the Court's view that the jury instructions and verdict forms in this case were proper and that jurors are presumed to follow the instructions of the court. *See, e.g., Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001) (citing *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985)).

In the Sixth Circuit, it is well established that "acquittal first" jury instructions are unconstitutional. *Spisak v. Mitchell*, 465 F.3d at 709; *Williams v. Anderson*, 460 F.3d at 810-13; *Davis v. Mitchell*, 318 F.3d at 698; *Mapes v. Coyle*, 171 F.3d at 416-17, 427-28. "An acquittal first jury instruction is 'any instruction requiring that a jury unanimously reject the death penalty before it can *consider* a life sentence. . . .'" *Williams*, 460 F.3d at 810 (quoting *Davis*, 318 F.3d at 689). Such instructions violate the Eighth Amendment by precluding the trier of fact from

161

giving effect to mitigating evidence. *Spisak*, 465 F.3d at 708-09 (discussing *Mills v. Maryland*, 486 U.S. 367, 374-75 (1988), and *McKoy v. North Carolina*, 494 U.S. 433, 443 (1990)).

Addressing the precise instructions challenged by Petitioner in his eighth ground for relief, (Tr.Vol. XI, at 200), this Court determined that nowhere did those instructions suggest to the jury that it was required to unanimously find that the aggravating circumstances did not outweigh the mitigating factors before it could consider the life sentence options. Subsequently addressing the life-sentence verdict forms challenged by Petitioner in his ninth ground for relief (Tr.Vol. XI, at 210), the Court also noted that it appeared that the verdict forms for the various life-sentence options contained wording reflecting not that the jurors had unanimously found that the aggravating circumstances did not outweigh the mitigating factors, but only that the jurors had not been unanimous in finding that the aggravating circumstances outweighed the mitigating factors. (Tr.Vol. XI, at 210.) Those determinations, which the Court made in finding that Petitioner was not prejudiced by any "acquittal first" remark made by his trial counsel during closing arguments, mean that this Court rejects Petitioner's argument in his eighth ground for relief that the trial court gave an improper acquittal first instruction during the penalty phase. Regarding Petitioner's argument that his trial attorneys compounded the trial court's error by making their own acquittal first remark during closing arguments, this Court rejected that claim of ineffective assistance in its discussion of sub-part (G) of Part II of Petitioner's first ground for relief. Finally, for the reasons that follow, the Court also rejects Petitioner's argument that the life sentence verdict forms violated Ohio law and Petitioner's rights to a fair trial and due process by requiring the jury to unanimously recommend a life sentence.

Petitioner's precise argument is that the jury instructions and verdict forms requiring any

of the life sentence recommendations to be unanimous left his jury unaware that a single juror could prevent a death sentence recommendation by finding that the aggravating circumstances did not outweigh the mitigating factors.  Petitioner's argument misses the mark and is foreclosed by Sixth Circuit precedent.  It is true that a jury need not be unanimous in order to consider the various life sentence options (by finding that death is not an appropriate sentence).  But once a jury reaches the point where it has rejected a death sentence, even if only because of the jury's inability to agree that the aggravating circumstances outweighed the mitigating factors, whatever life sentence option the jury eventually recommends must be unanimous.  *Williams v. Anderson*, 460 U.S. 789, 809 (6th Cir. 2006) ("The mere fact a defendant, practically speaking, may receive a life sentence despite a jury's inability to agree does not mean that a jury verdict imposing life need not be unanimous"); *Buell v. Mitchell*, 274 F.3d 337, 356 (6th Cir. 2001) ("Ohio courts and this court have made it clear that *both* death and life sentences must be unanimous under Ohio law and that jury instructions to that effect are not unconstitutional"); *Scott v. Mitchell*, 209 F.3d 854, 876 (6th Cir. 2001) ("*Brooks* did not hold that all instructions requiring unanimous recommendations of life or death in previously decided Ohio death-penalty cases were unconstitutional").  That is all that the verdict forms and instructions that Petitioner challenges herein required and that was an accurate description of Ohio law.

     For the foregoing reasons, the Court rejects Petitioner's argument that the Ohio Supreme Court's decision rejecting his eighth and ninth grounds for relief ignored the facts, denied Petitioner a fair sentencing hearing, or amounted to an unreasonable application of clearly established federal law.  Thus, the Court finds that Petitioner's eighth and ninth grounds for relief are without merit.

**Fourteenth Ground for Relief**: Firearms that were not identified as having been used during the course of the offense were admitted into evidence, violating the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Petitioner argues in his fourteenth ground[11] for relief that the trial court erred in admitting into evidence firearms that were never identified as having been used during the course of the offense. (Doc. # 18 ¶¶ 144-45.) Petitioner references State Exhibits 25 and 26, a shotgun and rifle respectively that police found under the kitchen sink in the residence in which they arrested Petitioner. Petitioner argues that the trial court erred in admitting those weapons because there was no testimony that they were used during the robberies or murders, which the prosecution even conceded during closing arguments. Petitioner argues that the weapons were inadmissible under Ohio R. Evid. 402 because they were irrelevant.[12] Petitioner also argues that the weapons were irrelevant under Ohio R. Evid. 401 because they did not have a tendency to make the existence of any fact or consequence more probable or less probable than it would have been without the weapons.[13] Petitioner further argues that he suffered prejudice because the improper admission of those weapons gave the jury the impression that Petitioner was an evil, violent man. (Doc. # 42, at 82-83.)

Petitioner raised this claim on direct appeal, and the Ohio Supreme Court rejected it on the merits. After citing the definition of "relevant evidence" set forth in Ohio R. Evid. 401 and

---

[11]    The Court skips from Petitioner's ninth ground for relief to his fourteenth ground for relief because the Court determined in its September 27, 2004 Opinion and Order that Petitioner had procedurally defaulted his tenth, eleventh, twelfth, and thirteenth grounds for relief. (Doc. # 27.)

[12]    Ohio R. Evid. 402 provides in relevant part: "All relevant evidence is admissible. . . . Evidence which is not relevant is not admissible."

[13]    Ohio R. Evid. 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

explaining that the admission or exclusion of relevant evidence rests within the sound discretion

of the trial, the Ohio Supreme Court went on to find that the trial court had not abused its

discretion in admitting the weapons into evidence.  *Jackson*, 92 Ohio St. 3d at 444.  Specifically,

the court noted:

> Malaika Williamson testified that when she picked up appellant and
> Boone on the way to the robbery, they brought out "two long guns" and placed
> them in the trunk of the getaway car.  Boone testified that he later saw one of the
> shotguns in a closet at appellant's apartment.  Based upon this information, police
> searched the apartment and found a shotgun in the closet and two additional long
> rifles, which were hidden behind the molding under the kitchen sink.  Boone, as
> well as other witnesses, testified that two long guns were used in the robbery,
> although they were never fired.  The guns retrieved from the apartment matched
> this description and were admissible as guns likely used during the robbery.  The
> trial court properly admitted these weapons into evidence.

*Id*. at 444.  For the following reasons, this Court cannot find that the Ohio Supreme Court's

decision contravened or unreasonably applied clearly established federal law or involved an

unreasonable determination of the facts.

Even without the constraints of the deferential standard of review by which this Court is

bound pursuant to § 2254(d), the bar for granting habeas corpus relief on claims challenging a

state trial court's admission of evidence is extremely high.  Only where the admission of

disputed evidence rendered the trial "so fundamentally unfair as to constitute a denial of federal

rights" may it provide a basis for granting habeas corpus relief.  *Clemmons v. Sowders*, 34 F.3d

352, 356 (6th Cir. 1994); *see also Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (holding

that evidentiary ruling violates due process and warrants habeas relief only if it is "so egregious

that it results in a denial of fundamental fairness").  "Whether the admission of prejudicial

evidence constitutes a denial of fundamental fairness turns upon whether the evidence is material

in the sense of a crucial, critical highly significant factor."  *Brown v. O'Dea*, 227 F.3d 642, 645

(6th Cir. 2000).  Under these standards, this Court cannot find unreasonable or contrary to clearly established federal law the Ohio Supreme Court's decision denying Petitioner's claim that the trial court erred in admitting into evidence a shotgun and rifle that were never identified as having been used during the offenses.

The Ohio Supreme Court essentially concluded that the shotgun and rifle were admissible as relevant evidence.  This Court cannot disagree with that conclusion, much less find that it was unreasonable or one that resulted in the denial of fundamental fairness to Petitioner.  BCI Agent Gary Wilgus was present when police arrested Petitioner at an apartment on Bancroft and when police searched the Bancroft apartment immediately after arresting Petitioner.  Agent Wilgus testified on direct examination that police recovered a browning arms shotgun from the closet, identified as State's Exhibit 24, as well as an Ithaca shotgun and 338 Winchester rifle behind some loose molding under the kitchen sink, identified as State's Exhibits 25 and 26, respectively. (Tr.Vol. VIII, at 79-80.)  Becky Lewis and Nikki Long both testified that at least two of the assailants during the robbery had shotguns or long guns.  (Tr.Vol. VIII, at 136-37, 267, 269, 277.)  Malaika Williamson testified that when she picked up Petitioner and Derrick Boone on the evening of the robbery, they placed some long guns in the trunk of her car.  (Tr.Vol. VIII, at 198-99.)  She further testified that when she had driven where Petitioner had told her to drive, and parked where Petitioner had told her to park, she popped the trunk because that is where the guns were and Derrick Boone and Michael Patterson had the two long guns before they entered the victims' apartment.  (Tr.Vol. VIII, at 201-02.)  Derrick Boone testified that Petitioner had instructed that Mr. Boone and Mr. Patterson were to use the long guns in the trunk and that, sure enough, he (Boone) and Mr. Patterson carried during the robbery the long guns that were in the

166

trunk of Ms. Williamson's car.  (Tr.Vol. IX, at 23-24, 27.)  Ivana King testified that only she was

listed on the lease for the apartment on Bancroft, that Petitioner stayed there off and on, and that

Mr. Boone began staying there regularly in March 1997.  (Tr.Vol. IX, at 110-11, 113-14.)  She

also testified that she had never known there to be any weapons there until the day the police

arrested Petitioner and found the weapons during the subsequent search.  (Tr.Vol. IX, at 118-19,

129.)

       It is true, as Petitioner asserts herein and as his defense counsel had argued in their

objection to the admission of those weapons into evidence (Tr.Vol. X, at 50-51), that no one had

ever testified that those weapons had been taken to the crime scene or used during a criminal act.

No fingerprints from any of the defendants had been found on them.  However, in light of the

testimony by victims Becky Lewis and Nikki Long that two of the robbers that night had long

guns, the testimony by Ms. Williamson and Mr. Boone that Mr. Boone and Mr. Patterson had

used during the robbery the long guns that Petitioner and Mr. Boone had put in the trunk of Ms.

Williamson's car earlier than evening, and the testimony of Ms. King that she had never known

there to be any weapons in her apartment, the Ohio Supreme Court was not unreasonable in

determining that the guns that police retrieved from the Bancroft apartment matched the

descriptions that various witnesses had provided and were likely the guns that the assailants had

used during the robbery.  That is, the Ohio Supreme Court was not unreasonable in determining

under Ohio law that the guns were admissible as relevant evident.  *Cf. Tobias v. Portuondo*, 367

F. Supp. 2d 384, 390-91 (W.D.N.Y. 2004) (finding relevant and admissible two loaded guns

found in the car in from which the Petitioner was apprehended as probative to the issue of

whether the Petitioner had been part of a group of armed men bent on forcibly robbing the

victims even though neither had been identified as the murder weapons or weapons wielded during the offenses).

Even assuming this Court could find, constrained as it by the deferential standard of review set forth in § 2254(d) and by the high bar for granting habeas relief on a state court evidentiary ruling, that the trial court's admission of the guns was error, the Court further notes that harmless error analysis applies to claims involving improper admission of evidence, *see, e.g., Chambers v. Maroney*, 399 U.S. 42, 52-53 (1970), and that Petitioner cannot possibly demonstrate that admission of the guns had a substantial and injurious effect or influence in the jury's verdict. *Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). To the extent that Petitioner argues that admission of the guns gave the jury the impression that Petitioner was an evil, violent man, this Court is of the view that the admission of the guns into evidence was no more likely to give the jury that impression than the testimony by Ms. Williamson and Mr. Boone about the use of long guns during the robbery and from where those guns had come (or than the testimony by Mr. Boone that Petitioner had shot the two victims in the back of the head and the testimony by Ms. King relating Petitioner's statement that he had "done two people"). Thus, even assuming the Court could find error on the part of the trial court in admitting the guns sufficient to rise to the level of denying Petitioner fundamental fairness, this Court concludes that any such error was harmless because there is no doubt, much less "grave doubt," that admission of the guns had a substantial and injurious effect or influence in the jury's verdict.

For the foregoing reasons, the Court concludes that Petitioner's fourteenth ground for relief is without merit and wholly incapable of sustaining habeas corpus relief.

168

**<u>Fifteenth Ground for Relief</u>: Mr. Jackson was denied his right to the effective assistance of appellate counsel.**

Petitioner argues in his fifteenth ground for relief that his appellate attorneys performed unreasonably and to his prejudice in failing to raise as issues the following alleged errors:

1.  Defense counsel failed to adequately investigate, prepare, and effectively cross-examine Derrick Boone and Malaika Williamson;

2.  Defense counsel failed to request funds for, and obtain the assistance of, an eyewitness identification expert;

3.  Defense counsel failed to present the jury with a cohesive defense theory;

4.  Defense counsel failed to object to the improper instructions provided to the jury during the trial phase;

5.  Defense counsel did not adequately prepare mitigation witnesses;

6.  Trial counsel's failure to object to prejudicial prosecutorial misconduct during the State's closing argument at the penalty phase prejudiced Appellant; and

7.  The jury did not receive an instruction that their vote did not have to be unanimous as to whether a mitigating factor existed.

(Doc. # 18 ¶¶ 146-50.)  Petitioner argues that his appellate attorneys had no tactical or strategic reasons for failing to present these substantial issues and that their deficient performance in this regard deprived him of the meaningful appellate review that is essential to ensuring the constitutionality of a death sentence.

Petitioner presented these allegations to the Ohio Supreme Court in an application for reopening pursuant to Rule 26(B) of the Ohio Rules of Appellate Procedure–the procedure in Ohio for raising claims of ineffective assistance of appellate counsel.  On January 16, 2002, the Ohio Supreme Court rejected Petitioner's application on the merits, albeit with a one-line entry. *State v. Jackson*, Case No. 98-726 (Jan. 16, 2002); J.A. Vol. II, D.A., OSC, Part B, at 169.

169

Petitioner argues that the Ohio Supreme Court's decision denying his application for reopening was contrary to and involved an unreasonable application of clearly established federal law. (Doc. # 42, at 85-86.)  This Court disagrees.

The *Strickland* test applies to appellate counsel.  *Burger v. Kemp*, 483 U.S. 776, 781-82 (1987).  Counsel must provide reasonable professional judgment in presenting the appeal.  *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985).  " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."  *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  *But see Smith v. Anderson*, 104 F. Supp. 2d 773, 839 (S.D. Ohio 2000) ("This Court believes that, in capital cases, appellate counsel should approach the traditional process of winnowing out claims with extreme caution."); *Jamison v. Collins*, 100 F. Supp. 2d 647, 740-41 (S.D. Ohio 2000) ("[W]e believe that any 'winnowing' or narrowing of issues must be done very cautiously when a person's life is at stake.").  Of course, not every decision made by appellate counsel can be insulated from review merely by categorizing it as strategic.  The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

A.      Were the omitted issues "significant and obvious?"

B.      Was there arguably contrary authority on the omitted issues?

C.      Were the omitted issues clearly stronger than those presented?

D.      Were the omitted issues objected to at trial?

E.      Were the trial court's rulings subject to deference on appeal?

F.      Did appellate counsel testify in a collateral proceeding as to his appeal strategy

        and, if so, were the justifications reasonable?

G.      What was appellate counsel's level of experience and expertise?

H.      Did the Petitioner and appellate counsel meet and go over possible issues?

I.      Is there evidence that counsel reviewed all the facts?

J.      Were the omitted issues dealt with in other assignments of error?

K.      Was the decision to omit an issue an unreasonable one which only an incompetent

        attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999).  The Sixth Circuit cautioned, however,

that this list is not exhaustive and need not produce a certain "score."  *Id.* at 428.

        In short, to establish a claim of ineffective assistance of counsel sufficient to establish

cause for the default of this claim for relief, Petitioner must show both deficient performance on

the part of his appellate attorneys and prejudice from the deficient performance:

> First, the defendant must show that counsel's performance was deficient.  This
> requires showing that counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
> Second, the defendant must show that deficient performance prejudiced the
> defense.  This requires showing that counsel's errors were so serious as to deprive
> the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.  Reviewing courts "must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  To

establish the prejudice prong of the *Strickland* test, a Petitioner must demonstrate that there is a

reasonable probability that, but for counsel's errors, the result of the proceedings would have

been different.  *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine

confidence in the outcome."  *Id.*

171

For the reasons that follow, the Court concludes that none of the underlying claims supporting the seven instances of appellate counsel ineffectiveness set forth above are meritorious. Therefore, they are insufficient to sustain a claim of ineffective assistance of appellate counsel for the failure to raise them. Having reviewed appellate counsel's brief on direct appeal with a mind toward comparing the relative strength of the issues that counsel omitted to that of the seventeen issues that counsel did raise, and fully mindful of all of the *Mapes* factors, this Court cannot conclude that Petitioner's appellate counsel performed deficiently or to Petitioner's prejudice in failing to raise the claims set forth above. More accurately, this Court cannot find that the Ohio Supreme Court's one-line entry denying his claims of appellate counsel ineffectiveness was contrary to clearly established federal law.

Petitioner argues in sub-part (1) that his appellate attorneys performed deficiently and to his prejudice in failing to raise as error defense counsel's failure to adequately investigate and prepare, and effectively cross-examine Derrick Boone and Malaika Williamson. Regarding defense counsel's failure to investigate and effectively cross-examine Derrick Boone, this Court already determined in its September 27, 2004 Opinion and Order addressing procedural default that Petitioner had not demonstrated appellate counsel ineffectiveness sufficient to excuse Petitioner's failure to present that claim of trial counsel ineffectiveness on direct appeal. (Doc. # 27, at 26-42.) Regarding defense counsel's failure to adequately investigate, prepare, and effectively cross-examine Malaika Williamson, Petitioner has not alleged any particular instances of deficiency on the part of trial counsel in that regard and it is not the duty of this Court to scour the transcript in search of any. Further, this Court conducted a thorough review of multiple aspects of defense counsel's trial phase performance in rejecting Part I of Petitioner's

172

first ground for relief.  For these reasons, the Court concludes that Petitioner has failed to demonstrate that his appellate counsel were ineffective for failing to raise as error defense counsel's failure to adequately investigate and prepare, and effectively cross-examine Derrick Boone and Malaika Williamson.

In sub-part (2), Petitioner argues that his appellate counsel performed deficiently and to Petitioner's prejudice by failing to raise as error defense counsel's failure to request funds for, and obtain the assistance of, an eyewitness identification expert.  This Court considered and rejected that allegation of trial counsel ineffectiveness when it rejected sub-part (C) of Part I of Petitioner's first ground for relief.  Thus, this Court cannot find that appellate counsel were ineffective for failing to raise that allegation of trial counsel ineffectiveness.  Further, to the extent that the allegation involves evidence outside the trial record, appellate counsel certainly cannot be regarded as ineffective for failing to raise on appeal an issue that was not apparent from the trial record.

Petitioner argues in sub-part (3) that his appellate counsel performed deficiently and to his prejudice by failing to raise as error defense counsel's failure to present the jury with a cohesive defense theory.  In rejecting sub-part (H) of Part I of Petitioner's first ground for relief, this Court considered and rejected that allegation of trial counsel ineffectiveness.  This Court therefore cannot find that appellate counsel were ineffective for failing to raise that allegation of trial counsel ineffectiveness.  Further, to the extent that the allegation involves evidence outside the trial record, appellate counsel certainly cannot be regarded as ineffective for failing to raise on appeal an issue that was not apparent from the trial record.

In sub-part (4), Petitioner argues that his appellate counsel performed deficiently and to

173

his prejudice by failing to raise as error defense counsel's failure to object to the improper instructions provided to the jury during the trial phase.  Petitioner fails to specify to which trial phase instructions defense counsel should have objected.  In view of the fact that appellate counsel did raise several propositions of law challenging various aspects of the jury instructions, as well as the fact that Petitioner failed even to offer ineffective assistance of trial counsel or appellate counsel to excuse the default of two claims that he raised challenging trial phase jury instructions (claim ten challenging the trial court's definition of purpose and claim eleven challenging the trial court's definition of prior calculation and design (Doc. # 27, at 71-76)), this Court is of the view that Petitioner has failed to sustain his burden of demonstrating deficient performance and prejudice on the part of appellate counsel for failing to raise as error defense counsel's failure to object to improper instructions provided during the trial phase.

Petitioner argues in sub-part (5) that his appellate counsel performed deficiently and to his prejudice in failing to raise as error defense counsel's failure to prepare mitigation witnesses. In rejecting sub-part (D) of Part II of Petitioner's first ground for relief, this Court considered and rejected that allegation of trial counsel ineffectiveness.  This Court thus cannot find that appellate counsel were ineffective for failing to raise that allegation of trial counsel ineffectiveness.  Additionally, to the extent that the allegation involves evidence outside the trial record, appellate counsel certainly cannot be regarded as ineffective for failing to raise on appeal an issue that was not apparent from the trial record.

In sub-part (6), Petitioner argues that his appellate counsel performed deficiently and to his prejudice by failing to raise as error trial counsel's failure to object to prejudicial prosecutorial misconduct during the State's closing argument at the penalty phase.  Regarding

174

the prosecutor's error in urging the jury to consider a statutory aggravating circumstance that was neither charged nor proven beyond a reasonable doubt, this Court concluded in its September 27, 2004 Opinion and Order that trial counsel were not ineffective for failing to object to that error. (Doc. # 27, at 62-71.) Thus, this Court cannot find that appellate counsel were ineffective for failing to raise that allegation of trial counsel ineffectiveness. Regarding the prosecution's alleged misstatement as to the weighing process, this Court considered and rejected that allegation of prosecutorial misconduct when it rejected Petitioner's fifth ground for relief. Thus, this Court cannot ineffective assistance of trial or appellate counsel for the failure to challenge those allegedly improper remarks.

Finally, in sub-part (7), Petitioner argues that his appellate counsel performed deficiently and to Petitioner's prejudice in failing to raise as error the trial court's failure to instruct the jurors that they did not have to be unanimous as to whether a mitigating factor existed. The Court has yet to address this issue in any fashion, but finds no constitutional error in the trial court's failure to give such an instruction and, concomitantly, no constitutional error in appellate counsel's failure to raise the issue on appeal. In *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), the United States Supreme Court held that it was unconstitutional for a trial court to give an instruction limiting a jury's consideration to only those mitigating factors upon which the jurors unanimously found to exist. 486 U.S. at 384; 494 U.S. at 439. Those cases did not create a constitutional requirement for a trial court to instruct jurors that they did not have to be unanimous as to whether a mitigating factor existed. *See Davis v. Mitchell*, 318 F.3d at 694-95 (finding no error in jury instructions where the judge did not state or even imply that jurors could consider only mitigating factors that all jurors agreed

were present); *see also Coe v. Bell*, 161 F.3d 320, 338 (6th Cir. 1998) (same).[14]  Because the trial

court's penalty phase instructions in this instance did not violate *Mills* or *McKoy*, this Court

cannot find ineffective assistance stemming from appellate counsel's failure to raise as error the

trial court's failure to instruct the jurors that they did not have to be unanimous as to whether a

mitigating factor existed.

      For the foregoing reasons, the Court concludes that Petitioner has failed to demonstrate

that his appellate counsel performed deficiently or to his prejudice in failing to raise the issues

set forth above.  Despite its notably spartan nature, the Ohio Supreme Court's one-line entry

denying Petitioner's appellate counsel ineffectiveness claims did not contravene clearly

established federal law.  Thus, Petitioner is not entitled to relief on his fifteenth ground for relief.

> **Sixteenth Ground for Relief**: The State Postconviction Process Provides an
> **Inadequate Corrective Process Contrary to the Fifth, Sixth, Eighth, and**
> **Fourteenth Amendments to the Constitution of the United States.**

      In his sixteenth ground for relief, Petitioner argues that the postconviction process in

Ohio fails to provide an adequate means for testing the constitutional validity of criminal

convictions and sentences.  (Doc. # 18 ¶¶ 151-56.)  The process is inadequate, Petitioner

maintains, because a Petitioner must file and litigate a postconviction petition without the benefit

of the discovery process that is available to other civil litigants.  (Doc. # 42, at 86.)  Additionally,

Petitioner complains that the following flaws render Ohio's postconviction process meaningless:

> If a witness refuses to talk to counsel investigating the case or is unavailable, a
> Petitioner has no means by which to compel that information.  If a Petitioner is
> without funds, there is no way to hire needed experts.  Even if the State has
> exhibited a propensity to withhold evidence, the Petitioner has no method to

---

[14]     Petitioner filed his merit brief in 1999, and the Ohio Supreme Court decided his direct appeal in
2001.  Although Petitioner's direct appeal had concluded before the *Davis* decision was issued, the *Coe* decision was
in existence at the time of Petitioner's direct appeal.

compel review of the prosecutor's file.  Yet the petition will be dismissed unless
it is supported by fact-specific evidence outside the record.  Further, there is an
unreasonable three-page pleading limitation in Ohio R. Crim. P. 35."

(*Id*. at 86-87.)

Petitioner raised this claim on appeal from the trial court's rejection of his postconviction

action, and the state appellate court rejected it on the merits.  *Jackson*, 2002 WL 1379001, at

*13.  This Court need not reach the merits of Petitioner's sixteenth ground for relief, however,

because writs of habeas corpus cannot be used to challenge errors or deficiencies in state

postconviction proceedings.  *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986) (holding that

"the writ is not the proper means by which prisoners should challenge errors or deficiencies in

state post-conviction proceedings").  A Petitioner is entitled to habeas relief only upon a showing

that an error of federal law makes his conviction and resulting incarceration unconstitutional, and

"relief may not be granted to a habeas Petitioner for alleged deficiencies in a state's post-

conviction procedures because such claims relate to a state civil matter, not the custody of a

defendant."  *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002); *see also Greer v. Mitchell*, 264

F.3d 663, 681 (6th Cir. 2001) (deficiencies in state postconviction proceedings do not warrant

habeas relief); *Smith v. Anderson*, 104 F. Supp. 2d 773, 836 (S.D. Oh. 2000) (same); *Carter v.

Mitchell*, No. 1:98-cv-853, 2006 WL 2334853, at *51 (S.D. Oh. Aug. 10, 2006) (same).

Therefore, Petitioner's sixteenth ground for relief is not cognizable on federal habeas review.

**Seventeenth Ground for Relief: The death penalty is disproportionately
meted out to racial minorities and/or defendants who are accused of killing
white victims, contrary to Fifth, Sixth, Eighth, Ninth and Fourteenth
Amendments of the United States Constitution.**

In his seventeenth ground for relief, Petitioner argues that the death penalty is

disproportionately imposed upon racial minorities and those defendants accused of killing white victims.  (Doc. # 18 ¶¶ 157-159.)  In support of this ground for relief, Petitioner offers statistical data comparing the racial make-up of Ohio as a whole to the racial make-up of Ohio's death row. Specifically, Petitioner cites statistics indicating that although African-Americans comprise only 11.5% of Ohio's general population, approximately 50% of all individuals on Ohio's death row are African-Americans.  (Doc. # 42, at 90-91.)  Additionally, Petitioner states that although forty-five African-Americans are on death row for killing a Caucasian person, only three Caucasians are on death row for killing an African-American.  (*Id.* at 91.)  With respect to Franklin County, Ohio, Petitioner notes that only six of the eleven defendants on death row are Caucasian even though 82% of all people in Franklin County are Caucasian.  (Doc. # 18 ¶ 158.) Petitioner contends that the statistics he cites prove that African-Americans are more likely to be sentenced to death and that Ohio imposes death sentences in a racially discriminatory manner.

In rejecting Petitioner's argument during the state postconviction proceedings, the Franklin County Court of Appeals determined that Petitioner failed to provide any evidence of a specific discriminatory intent with respect to the imposition of the death penalty in Ohio. *Jackson*, 2002 WL 1379001, at *12.  Citing Ohio law, the court reiterated that statistical evidence of a disparate impact, standing alone, cannot establish a claim of discriminatory enforcement of the death penalty.  *Id.*

Petitioner argues that the decision of the state appellate court is an unreasonable application of clearly established federal law because "the statistical data demonstrates the discriminatory practice of placing African-Americans on Death Row."  (Doc. # 42, at 89.)  This Court cannot agree.  Petitioner fails to cite any Supreme Court precedent supporting his claims,

178

and Petitioner makes no attempt to distinguish clearly established federal law on this issue.  It is well settled that a death-sentenced individual cannot rely on statistical evidence alone to establish discriminatory imposition of the death penalty.  *McCleskey v. Kemp*, 481 U.S. 279, 313 (1987).  Considering statistics nearly identical to the statistics presented by Petitioner, the Sixth Circuit determined that "[a]lthough the racial imbalance in the State of Ohio's capital sentencing system is glaringly extreme, it is no more so than the statistical disparities considered and rejected by the Supreme Court in *McCleskey* as insufficient to 'demonstrate a constitutionally significant risk of racial bias affecting the . . . capital sentencing process.' "  *Coleman v. Mitchell*, 268 F.3d 417, 441-42 (6th Cir. 2001) (citing *McCleskey*, 481 U.S. at 313); *see also Smith v. Mitchell*, 348 F.3d 177, 211 (6th Cir. 2003) (rejecting argument that "the death penalty is disproportionately applied to blacks"); *Greer v. Mitchell,* 264 F.3d 663, 690 (6th Cir. 2001) (holding that Petitioner "failed to demonstrate a constitutionally significant risk of racial bias affecting the Ohio capital sentencing process").

Like the Petitioner in *Coleman*, Petitioner offers nothing more than statistical evidence to support his claim that the death penalty in Ohio is imposed in a racially discriminatory manner. Absent some showing that the decision-makers in his own case acted with discriminatory purpose, a showing that Petitioner does not attempt to make, Petitioner cannot prevail on this ground for relief.  Accordingly, the Court finds that in rejecting this constitutional challenge to Ohio's death penalty scheme, the Ohio courts did not act contrary to, or unreasonably apply, clearly established federal law as determined by the Supreme Court.

**Eighteenth Ground for Relief**: Mr. Jackson's conviction and sentence are
unconstitutional because of the cumulative effect of the many errors that
occurred during his trial and in all subsequent proceedings.

Petitioner argues in his eighteenth and final ground for relief that the cumulative effect of the errors in this case resulted in a conviction and death sentence in violation of his federal constitutional rights.  (Doc. # 18 ¶ 160.)  Conceding that "there may be a lack of Supreme Court precedent explicitly referring to cumulative error, " Petitioner insists that "an accused indisputably has the federal constitutional right to due process, a fair trial, and a reliable sentencing procedure."  (Doc. # 42, at 92.)  Petitioner reasons that because considering errors under a due process standard mandates that errors be considered in the context of the entire proceedings, "[t]his is effectively a cumulative error standard."  (*Id*.)

Petitioner presented a cumulative-effect-of-the-errors claim on direct appeal.  The Ohio Supreme Court acknowledged that a conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial, but concluded that "in this case, we find that appellant has received a fair trial and a fair sentencing determination."  *Jackson*, 92 Ohio St. 3d at 451.  Petitioner also raised a cumulative-effect-of-the-errors claim on appeal from the trial court's decision denying his postconviction action.  The state appellate court rejected it on the merits, specifically holding that "[b]ecause we have not found any instances of error in this case, the doctrine of cumulative error does not apply."  *Jackson*, 2002 WL 1379001, at *13.  Petitioner argues that the state appellate court's decision was based on an unreasonable determination of the facts in light of the evidence that was presented.  (Doc. # 42, at 93.)  Petitioner makes no argument against the Ohio Supreme Court's decision but, because he raised a cumulative error claim herein, this Court will presume that Petitioner is of the view that the Ohio Supreme Court's decision rejecting his cumulative error claim, like the state appellate court's decision in postconviction, was based on an unreasonable determination of the facts in light of the evidence

180

presented. In any event, his arguments are of no avail.

Petitioner's claim is foreclosed by Sixth Circuit precedent that clearly establishes as to cases governed by the AEDPA that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002), *amended on other grounds*, 307 F.3d 459 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003); *see also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006) (holding that Supreme Court has never held that distinct claims can accumulate to grant habeas relief), *cert. denied*, 127 S. Ct. 1485 (2007); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (same), *cert. denied*, 127 S. Ct. 557 (2006). In light of the foregoing, this Court cannot find that the Ohio courts' decisions rejecting Petitioner's cumulative-effect-of-the-errors claims was contrary to or involved an unreasonable application of clearly established federal law.[15] Even assuming that Petitioner's claim was not precluded by Sixth Circuit precedent, this Court is not of the view that it warrants habeas corpus relief because this Court has not found any errors to accumulate. *See Getsy v. Mitchell*, 495 F.3d 295, 317 (6th Cir. 2007) (holding that cumulative-error claim failed "because there simply are no errors to accumulate" (citing *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004))).

Accordingly, the Court finds that Petitioner's eighteenth ground for relief is without merit.

## IV. Conclusion

For the foregoing reasons, the Court **DENIES** Petitioner's habeas corpus claims,

---

[15] This Court is mindful that the Sixth Circuit granted relief on a cumulative-error claim in *DePew v. Anderson*, 311 F.3d 742, 751 (6th Cir. 2003), but that case was not governed by the AEDPA.

**DISMISSES** this action, and **DIRECTS** the Clerk to enter judgment dismissing this action.

 **IT IS SO ORDERED**.

                                                              /s/ Gregory L. Frost
                                                              GREGORY L. FROST
                                                              UNITED STATES DISTRICT JUDGE

182